# EXHIBIT C

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

FRED MOGUL,

             Plaintiff,

       - against -

NEW YORK PUBLIC RADIO; WNYC;
and AUDREY COOPER;

             Defendants.

**COMPLAINT**

INDEX NO. 652968/2021

Plaintiff Fred Mogul, by his attorneys BELDOCK LEVINE & HOFFMAN LLP, as and for his complaint against defendants, alleges as follows:

## INTRODUCTORY STATEMENT

1.     This is an action against defendants New York Public Radio (NYPR), WNYC and Audrey Cooper who by their actions defamed and wrongfully terminated the employment of plaintiff, a WNYC reporter for 18 years, in violation of law.

2.     The pretext for defendants' actions was two sentences of Associated Press (AP) copy, appearing in a draft of an unpublished story, which credited AP and contained a link to the AP story, and which plaintiff agreed to omit, although the story was prepared in accordance with past practice in the WNYC Newsroom and other newsrooms across the country.

3.     On the basis of these two sentences of draft unpublished copy, defendants

1

summarily terminated plaintiff's 18 years of employment as a reporter for WNYC, without notice, adequate opportunity to be heard or severance pay to which he was entitled, falsely accusing him of plagiarism and deception and making other false, defamatory and misleading statements about him.

4.       Following their summary termination of plaintiff's employment, defendants reiterated and published the false allegations of plagiarism and deception and other false statements of fact to Newsroom staff in two Zoom meetings held later that same day.

5.       Defendants knew or should have known that their statements were false; at a minimum they acted with reckless disregard and avoidance of the truth.

6.       Defendants' false statements constitute slander per se.

7.       Defendants' false and defamatory statements have injured plaintiff.  They have damaged his name, reputation and career, causing substantial professional harm.  They have also intentionally and unnecessarily inflicted emotional pain and suffering.

8.       Plaintiff brings this lawsuit to obtain redress for these injuries.

## PARTIES

9.       Plaintiff is a journalist.

10.      Until the actions complained of in this complaint, plaintiff was a reporter for NYPR and WNYC for over 18 years. He was a working journalist for almost 30 years.

11.      Plaintiff is a citizen of the United States and a citizen and resident of the State of New York.

12.      Plaintiff's date of birth is June 18, 1968.  He is currently fifty-two (52) years old.

13.      Plaintiff commenced employment as a reporter for NYPR in 2002.

2

14.     Plaintiff has primarily covered healthcare and medicine for WNYC since 2002.

15.     Defendant NYPR is a nonprofit media organization, with its principal office at 160 Varick Street, New York, New York.

16.     Defendant WNYC is part of NYPR.  WNYC is a radio station, billing itself as New York City's premier public radio station.

17.     Some years ago, WNYC added a website, WNYC.org.

18.     In 2018, NYPR acquired *Gothamist*, an internet news site.  Web versions of NYPR radio stories may appear on either WNYC.org or *Gothamist*.

19.     Defendant Audrey Cooper is Editor in Chief of NYPR.  Her office is located at 160 Varick Street, New York, New York.  Her background is print journalism.

20.     Plaintiff reserves the right to seek expedited discovery in order to determine whether there is a basis to name Chief Executive Officer Goli Sheikholeslami, Executive Editor Jen Chung, Acting HR Head Janna Freed, Chief Content Officer Andrew Golis, and General Counsel Ivan Zimmerman as additional defendants.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction pursuant to N.Y. C.P.L.R. § 301.

22.     Venue is proper in this Court pursuant to N.Y. C.P.L.R. §§ 503 and 509.

## FACTUAL ALLEGATIONS

### Plaintiff's Responsibilities and Job Performance

23.     Plaintiff received a B.A. from Amherst College.

24.     Plaintiff's professional accomplishments are extensive, as shown on his Curriculum Vita, a copy of which is attached as Exhibit A.

3

25.     Plaintiff is the recipient of awards from the Associated Press, the Association of Health Care Journalists, and the Dart Center for Journalism and Trauma.

26.     Until February 5, 2021, plaintiff was a Healthcare and Medicine Reporter for WNYC News.  His WNYC bio as it last appeared on WNYC's website is attached as Exhibit B.

27.     In the course of covering health care and medicine for WNYC, plaintiff has interviewed and spoken to patients, health care providers, researchers and officials in hospitals, clinics, health agencies and labs across the region, and has developed relationships with news organizations throughout the country.  Through a fellowship with NPR and Kaiser Health News, his stories frequently run nation-wide.  His work has also appeared in the *New York Times*, *Time* magazine, the *Philadelphia Inquirer* and many other outlets.

28.     Plaintiff has worked collegially and maintained an excellent working relationship with WNYC's numerous reporters and editors over the years.

29.     Plaintiff's professional reputation is exemplary in all respects.

30.     Over the years of his work for WNYC, plaintiff has never had any question raised concerning his journalistic ethics.

**The January 28, 2021 News Story**

31.     During his years as a reporter in NYPR's news unit, plaintiff has had several editors.

32.     At WNYC, editors assign stories to reporters and edit drafts of stories prepared by reporters, among other things.

33.     Plaintiff's editor until early January 2021, was Matthew Schuerman.

34.     In January 2021, Mr. Schuerman was replaced by Nsikan Akpan, a new hire at NYPR, as plaintiff's editor.

4

35.    On or about January 26, 2021, plaintiff's assignment was to take an AP story about the Miami Heat's use of COVID sniffing dogs for spectators coming to games and prepare a local version of the story exploring the science behind canine COVID detection. He was to prepare several paragraphs, and then have a "Q&A" with a scientist.

36.    Plaintiff prepared the story, including conducting and condensing an interview with a researcher at the Children's Hospital of Philadelphia.

**First Draft of the Story**

37.    On January 27, 2021, plaintiff submitted a draft of the story to his editor via Google Docs, a cloud-based platform for sharing documents.

38.    Plaintiff's draft is attached hereto as Exhibit C.

39.    Plaintiff's setup paragraphs prior to the Q&A portion of the story included two paragraphs from the AP.  The first paragraph included a quote from a Miami Heat executive.  It also included a digital link to the AP story:

> *"If you think about it, detection dogs are not new," Matthew Jafarian, the Heat's executive vice president for business strategy, told the Associated Press. "You've seen them in airports, they've been used in mission critical situations by the police and the military. We've used them at the arena for years to detect explosives."*

40.    The following paragraph, consisting of two sentences right under the link to AP, was also from the AP article:

> *A health screening questionnaire will be mandatory for all guests, masks must be worn continually, and only soda and water will be sold.  All transactions will be cashless and if a fan feels ill during a game, isolation rooms will be available.*

41.    Under what he understood and believed to be WNYC's "usage" or license agreement with AP, allowing WNYC to use AP copy with or without quotation marks as long as AP was credited, plaintiff added an attribution line at the end of his story crediting AP:

5

"~*Reporting       from       Miami       by       the       Associated       Press*"

42.     In draft stories for *Gothamist*, reporters do not generally insert their own bylines; rather bylines are inserted by editors, after the editing process is complete. Editors then copy and paste the final draft from Google Docs into the software program Aviary, a Content Management System (CMS), for publication.

43.     Plaintiff's draft did not contain a proposed byline.

44.     But here, as noted above and as shown on the draft attached as Exhibit C, plaintiff added the AP attribution line at the end of the story to be included when his editor placed the story into the CMS for publication.

45.     In accordance with Newsroom policy, plaintiff prepared the story using the Google Docs platform and "shared" it with his editor using the "share" feature of Google Docs enabling his editor to edit and insert comments upon the draft.

46.     In Google Docs, all revisions are preserved and visible, including deletions.

47.     Using Google Docs' commenting feature, plaintiff's editor, Mr. Akpan, inserted a comment in the margin next to the two sentence AP copy following the quote and the AP link: "*We shouldn't copy-paste text (outside of quotes) from AP stories.*"

48.     Mr. Akpan struck through these two sentences and also struck the attribution to AP at the bottom of the draft.

49.     Plaintiff replied with this comment:

"*We've been told that's kosher, I'm pretty sure, since we're paying members -- as long as they're bylined at the top or bottom. Want me to rewrite or just omit?*"

50.     Following the two comments relating to the AP passage, Google Docs shows "*Suggestion accepted.*"

6

51.     Mr. Akpan proceeded to place the story into the CMS for publication, deleting both the two-sentence paragraph and the AP attribution line.

52.     Mr. Akpan did not indicate that this was a significant issue.  He otherwise praised the story—including both the lede and the interview with the expert.

53.     Because he has been locked out of his Google work account, plaintiff no longer has direct access to the draft in Google Docs which shows Mr. Akpan's strikeouts and comments.

54.     However, copies of the stand-alone comments have been produced by NYPR counsel and are attached hereto as Exhibit D.

55.     Plaintiff prepared his story in accordance with WNYC policy and practice with respect to the use of AP copy.

56.      Plaintiff did not violate NYPR editorial policy or guidelines with respect to the use of AP copy in the draft story.

57.     Plaintiff did not commit plagiarism.

**The Story as Published**

58.     The story appeared as per Mr. Akpan's text deletions, after Mr. Akpan submitted it for publication adding plaintiff's byline at the top and without byline attribution to AP top or bottom.

59.     The published story is attached as Exhibit E.

60.     The AP story is attached as Exhibit F.

**Post- Publication**

61.     That was the last plaintiff heard until he was contacted on Thursday, February 4, and asked to meet with Human Resources on Friday, February 5.  He was not told the reason for the meeting, but he was informed he could bring a representative from his union, the Screen Actors

7

Guild-American Federation of Television and Radio Announcers (SAG-AFTRA).

62.  When plaintiff asked his editor about the upcoming meeting, he was told it was about the AP copy.  Mr. Akpan said that when he flagged the copy and plaintiff told him that he thought they could use AP copy without quotation marks as long as they by-lined AP, Mr. Akpan asked Jen Chung, Executive Editor and co-founder of *Gothamist*, for clarity about policy.

63.  Mr. Akpan told plaintiff that Ms. Chung flagged the issue to Audrey Cooper, Editor in Chief of NYPR.  He did not indicate that plaintiff was about to be terminated.  He said that he would like to keep working with plaintiff and that plaintiff should explain the use of AP copy as a misunderstanding.

64.  Plaintiff looked at the WNYC Newsroom NYPR Style Guide and Handbook before the meeting.  The only provision referring to AP usage is on page 20, under the heading "WHAT WE WRITE FOR WEB AND WHEN:"

> *Newscast items taken from the Associated Press or NPR may be posted on the web by editors or producers – with pic, etc. – if it is an important enough story and we don't have a reporter on it. We also use AP/NPR copy as a placeholder until we get our own copy up, or add to it as needed.*

65.  A comparison of stories on WNYC.org with the underlying AP stories shows different patterns of quotation and attribution of AP copy.

66.  On WNYC.org, attribution to AP sometimes takes the form of a joint byline on the top, and sometimes takes the form of an attribution tagline at the bottom, stating "With reporting from the Associated Press," like plaintiff's draft story.  Plaintiff prepared a memorandum for the meeting in which he cited examples of such stories.

67.  Plaintiff has subsequently found numerous other stories by colleagues using AP copy, without quoted passages, joint-bylined with AP or with an AP attribution tagline at the

8

bottom, like plaintiff's draft story. These WNYC reporters, hosts, and editors include Kate Hinds, Patricia Willens, Julianne Welby, Jennifer Vanasco, Joseph Capriglione, Alec Hamilton, Sean Carlson, Beth Fertig, Brigid Bergen, Arun Venugopal, Mirela Iverac, Yasmeen Khan and Stephen Nessen.

### February 5, 2021 Meeting with Plaintiff

68.     The February 5 meeting took place on Zoom and was presided over by Editor in Chief Audrey Cooper, with Mr. Akpan, an HR representative and a representative from SAG-AFTRA, plaintiff's union, in attendance.

69.     Ms. Cooper started the meeting by stating that plaintiff "lifted" a paragraph from the AP story in the "final draft" of the story he submitted.

70.     She said that plaintiff's editor noticed the paragraph and told plaintiff it was not appropriate to "lift" copy verbatim.

71.     Plaintiff responded that he thought doing so was permitted if appropriate credit was attributed at the top or bottom.

72.     Plaintiff also told her that the draft was not the final draft but a first draft.

73.     He noted that the paragraph above the paragraph to which Ms. Cooper was referring quoted the AP story and linked to the AP story, and that the draft contained an attribution line "reporting from Miami by the Associated Press."

74.     Plaintiff pointed out the exchange of comments with Mr. Akpan on the Google Docs draft, including the reference to plaintiff's understanding that as paying members of AP, using AP copy was permissible as long as a story is bylined at the top or the bottom.   He noted that he asked his editor if he wanted him to rewrite the story or omit the two sentences.

75.     He referred to the WNYC Newsroom Style Guide and Handbook.

9

76.     He also referred to the practice at WNYC among his colleagues to use AP copy without quotation marks as long as the story was bylined to AP, offering to share his examples which he described in summary form.

77.     He told Ms. Cooper that this had been WNYC's attribution practice, protocol and understanding and that if she were to search, she would find stories by many of his colleagues like his draft.

78.     In response, Ms. Cooper told him that his reference to the WNYC Style Guide and Handbook did not apply.

79.     Instead, she referred to a provision in a different policy—which plaintiff later recognized as the NYPR Editorial Policy and Guidelines—which referred to plagiarism.

80.     Ms. Cooper also said that because he did not just "lift" the paragraph but also edited it to make it fit the story, his explanation "strains credibility."

81.     When plaintiff reiterated that he had cited the AP story and had a byline for AP, she said he did not.

82.     When plaintiff said that he put the byline at the bottom, she said he did not.

83.     Dismissing plaintiff's factually accurate statements, she dismissed plaintiff's references to Newsroom practice and AP usage as irrelevant.

84.     Ms. Cooper refused to accept or acknowledge plaintiff's explanation.

85.     When plaintiff tried to speak, Ms. Cooper cut him off.

86.     At no time did Ms. Cooper make any reference to plaintiff's offer to omit or rewrite the two sentences of copy or take into account the fact that the two sentences at issue followed a link to the AP article and were not, in any event, contained in the published story.

87.     Although the memorandum plaintiff had prepared for the meeting contained

10

Case 1:21-cv-05882-CM Document 1-3 Filed 07/08/21 Page 12 of 98

examples of other published stories using AP copy without quotes, Ms. Cooper did not provide

him an opportunity to present it.

88.     Nor did she respond to plaintiff's request to clarify the distinction between stories

by other reporters and his story.

89.     Ms. Cooper concluded by saying that she had made a decision to terminate

plaintiff's employment effective immediately, and exited the meeting while plaintiff was in mid-

sentence.

90.     Thus, defendant Cooper summarily dismissed an 18-year veteran WNYC reporter,

accusing him of plagiarism and deception, on the basis of two sentences of AP copy appearing in

a draft unpublished story which he offered to rewrite which followed a link to the AP story and

included an attribution tagline crediting AP, all in accordance with past practice in the WNYC

Newsroom.

**February 5, 2021 Newsroom Meetings**

91.     Following the meeting in which she terminated plaintiff's employment, defendant

Cooper held a Zoom meeting with NYPR editors and two Zoom meetings with the NYPR

Newsroom staff on February 5, 2021.

92.     The second Newsroom staff meeting included senior management Jen Chung,

Executive Editor and Co-founder of *Gothamist*, Acting HR Head Janna Freed, Chief Content

Officer Andrew Golis, and General Counsel Ivan Zimmerman.

93.     Both meetings were attended, upon information and belief, by more than 50

reporters, editors and other staff members.

94.     In these meetings, defendant Cooper reiterated accusations of plagiarism and

deception and other false statements against plaintiff.

11

Case 1:21-cv-05882-CM   Document 1-3   Filed 07/08/21   Page 13 of 98

95.     The *New York Times* published an article on May 23, 2021, concerning ongoing issues at WNYC. The article referred, among other matters, to the termination of plaintiff's employment.

96.     The *New York Times* article also disclosed that there was a recording of at least one of the virtual meetings called by defendant Cooper "to inform the full newsroom of her decision to fire Mr. Mogul." Although plaintiff has not at this time been able to obtain a copy of the recording, he has been informed that defendant Cooper made the below statements in words or substance. Plaintiff reserves his right to amend this complaint upon receipt or production of the recording(s). A copy of the *New York Times* article is attached as Exhibit G.

97.     Defendant Cooper informed the Newsroom that she had just terminated plaintiff's employment for "plagiarism."

98.     According to one employee, defendant Cooper described plaintiff's actions as an out-and-out instance of "deception."

99.     According to employees in attendance, Cooper made additional false statements of fact and statements intended to support the charge of plagiarism and indicate deceit on the part of plaintiff including statements that plaintiff:

    a.      "signed his name on AP copy without having AP on the byline;"

    b.      "lifted another person's words" and "presented them as his own work;"

    c.      "did not include a byline crediting AP;"

    d.      "this was plagiarism because he didn't cite AP;"

    e.      "clear case of his taking credit for someone else's work;"

    f.      "explanation strained credibility;"

    g.      "got caught" for doing this;

12

h. if font weren't different, would have "gotten away with it."

100. Upon information and belief, defendant Cooper dodged further questions concerning plaintiff's AP attribution when further questioned about it by Newsroom staff.

101. Upon information and belief, many employees expressed concern that they had prepared stories using AP articles and copy in accordance with the same AP usage policy and practice relied on by plaintiff and indicated that there was a lack of clarity concerning AP usage policy.

102. According to the *New York Times* article, "several stunned radio reporters questioned the move, explaining that they regularly incorporated AP copy into stories on air and had imported the practice to WNYC's little-read website, crediting the AP at the bottom of the story."

103. The *New York Times* reported that one WNYC host told Ms. Cooper: "Go through every single one of our articles and fire all of us, because that is exactly what we have all done."

104. Ms. Chung, Mr. Golis, Ms. Freed and Mr. Zimmerman, all present at the second meeting, by their words and conduct, reiterated, ratified, supported and/or approved the republication of Ms. Cooper's false and defamatory statements about plaintiff.

105. Within a week, approximately seventy (70) NYPR employees from various departments submitted a petition to CEO Goli Sheikholeslami protesting plaintiff's termination and requesting his reinstatement.

106. On February 11, 2021, Ms. Sheikholeslami responded by defending the termination decision, characterizing it as "careful process that involved multiple members of newsroom leadership" including herself, based on a "thorough review of the facts."

**NYPR Practice**

13

107.    Upon information and belief, it has been the longstanding policy and practice of NYPR, and in particular WNYC, to include AP text with WNYC text and credit AP in an attribution line at the bottom of the story or joint byline at the top of a story.

108.    Upon information and belief, the basis for such practice is understood by Newsroom staff to be NYPR's membership in the Associated Press, enabling WNYC to use AP copy.

109.    As indicated, *supra,* plaintiff has been able to find numerous examples which show that NYPR/WNYC has published stories in which AP copy was used in the same way it appeared in plaintiff's draft article.

110.    Side by side comparisons of several such stories are attached as Exhibit H.

111.    As one well-known WNYC journalist has stated:

> "*Almost every other journalist in the newsroom is guilty of some variation of what Fred did- so why the unequal treatment? And if Fred was fired for some other reason, management should have the decency to say so, and not shame him with the worst transgression a journalist can commit.*"

**Industry Practice**

112.    Upon information, WNYC practice is consistent with industry practice.

113.    Side by side comparisons of stories from other media organizations are attached as Exhibit I.

114.    According to one AP employee, what plaintiff did is what "people at newspapers and websites around the world do every day with our copy."

115.    The founder of the NiemanLab, a media studies center at Harvard University, tweeted, on the day after publication of the *New York Times* article: "AP customers can't really 'plagiarize' AP content. They're paying for the right to use that content, either as freestanding

stories or within their own work."

### NYPR Policy Documents

#### *WNYC Newsroom Style Guide & Handbook*

116.    The WNYC Newsroom Style Guide & Handbook on page 20 provides in the

section Filing For Web: What We Write for Web and When:

> **Newscast items taken from the Associated Press or NPR** may be posted
> on the web by editors or producers – with pic, etc. – if it is an important enough
> story and we don't have a reporter on it. We also use AP/NPR copy as a placeholder
> until we get our own copy up, or add to it as needed.

#### *NYPR Editorial Policy and Guidelines*

117.    The NYPR Editorial Policy and Guidelines provide on page 11:

> 1. Plagiarism is an unforgivable offense.  NYPR staff members do not take
> other peoples' work and present it as our own.

> 2. a) Staff producing NYPR content must take special care in the use they
> make of information from wire service stories…No material from another
> source should ever be included verbatim, or substantially so, *without attribution*.
> (Emphasis added).

> b) Wire service is one category where it is acceptable to use quotations
> without attribution.  That is where a story from a wire service is about some public
> event like a press conference, speech by a public official in a public setting, an
> official statement of a government agency, a congressional hearing, and the like. In
> those cases, we reasonably expect that these reporters are reliable conveyors of
> those quotations in the same way we regard the transcript services we use for these
> events.

#### *Standards of Employee Conduct and Key Policies*

118.    The Standards of Employee Conduct provide for confidential investigation of

policy violations.

119.    In a May 24, 2021 email to employees, CEO Sheikholeslami confirmed that

"personnel issues are mostly confidential."

15

120.    In violation of NYPR standards and policies of confidentiality, defendants published false and defamatory statements concerning plaintiff to the entire NYPR Newsroom staff.

### *SAG-AFTRA Collective Bargaining Agreement (CBA)*

121.    As a reporter, plaintiff is a member of SAG-AFTRA and entitled to the benefits afforded to reporters under the applicable collective bargaining agreement (CBA).

122.    The applicable CBA provides that "all efforts shall be made to notify the Union in advance of any termination."

123.    In violation of the CBA, defendants did not provide plaintiff with advance notice of his termination.

124.    The applicable CBA provides for severance pay in an amount equal to two (2) weeks' pay for each year of employment to an employee who is terminated without cause, in addition to contributions to the SAG-AFTRA health and retirement plan.

125.    In violation of the CBA, defendants did not provide plaintiff the notice or severance pay and benefits to which he is entitled.

126.    Upon information and belief, the false and defamatory accusations against plaintiff were a pretext for the willful denial of severance pay and benefits.

127.    Defendants have not acted in accordance with NYPR's own journalistic standards and professional ethics.

128.    Upon information and belief, defendants' actions have created a "chilling effect" on Newsroom employees, intending and operating to inhibit their speech and actions.

### **Plaintiff's Damages**

16

Case 1:21-cv-05882-CM   Document 1-3   Filed 07/08/21   Page 18 of 98

129.    Plaintiff now finds himself, a veteran reporter with a distinguished career and reputation at NYPR/WNYC, without employment and labelled with a false charge of plagiarism, based on two sentences of unpublished AP copy, attributed to AP in accordance with widely held practice and general understanding of applicable policy.

130.    As noted above, an accusation of plagiarism constitutes "the worst transgression a journalist can commit."

131.    Defendants and their agents have acted in bad faith, with malice, without justification, and with the intention to harm plaintiff.

132.    Defendant's false, defamatory, and misleading statements have injured plaintiff. They have damaged his name, reputation and career, causing substantial professional harm. They have also intentionally and unnecessarily inflicted emotional pain and suffering.

133.    As a consequence of defendants' actions, plaintiff has sustained damages, including termination of his employment, loss of income and benefits, loss of severance pay and benefits, damage to his name, reputation and career, damage to his ability to obtain future employment as a journalist, attorneys' fees and other special damages, as well as pain and suffering and emotional distress.

## LEGAL CLAIMS

### FIRST CAUSE OF ACTION
**Defamation**

134.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

17

135. By their actions, defendants and their agents have defamed plaintiff in that they have made and published false and defamatory statements about him, which have damaged and will continue to damage him in his trade, business and profession.

136. As described in the foregoing paragraphs, on the morning of February 5, 2021, Audrey Cooper falsely accused plaintiff of plagiarism and deception, made other false statements about him, and terminated his employment effective immediately.

137. Following the false accusations and statements made to plaintiff on February 5, 2021, defendant Cooper repeated these false and defamatory statements to third parties as described in the foregoing paragraphs.

138. Specifically, in two Zoom Newsroom staff meetings held on February 5, 2021, defendant Cooper made false accusations of plagiarism and deception against plaintiff along with other false statements about plaintiff.

139. On February 5, 2021, defendant Cooper in a Zoom meeting of Newsroom staff, falsely accused plaintiff of plagiarism.

140. On February 5, 2021, defendant Cooper in a Zoom meeting of Newsroom staff, falsely accused plaintiff of deception.

141. Defendant Cooper made additional false statements of fact and statements intended to support the false accusation of plagiarism and indicate deceit on the part of plaintiff including, *inter alia*, statements that plaintiff:

    a. "signed his name on AP copy without having AP on the byline;"

    b. "lifted another person's words" and "presented them as his own work;"

    c. "did not include a byline crediting AP;"

    d. "this was plagiarism because he didn't cite AP;"

18

    e.   "clear case of his taking credit for someone else's work;"

    f.   "explanation strained credibility;"

    g.   "got caught" for doing this;

    h.   if font weren't different, would have "gotten away with it."

142.    Plaintiff did not "lift" or use AP copy without attribution.

143.    Plaintiff's draft story included a link and attribution line crediting AP.

144.    Plaintiff did not commit plagiarism.

145.    Plaintiff did not engage in deception.

146.    Defendant Cooper's false accusations and statements constitute slander.

147.    Defendant Cooper's false accusations and statements constitute defamation.

148.    A charge of plagiarism tends to injure a journalist in his trade, business or profession as a journalist and is therefore defamatory per se.

149.    Defendant Cooper's charge of plagiarism was defamatory and slander per se.

150.    Defendant Cooper's charge of deceit was defamatory and slander per se.

151.    Defendant Cooper's false statements concerning plaintiff were defamatory per se.

152.    Defendant Cooper's statements to the Newsroom constituted a publication to third parties.

153.    Defendant Cooper made and published these false and defamatory statements concerning plaintiff knowing that they were false or with reckless disregard for their truth or falsity.

154.    Defendant Cooper's false statements were motivated solely by spite and ill will, and with wanton, reckless, or willful disregard for their injurious effects on plaintiff.

19

Case 1:21-cv-05882-CM   Document 1-3   Filed 07/08/21   Page 21 of 98

155.    Defendant NYPR's senior executives, Jen Chung, Andrew Golis, Janna Freed, and Ivan Zimmerman, were present at the second Zoom Newsroom staff meeting on February 5, 2021.

156.    In the second meeting, defendant Cooper repeated and published all or part of her false and defamatory accusations and statements against plaintiff.

157.    By their words and/or conduct, NYPR executives Jen Chung, Andrew Golis, Janna Freed, and Ivan Zimmerman reiterated, ratified, supported, and/or approved the republication of defendant Cooper's defamatory statements.

158.    Such actions constituted a further publication to third parties.

159.    NYPR's CEO Goli Sheikhomeslami had authority and control over, and subsequently ratified and approved, the publication of defendant Cooper's defamatory statements.

160.    Defendant Cooper's defamatory statements were made in the scope and course of her employment as Editor in Chief of NYPR.

161.    Defendant NYPR, as defendant Cooper's employer, is liable for defendant Cooper's slander and defamation under the legal doctrine of respondeat superior.

162.    Defendants and their agents have published false, misleading and defamatory statements to third parties.

163.    Defendants had no privilege or authorization to publish these false and defamatory statements.

164.    In publishing false, misleading, and defamatory statements, defendants acted with actual and common law malice.

165.    Defendants knew or should have known that their defamatory statements were false and/or recklessly disregarded the truth, including by intentionally avoiding the truth.

20

166.    Defendants' false, misleading, and defamatory statements were intended to, have, and will continue to injure plaintiff in his trade, business or profession.

167.    Plaintiff requested a retraction of defendants' false and defamatory statements.

168.    Defendants have refused to issue a retraction.

169.    As a consequence of defendants' publication of false, misleading, and defamatory statements, plaintiff has sustained and will continue to sustain injuries and special damages, including termination of his employment, loss of income and benefits, loss of severance pay and benefits, damage to his name, reputation, and career, damage to his ability to obtain future employment as a journalist, and damage to his trade, business, and profession as a journalist, as well as pain and suffering and emotional distress.

### SECOND CAUSE OF ACTION
### Wrongful Termination of Employment

170.    Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

171.    Defendants terminated plaintiff's employment on the pretext of false and defamatory accusations of plagiarism and deception.

172.    The false and defamatory accusations of plagiarism and deception against plaintiff were a pretext for the willful denial of vested severance pay and benefits to which plaintiff was entitled upon termination of his employment.

173.    Defendants' pretextual termination of plaintiff's employment on the basis of the false and defamatory accusations of plagiarism and deception denied plaintiff the advance notice of termination to which he was entitled.

174.    Defendants terminated plaintiff's employment in violation of NYPR standards and

21

Case 1:21-cv-05882-CM    Document 1-3    Filed 07/08/21    Page 23 of 98

policies of confidentiality.

175.    The circumstances of defendants' termination of plaintiff's employment and deprivation of severance benefits without legitimate justification, together with the very public dissemination of the accusation of plagiarism and other false and defamatory statements, constitute a violation of applicable NYPR contracts, covenants, handbooks, policies and practices.

176.    Defendants have not acted in accordance with NYPR's own journalistic standards and professional ethics.

177.    Based on all the facts and circumstances, defendants' termination of plaintiff's employment, deprivation of severance benefits, and publication of false and defamatory accusations of plagiarism, in violation of applicable NYPR contracts, covenants, handbooks, policies and practices, journalistic standards and ethics, and in violation of the covenant of good faith and fair dealing implied in New York contracts, constitutes a wrongful discharge and wrongful termination of plaintiff's employment.

178.    As a consequence of defendants' actions, plaintiff has sustained damages, including termination of his employment, loss of income and benefits, loss of severance pay and benefits, damage to his name, reputation and career, and damage to his ability to obtain future employment as a journalist, as well as pain and suffering and emotional distress.

### THIRD CAUSE OF ACTION
**Denial of Severance Pay and Benefits in Violation of New York Labor Law §§ 190, et seq.**

179.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

180.    Plaintiff was terminated without legitimate cause.

22

181.     Plaintiff is entitled under the applicable CBA to severance pay in an amount equal to two (2) weeks' pay for each year of his eighteen (18) years of employment.

182.     Plaintiff is also entitled to contributions to the SAG-AFTRA health and retirement plan.

183.     Defendant NYPR has failed to pay plaintiff the severance pay and benefits to which he is entitled.

184.     Defendant NYPR asserts that Plaintiff's claim for severance pay and benefits is not subject to the grievance or arbitration process under the CBA.

185.     As a result of the foregoing, plaintiff is entitled to severance pay in the amount of $69,954 with interest, contributions to the SAG-AFTRA health and retirement plan, liquidated damages under New York Labor Law § 198 in the amount of 25% of severance pay and benefits; and attorneys' fees under the New York Labor Law.

## FOURTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing

186.     Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

187.     Under New York law, there is a covenant of good faith and fair dealing implied in all contracts, which holds that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

188.     A party breaches the implied covenant by depriving another party of his right to receive the benefits under an agreement, whether or not such conduct is prohibited by the terms of the agreement.

23

189. The WNYC Standards of Employee Conduct providing, among other things, for confidentiality relating to personnel matters, is a valid and enforceable contract between plaintiff and defendants.

190. The CBA providing, among other things, for advance notice of termination and severance pay and benefits, is a valid and enforceable contract between defendant NYPR and plaintiff's union, SAG-AFTRA.

191. Plaintiff performed all of his obligations under both the WNYC Standards of Employee Conduct and the CBA.

192. Defendants breached *their* obligations under both the WNYC Standards of Employee Conduct and the CBA.

193. Defendants' actions deprived plaintiff of the benefits to which he was entitled under these agreements including advance notice of his termination, confidentiality, and severance pay and benefits.

194. By all their actions as described above, defendants have breached the covenant of good faith and fair dealing implied in these agreements.

195. By all their actions as described above, defendants have breached the covenant of good faith and fair dealing implied in the employment relationship between plaintiff and defendants.

196. Defendants' actions were taken in bad faith.

197. As a consequence of defendants' breach, plaintiff has sustained damages, including termination of his employment, loss of income and benefits, loss of severance pay and benefits, damage to his name, reputation and career, and damage to his ability to obtain future employment as a journalist, as well as pain and suffering and emotional distress.

## FIFTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

198.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

199.     The facts and circumstances of defendants' termination of plaintiff's employment constitute intentional and reckless tortious conduct under applicable New York law.

200.     As described in the foregoing paragraphs, on February 5, 2021, defendants NYPR, through its agents, including in particular defendant Cooper, falsely accused plaintiff of plagiarism and deceit, made other false statements about him, and terminated his employment effective immediately.

201.     As described in the foregoing paragraphs, on February 5, 2021, defendant NYPR, through its agents, including in particular defendant Cooper, published false and defamatory accusations against plaintiff of plagiarism and deceit and published such false and defamatory allegations to the entire NYPR Newsroom.

202.     In the field of journalism, a false accusation of plagiarism and termination of employment based on such a false accusation constitutes extreme and outrageous conduct.

203.     Defendants knew or should have known that their conduct would cause serious damage to plaintiff's name, reputation and career as a journalist.

204.     In fact, Defendants' conduct was calculated to damage plaintiff's name, reputation and career as a journalist.

205.     Defendants, through the foregoing acts, did commit extreme and outrageous conduct and thereby intentionally and/or recklessly cause plaintiff to suffer severe mental and emotional distress, pain and suffering, and damage to name, career and reputation.

Case 1:21-cv-05882-CM   Document 1-3   Filed 07/08/21   Page 27 of 98

206.    Defendants committed the foregoing acts intentionally, willfully, and with malicious disregard for plaintiff's rights and are therefore liable for punitive damages.

207.    As a direct and proximate result of defendants' actions, plaintiff has sustained damages, including termination of his employment, loss of income and benefits, loss of severance pay and benefits, damage to his name, reputation and career, and damage to his ability to obtain future employment as a journalist, as well as pain and suffering and emotional distress.

### DEMAND FOR RELIEF

WHEREFORE, plaintiff respectfully requests the Court to award the following relief:

a)    Judgment declaring that defendants' acts complained of herein violate plaintiff's rights;

b)    Compensatory damages to compensate plaintiff for loss of his employment and all economic loss, including back pay, future lost earnings and severance pay and benefits, damage to name, reputation, career and profession, pain and suffering, emotional distress and mental anguish, including but not limited to embarrassment, indignity and dis-accommodation, in an amount to be determined at trial;

c)    Severance pay and benefits to which plaintiff is entitled;

d)    Liquidated damages and attorney' fees under New York Labor Law § 198.

e)    Punitive damages in an amount to be determined at trial;

f)    Attorneys' fees and costs;

g)    Such additional relief as may be just and proper.

Dated: New York, New York
          June 15, 2021

BELDOCK LEVINE & HOFFMAN LLP

By: _____

Cynthia Rollings
Luna Droubi
Rebecca Pattiz

99 Park Avenue
New York, New York 10016
(212) 490-0400
*Attorneys for Plaintiff*

27

# EXHIBIT A

# Fred Mogul

50 8th Ave., Brooklyn, NY 11217          (917) 572-4700          Twitter: @fredmogul       fred.mogul@gmail.com

## JOURNALISM EXPERIENCE

*WNYC – New York Public Radio,* New York City, NY                                         (2002–2021)
- **State Government and Politics Reporter** (2017-present). Covering the flow of power and money from the metropolitan area to Albany and back, including: state budget and fiscal health, legislative activity, city-state tensions, political corruption, election campaigns. Increasing emphasis on state environment and energy policy.
- **Healthcare and Medicine Reporter** (2002-present). Covered pandemic response and public health; healthcare delivery system; health agencies, insurers, unions; local, state and federal health policy. Ongoing areas included health care reform; health disparities; medical and epidemiological research; disaster response and preparedness.
- **NPR Fellow, Health and State Government** (2011-present): Regularly contribute to NPR, Kaiser Health News on health, science and various political and policy issues.
- **Other Coverage**: frequently report on breaking news, education, culture and business. Contribute extensive content to *Gothamist* site, including digital photography. Some podcast development and show hosting experience.
- **Occasional fill-in work as Afternoon/Evening News Editor**, including a 6-month stint, assigning and editing stories for *All Things Considered* and *Morning Edition*.

*Freelance Reporter/Stringer*, Philadelphia, Pa.                                          (2000–2002)
Reported news, produced features for *NPR*, *New York Times*, *Philadelphia Inquirer, Time* magazine and others.

*WHYY – Philadelphia Public Radio and TV,* Philadelphia, Pa.                              (1999–2002)
- Radio reporter (per diem). Covered arts, culture, politics, education, business, religion and other topics.
- Co-Producer/Associate Producer of TV documentaries, including *City Hall 100, The Next Mayor* and *Rizzo.* Researched, scripted, supervised shooting, editing of 60- and 90-minute documentaries on local public affairs.

*The Omaha World-Herald*, Omaha, Neb.                                                     (1995–1999)
Reporter. Covered various beats at Nebraska's largest newspaper (daily circulation 230,000), including Living Section-Features, western Iowa, Omaha suburbs, Night cops and General Assignment.

*Manhattan Mercury*, Manhattan, Kan.                                                      (1994–1995)
Military/Area Reporter.  Covered the 1st Infantry Division and Army life at Fort Riley, rural issues and cultural activities in Manhattan, home of Kansas State University. Edited several pages of Sunday edition.

*Freelance Writing,* Jerusalem, Israel, Hong Kong, Washington, DC                         (1991–1993)
Covered wide range of issues for the *Jerusalem Post* and *South China Morning Post.* Copy-edited for *Hong Kong Standard.* Interned for 10 months in the Jerusalem bureau of the United Press International. Worked as research assistant for DC-based investigative reporter, author and documentary filmmaker.

## SELECTED AWARDS AND FELLOWSHIPS

*New York Associated Press* – Best Investigative Story, for "A Vote is a Terrible Thing to Waste"          2018
*Center for Health Journalism Fellowship* – USC Annenberg School of Communications                        2016
*Association of Health Care Journalists* – Best Beat Reporter (third place), for Body of Work              2015
**NPR-State Government  Fellow**                                                                  2017-present
**NPR-Kaiser Health News Fellow**                                                                 2011-present
*Dart Award for Excellence in Coverage of Trauma* – Team Prize, for "Living 9/11"                          2012
*NIH Medicine in the Media Fellowship* – Dartmouth University                                              2008
*CDC Bootcamp Fellowship* – Centers for Disease Control and Prevention                                     2004

## EDUCATION

*Amherst College*, Amherst, Mass.                                                         (1986–1990)
Graduated cum laude, double-major in Russian Studies and American Studies. Attended *Moscow Energy Institute* in 1989 for one semester, studying Russian history, politics, literature and language. Interned at NPR affiliate WFCR.

## TECHNICAL SKILLS

Experienced in DAVID audio editing software. Familiar with ProTools, Excel, HTM. Proficient in Russian, Hebrew. Basic knowledge of Spanish.

Case 1:21-cv-05882-CM   Document 1-3   Filed 07/08/21   Page 31 of 98

# EXHIBIT B

FILED: NEW YORK COUNTY CLERK 06/15/2021 03:57 PM

NYSCEF DOC. NO. 8

INDEX NO. 652968/2021

RECEIVED NYSCEF: 06/15/2021

# Fred Mogul

## Healthcare and Medicine Reporter, WNYC News



🐦 Follow @fredmogul

Fred Mogul has been covering healthcare and medicine for WNYC since 2002.

His beat has him talking to patients, healthcare providers, researchers and officials in hospitals, clinics, health agencies and labs across the region. Through a fellowship with NPR and Kaiser Health News, his stories frequently run nation-wide. His work has also appeared in *The New York Times*, *Time* magazine, the *Philadelphia Inquirer* and many other outlets.

His first work in radio was at WFCR in western Massachusetts during college, and he then worked as a staff reporter and free-lance writer for newspapers, magazines, and wire services. He also produced historical, public affairs and health documentaries and shows for public and cable television, before circling back to public radio at WHYY and WRTI in Philadelphia. Raised in Westchester County, he has also lived in Israel, Hong Kong, Washington, D.C., Kansas and Nebraska. He lives in Brooklyn with his wife, daughter, son and dog.

*Read Fred's latest reporting on Gothamist.*

# EXHIBIT C

Possible HED:
Should COVID Screening Go To The Dogs?

The latest technology for detecting COVID-19 could involve cold, wet noses and a few quick sniffs -- but not from the people being screened.

This week, the Miami Heat is debuting a vanguard of coronavirus-attuned canines at the entrance to AmericanAirlines Arena. They'll walk up a line of socially distanced spectators waiting to get in, and, if all goes according to plan, sit down next to those who are infected.

"If you think about it, detection dogs are not new," Matthew Jafarian, the Heat's executive vice president for business strategy, told the Associated Press. "You've seen them in airports, they've been used in mission critical situations by the police and the military. We've used them at the arena for years to detect explosives."

A health screening questionnaire will be mandatory for all guests, masks must be worn continually, and only soda and water will be sold. All transactions will be cashless and if a fan feels ill during a game, isolation rooms will be available.

Representatives from the New York Knicks and Brooklyn Nets did not return calls to discuss potential dog deployment at Madison Square Garden and the Barclays Center.

They would certainly be right to wonder about the effectiveness of dogs, Dr. Audrey Odom John told Gothamist. She leads an infectious disease team at the Children's Hospital of Philadelphia that is exploring how dogs can be used to identify people with COVID-19, malaria, and other diseases. Over the course of 20 minutes on the phone, John laid out the pros, cons, and long-term promise of nostril-based screening.

**Gothamist:  Many people are aware of dogs' superpowers in screening people for drugs and explosives, and they might have heard that some dogs can sniff out diabetes. Where we are with infectious diseases and, in particular, SARS-CoV-2?**

John: It turns up that infectious diseases themselves give off their own odor. We had previously done some work in malaria and found that malaria parasites make volatile odors -- their own perfume, if you will. But in the case of viruses, it probably has more to do with the host immune response. These reactions by the body generate specific compounds that dogs can detect through smell. Our work involves trying to identify what those compounds are.

**What kinds of experiments have you been doing with the dogs to see if they can smell the right stuff?**

We have been working with an investigator named Cynthia Otto, who directs the Penn Vet Working Dog Center, and she and her team were able to use samples from children and adults with and without SARS-CoV-2 infection and train the dogs on those samples to successfully distinguish individuals with and without infection, with really high sensitivity and specificity.

**And speaking of false positives [sensitivity] and false negatives [specificity], how did they do? What was their batting average ?**

There were nine dogs. Most of them were over 90 percent accurate, and one of them never missed a beat and approached 100% accuracy.

**That's quite a good dog! But you used saliva and urine samples in a lab. Do you think they could do as well outside, sniffing people wearing pants and coats and cologne and perfume, with the smell of stale beer on the pavement?**

There's testing in a controlled setting, and then there's the real world experience. So, if we have a dog who do around 100% in the lab -- can she do this in a field setting? It's certainly likely to be a harder thing for them to do when there's distractible odors and other distractions in the environment.

**Given that, do you think the sports arena setup is likely to be accurate?**

Without seeing their data and what tests that they've done to show their own accuracy in a complex environment like a stadium, it's hard to know how good they're going to do. But I do think it's very likely the dogs can do it. They do it with ovarian cancer, for instance, which would seem to be an even more complicated thing to sniff out.

**You're not an ethicist, but I wonder what you think of putting dogs in this situation. Here you've got spectators spending hundreds of dollars on tickets, and you've got dogs who maybe don't bat .1000. Say they miss five or ten percent: they're still doing pretty well, but that's not much comfort if you've got courtside tickets. Are we asking too much of the dogs?**

I would see using these animals as a preliminary test, a little bit like a thermometer -- so, if the dog screens positive on you, you would then go to the little room, and you'd get one of the rapid antigen tests that in 15 minutes will tell you Yes or No. That's how I would imagine using it, not with the dog as the only thing.

**You know, this internet meme-type thing went around a while back about how to appear intelligent in meetings, and one thing they suggested was that no matter what the issue is, always ask, "But will it scale?" So I'm asking you: will it scale -- this system with dogs here, there, and everywhere, screening people for COVID?**

I don't think it's too likely. There are only so many dogs and only so many trainers and only so many handlers. The scenario that we think is most viable in terms of putting this out at scale is doing more of a breathalyzer -type test. There's on-the-shelf detection technology that can rapidly translate to point-of-care sensors. We've identified specific biomarkers for COVID, and the next step is to validate those with new children and adults. We're in the process of doing sample collection for our validation studies. The big question is whether you can identify individuals who are asymptomatically infected. Being able to catch people before they're infectious would be a real benefit.

**So the dogs are just doing the leg work for you -- but they're a means to an end, and these breathalyzer tests are real goal?**

We've been essentially approaching this two ways, both trying to use mass spectrometry, which is a technique to look at all the different compounds that are present in breath, to see if the machine can 'smell' the difference between people with and without infection. And at the same time, we're also using dogs. They actually do all the math and the mass spectrometry by themselves just with their noses. And the dogs tell us right away that this is a viable way to make a new diagnostic test. If dogs can tell the difference, we should be able to make a machine that can tell the difference. Whether or not, ultimately, it would be detecting compounds from smelling breath or from odor from the skin -- that's part of what we're figuring out.

~Reporting from Miami by the Associated Press

# EXHIBIT D



**Nsikan Akpan**

**Delete:** *"A health screening questionnaire will be mandatory for all guests, masks must be worn continually, a…"*

Reply



Nsikan Akpan

We shouldn't copy-paste text  (outside of quotes) from AP stories.

2:33 PM Jan 27 (edited 2:38 PM Jan 27)



Fred Mogul

We've been told that's kosher, I'm pretty sure, since we're paying members -- as long as they're bylined at the top or bottom.  Want me to rewrite or just omit?

3:29 PM Jan 27

Nsikan Akpan   *Suggestion accepted*

# EXHIBIT E

6/4/2021          Cuomo Wants Rapid Testing To Reopen Sporting Events. Should He Consider COVID-Sniffing Dogs? | Gothamist
Case 1:19-cr-00832-CM   Document 1   Filed 07/08/21   Page 40 of 98

NEWS (/NEWS)

# Cuomo Wants Rapid Testing To Reopen Sporting Events. Should He Consider COVID-Sniffing Dogs?

BY FRED MOGUL, WNYC [/STAFF/FRED-MOGUL]

JAN. 28, 2021 1:23 P.M.   •   3 COMMENTS

   



Greyhound mix Kossi works as a coronavirus sniffer during a four-month test phase at Helsinki-Vantaa airport near Helsinki, Finland, September 23, 2020. MAURI RATILAINEN/EPA-EFE/SHUTTERSTOCK

The latest technology for detecting COVID-19 could involve cold, wet noses and a few quick sniffs—but not from the people being screened.

This week, the Miami Heat is debuting a vanguard of coronavirus-attuned canines at the entrance to AmericanAirlines Arena. They'll walk up a line of socially distanced spectators waiting to get in, and, if all goes according to plan, sit down whenever they encounter anyone who is infected. These COVID sniffers have also been deployed at airports in Europe (https://www.bbc.com/news/world-europe-54288067).

"If you think about it, detection dogs are not new," Matthew Jafarian, the Heat's executive vice president for business strategy, told the Associated Press (https://apnews.com/article/nba-miami-coronavirus-pandemic-miami-heat-basketball-7d080a60484d5a85582121f22f256f9a). "You've seen them in airports, they've been used in mission critical situations by the police and the military. We've used them at the arena for years to detect explosives."

ADVERTISEMENT

FILED: NEW YORK COUNTY CLERK 06/15/2021 03:57 PM INDEX NO. 652968/2021
NYSCEF DOC. NO. 11 RECEIVED NYSCEF: 06/15/2021

Representatives from the New York Knicks and Brooklyn Nets did not return calls to discuss potential dog deployment at Madison Square Garden and the Barclays Center.

But they would certainly be right to wonder about the effectiveness of these doggie detectors, Dr. Audrey Odom John told Gothamist. She leads an infectious disease team at the Children's Hospital of Philadelphia (https://www.chop.edu/) that is exploring (https://research.chop.edu/cornerstone-blog/where-breath-meets-bark-canines-collaborate-with-scientists-to-identify-covid-19-biomarkers) how dogs can be used to identify people with COVID-19, malaria, and other diseases. Dr. John laid out the pros, cons, and long-term promise of nostril-based screening.

**Many people are aware of dogs' superpowers in screening people for drugs and explosives, and they might have heard that some dogs can sniff out diabetes (https://www.npr.org/2020/02/12/798481601/the-hope-and-hype-of-diabetic-alert-dogs). Where we are with infectious diseases and, in particular, the SARS-CoV-2 coronavirus?**

It turns out that infectious diseases themselves give off their own odor. We had previously done some work in malaria and found that malaria parasites make volatile odors—their own perfume, if you will.

But in the case of viruses, it probably has more to do with the host immune response. These reactions by the body generate specific compounds that dogs can detect through smell. Our work involves trying to identify what those compounds are.

**How do you do that?**

We have been working with an investigator named Cynthia Otto, who directs the Penn Vet Working Dog Center (https://www.vet.upenn.edu/research/centers-laboratories/center/penn-vet-working-dog-center). She and her team were able

Case 2:1w-ous-0882zto Moumbustus Eventsn Events Fileu 67/08/21 CCPmage 41 nf 98 Gothamist
6/4/2021

to use samples from children and adults with and without SARS-CoV-2 infection and train the dogs (https://www.vet.upenn.edu/about/press-room/press-releases/article/penn-vet-launches-covid-19-canine-scent-detection-study) on those samples...with really high sensitivity and specificity.

**That's because sensitivity is the rate of true positives, while specificity is their ability to distinguish SARS-CoV-2 from other germs, right? How did the dogs do? What was their batting average?**

There were eight dogs — seven Labrador retrievers and one Belgian Malinois. Most of them were over 90 percent accurate, and one of them never missed a beat and approached 100% accuracy.

**That's quite a good dog! But you used saliva and urine samples in a lab. Do you think they could do as well outdoors, sniffing people wearing pants and coats, cologne, and perfume—with the smell of stale beer on the pavement?**

There's testing in a controlled setting, and then there's the real world experience. So, if we have a dog who does around 100% in the lab, can she do this in a field setting? It's certainly likely to be a harder thing for them to do when there's distractible odors and other distractions in the environment.

**Given that, do you think the sports arena setup is likely to be accurate?**

Without seeing their data and what tests that they've done to show their own accuracy in a complex environment like a stadium, it's hard to know how good they're going to do. But I do think it's very likely the dogs can do it. They do it with ovarian cancer (https://methods.sciencefriday.com/cancer-dogs), for instance, which would seem to be an even more complicated thing to sniff out.

**You're not an ethicist, but I wonder what you think of putting dogs in this situation. Here you've got spectators spending hundreds of dollars on tickets, and you've got dogs who maybe don't bat .1000. Say they miss five or ten**

Case 21-cv-5822-CM Document 1 Filed 07/06/21 Page 44 of 98
6/4/2021
Cuomo Wants Rapid Testing To Reopen Sporting Events. Should He Consider COVID Sniffing Dogs? - Gothamist

**percent: They're still doing pretty well, but that's not much comfort if you've got courtside tickets. Are we asking too much of the dogs?**

I would see using these animals as a preliminary test, a little bit like a thermometer. If the dog screens positively on you, you would then go to the little room, and you'd get one of the rapid antigen tests that in 15 minutes will tell you Yes or No. That's how I would imagine using it, not with the dog as the only thing.

**You know, this internet meme-type thing went around a while back about how to appear intelligent in meetings** (https://thecooperreview.com/10-tricks-to-appear-smart-during-meetings/)**, and one thing they suggested was that no matter what the issue is, always ask, "But will it scale?" So I'm asking you: will it scale—this system with dogs here, there, and everywhere, screening people for COVID?**

I don't think it's too likely. There are only so many dogs and only so many trainers and only so many handlers. The scenario that we think is most viable in terms of putting this out at scale is doing more of a breathalyzer-type test. There's on-the-shelf detection technology that can rapidly translate to point-of-care sensors. We've identified specific [blood] biomarkers for COVID, and the next step is to validate those with new children and adults.

The big question is whether you can identify individuals who are asymptomatically infected. Being able to catch people before they're infectious would be a real benefit.

**So the dogs are just doing the leg work for you—they're a means to an end. These breathalyzer tests are the real goal?**

We've been essentially approaching this two ways, both trying to use mass spectrometry, which is a technique to look at all the different compounds that are present in breath, to see if the machine can 'smell' the difference between people with and without infection.

And at the same time, we're also using dogs. They actually do all the math and the mass spectrometry by themselves just with their noses.

And the dogs tell us right away that this is a viable way to make a new diagnostic test. If dogs can tell the difference, we should be able to make a machine that can tell the difference.

**NYC news never sleeps. Get the Gothamist Daily newsletter and don't miss a moment.**

```
your@email.com
```

By submitting your information, you're agreeing to receive communications from New York Public Radio in accordance with our Terms (https://www.wnyc.org/terms/).

#DOG [/TAGS/DOG]    #TESTING [/TAGS/TESTING]    #COVID-19 [/TAGS/COVID-19]

**Do you know the scoop?**  Comment below or Send us a Tip (mailto:tips@gothamist.com)

ADVERTISEMENT

Case 1:21-cv-05882-CM   Document 1-3   Filed 07/08/21   Page 46 of 98

# EXHIBIT F

Case 1:21-cv-05882-CM Document 1-8 Filed 07/06/21 Page 47 of 98
6/4/2021                      Heat to use COVID-19-sniffing dogs to screen fans at games



**AP**

Heat to use COVID-19-sniffing dogs to scre...      Top Stories    Topics ⌄    Video    Listen

ADVERTISEMENT

RELATED
TOPICS

Miami

NHL

Hockey

Basketball

Sports

FL State Wire

Coronavirus
pandemic

Miami Heat

NBA

# Heat to use COVID-19-sniffing dogs to screen fans at games

By TIM REYNOLDS      January 24, 2021

MIAMI (AP) — The
Miami Heat are
bringing back some
fans, with help from
some dogs.



The Heat will use
coronavirus-sniffing
dogs at
AmericanAirlines Arena to screen fans
who want to attend their games. They've
been working on the plan for months,
and the highly trained dogs have been in
place for some games this season where
the team has allowed a handful of guests
— mostly friends and family of players
and staff.

Starting this week, a limited number of
ticket holders will be in the seats as well,
provided they get past the dogs first.

"If you think about it, detection dogs are
not new," said Matthew Jafarian, the
Heat's executive vice president for

ADVERTISEMENT

**Trending on AP News**

Satellite photos show hulk of what was
biggest Iran warship

Mississippi teen fatally shot hours after
graduation

'Girl from Ipanema:' Re-imagining a
classic for today's Rio

6/4/2021
Case 1:21-cv-05882-CM Document 1-1 Filed 07/07/21 Page 48 of 98
Heat to use COVID-19-sniffing dogs to screen fans at games

## Heat to use COVID-19-sniffing dogs to scre...

critical situations by the police and the military. We've used them at the arena for years to detect explosives."

The first Heat game with ticket holders is set for Thursday against the Los Angeles Clippers. Monday is the first day that season ticket holders will be able to start securing their seats.

ADVERTISEMENT

The Heat have sold out 451 consecutive games, the sixth-longest streak in NBA history. Sellouts obviously aren't happening this year. The Heat will keep attendance under 2,000 for now, or less than 10% of the arena's typical capacity.

"Please note that seating will be very limited, as we will be observing proper physical distancing," the team said in its letter to season ticket holders.

The coronavirus-sniffing dog idea has been put into place at airports in Dubai, United Arab Emirates, and Helsinki, Finland, in recent months. At Heat games, fans arriving for the game will be brought to a screening area and the detection dogs will walk past. If the dog keeps going, the fan is cleared; if the dog sits, that's a sign it detects the virus and the fan will be denied entry.

Other protocols the Heat will use: A health screening questionnaire will be mandatory for all guests, masks must be worn continually and only soda and water will be sold. All transactions will be cashless and if a fan feels ill during a game, isolation rooms will be available.

And if a fan is allergic to or afraid of dogs, the Heat are offering an option to skip the dog screening and submit to a

## Heat to use COVID-19-sniffing dogs to scre...

Top Stories    Topics    Video    Listen

45 minutes.

The move comes at a time where some arenas in Florida — such as Amalie Arena in Tampa, home of the NHL's Tampa Bay Lightning and temporary home of the NBA's Toronto Raptors — are not allowing any fans, despite doing so earlier this season. The NHL's Florida Panthers, who play about a half-hour north of Miami, have allowed fans.

It also comes during a month when the NBA has postponed 19 games because of virus-related issues such as positive tests or multiple players on a team being flagged by contact tracing.

And this weekend, the entire University of Michigan athletic department announced it was pausing activities after several positive tests for the new COVID-19 variant that transmits at a higher rate.

Dogs have a superior sense of smell, which is why they're often used by law enforcement to find everything from drugs to bombs to missing people. Medical researchers have long reaped the benefit of canine sniffing, training some dogs to detect when a human is dealing with things like too much stress, too little blood sugar and even certain cancers.

ADVERTISEMENT

"Researchers are finding that specially trained dogs can detect COVID on humans quickly and accurately," Jafarian said.

———

More AP NBA: https://apnews.com/NBA and https://twitter.com/AP_Sports

Case 1:21-cv-05882-CM   Document 1-3   Filed 07/08/21   Page 50 of 98

# EXHIBIT G

The New York Times | https://www.nytimes.com/2021/05/23/business/media/wnyc-public-radio-bullying.html

**THE MEDIA EQUATION**

## *It's the Media's 'Mean-Too' Moment. Stop Yelling and Go to Human Resources.*

In public radio, there is either an epidemic of bullying or an epidemic of whining, depending on whom you ask.

**By Ben Smith**

Published May 23, 2021    Updated June 1, 2021

For 20 years, the WNYC radio show "On The Media" has been the sort of place where the hosts' on-air repartee makes it a fun listen, while their off-air screaming matches send producers diving for cover.

But times are changing.

During a meeting last June, a producer suggested that the show, which was hosted by Brooke Gladstone and Bob Garfield, do a segment on whether the media's coverage of climate change had overlooked minorities. After an extended back and forth, Mr. Garfield got sick of his staff pushing back, dismissed the story with a barnyard epithet, and eventually yelled that he was "tired of being accused of not being woke enough," two people in the meeting recalled.

Someone complained to human resources about that incident and two others during which Mr. Garfield screamed at producers. Mr. Garfield was told by management that if it happened again, he could be fired.

Then this spring, Mr. Garfield suffered a shoulder injury. During a virtual meeting with his colleagues, he said he needed surgery sooner than planned. He said he then faced 15 minutes of what he viewed as "bullying" from Ms. Gladstone and their executive producer, and which they viewed as him bullying them, according to a spokeswoman.

Eventually, Ms. Gladstone accused Mr. Garfield of "bathing in self-pity," he recalled. He swore at her and slammed his computer shut, he said, calling the incident "an appalling abuse of an employee's health prerogatives." WNYC fired him for violating its anti-bullying policy, and he is starting a newsletter on Substack on Monday.

When I started trying to figure out what was going on inside America's biggest and angstiest public radio station for this week's column, I thought it would be a straightforward story about changing newsroom norms, where nobody — not even on-air talent — is allowed to yell. This is media's "mean-too" moment, as one skeptical tabloid hack put it to me, embodied by the exposés of the producer Scott Rudin.

That is, in fact, part of the story. WNYC's human resources department seems to have its hands full with complaints and counter-complaints of bullying, including those against two prominent women who joined WNYC from sharp-elbowed commercial newsrooms. On Sunday, the company's labor union filed a formal complaint against the station's editor in chief, Audrey Cooper, with the National Labor Relations Board, for reportedly waging a "coordinated and aggressive campaign" against her internal critics. Meanwhile, H.R. is conducting an investigation of one of WNYC's biggest stars, "The Takeaway" host Tanzina Vega, over complaints from her producers.



Audrey Cooper, who is now WNYC's editor in chief, in 2016. The company's labor union filed a complaint against her on Sunday with the National Labor Relations Board.  Jim Wilson/The New York Times

Depending on whom you ask, WNYC is experiencing either an epidemic of bullying or an epidemic of whining.

Case 1.21-cv-05882-LJL Document 13 Filed 07/08/21 Page 52 of 98

WNYC has been turned inward at least since December 2017, when the #MeToo movement flushed out accusations of inappropriate conduct against three prominent male hosts, which led to the exit of top leaders at the station who were criticized for mishandling the accusations. When the new chief executive, Goli Sheikholeslami, arrived in 2019, she said, she did a listening tour and all anyone wanted to talk about was the internal culture.

"When you're a mission-based organization, the people that choose to work here are incredibly passionate and committed to the work that we do," she said in an interview on Friday.

Even by the standards of our fraught media moment, public radio — and the parts of the podcast industry that emerged from it — has been beset by seemingly constant clashes that can be difficult for outsiders to make sense of.

The reasons are partly structural. Audio production makes literal many of the inequalities that journalists complain about: Increasingly diverse teams of young producers labor anonymously in soundproof rooms to make a single host, traditionally a white guy, though that is changing, look good. (It's sort of like TV, but with less camera-ready people and without a fat salary to make up for the indignities.) And radio stations filled with idealists who view themselves as working for the public good are often led by people whose greatest skill is raising millions of dollars from affluent donors.

---

**Today in Business**

**Latest Updates ›**

Updated June 3, 2021

- Bill Ackman's SPAC is close to a deal valuing Universal Music at $40 billion.

- Treasury official sentenced to 6 months in prison for leaking bank reports of Trump associates.

- Biden issues an order banning U.S. investment in firms that aid surveillance and repression.

---

At WNYC, they refer to the period that began in 2017 as The Troubles. The place came apart again last summer after Ms. Sheikholeslami asked staff members what they wanted in a leader, and they asked for a person of color with roots in New York and a connection to public media. Instead, she and the station's chief content officer, Andrew Golis, hired Ms. Cooper, the white editor of The San Francisco Chronicle. Ms. Cooper was welcomed to New York with the headline "WNYC Employees Demanded Diversity. They Got Another White Boss."

Ms. Sheikholeslami became chief executive of WNYC in 2019.
Chicago Public Media

After that Bronx cheer, Ms. Cooper sought to reassure the staff that she would make diversity a priority. She boasted at a large, early meeting of her record of hiring white men at The Chronicle, three people who Zoomed into the virtual gathering said. That wasn't quite what the staff had wanted, either, though, and they were "horrified" at the remark, a cultural critic at the time, Rebecca Carroll, said this week.

Perhaps even worse, Ms. Cooper remarked early on that she'd never heard of Brian Lehrer, the beloved WNYC morning host whose gently probing, public-spirited interviews embody the station's appeal, and that she didn't "get" why he was popular. She has since come to the view that "Brian is the soul of the station and, in many ways, the city itself," a WNYC spokeswoman, Jennifer Houlihan Roussel, said in an email.

In fact, Ms. Cooper's mission was to jump-start the station's lagging digital transformation, something she had done with unusual success in San Francisco and that requires a willingness to make enemies. She has ambitious plans to hire 15 to 20 more reporters — but first she had the near-impossible assignment of bringing together a group of traditional radio journalists, used to working for days and occasionally weeks on colorful local features, with the reporters at Gothamist, the scrappy local blog that WNYC bailed out in 2018. Ms. Cooper sought to professionalize Gothamist away from its bloggy and irreverent roots, telling reporters to be less openly hostile to the New York Police Department in their reporting, two reporters said. Ms. Roussel suggested that Ms. Cooper was trying to rein in Gothamist's habit of adding "an element of editorializing to its coverage that can be interpreted as bias."

6/5/2021                  Case 1:21-cv-05882-NJM-WM Public Radio's Bullying and Humane Resources Page 53 of 98

And Ms. Cooper started pushing the radio journalists to pick up their pace and to file stories for the web. That seemed like a reasonable request, but it led to another stumble in early February, when an 18-year veteran of the radio side, Fred Mogul, filed a story with one paragraph printed in a different font. The editor realized it was Associated Press copy; Ms. Cooper promptly fired Mr. Mogul for plagiarism without a review of whether he'd ever done it before.

Ms. Cooper declined to speak to me about Mr. Mogul's termination. But one thing I learned this week about public radio is that no matter what is happening, someone is always recording it. And that was true when Ms. Cooper called a virtual meeting Feb. 5 over Zoom to inform the full newsroom of her decision to fire Mr. Mogul. According to a copy of the recording provided to me by an attendee, Ms. Cooper told the staffers, "It's totally OK to be sad." But then several stunned radio reporters questioned the move, explaining that they regularly incorporated A.P. copy into stories on air and had imported the practice to WNYC's little-read website, crediting The A.P. at the bottom of the story.

"Go through every single one of our articles and fire all of us, because that is exactly what we have all done," one host, Rebeca Ibarra, told her.

After this article was published online, Mr. Mogul's lawyer, Cynthia Rollings, said in an email that he disputed the accusation that he had misused A.P. copy and said that his draft had included attribution to The A.P. She said Mr. Mogul "has commenced legal action against Audrey Cooper and New York Public Radio for wrongful termination and defamation." (His response to an earlier email seeking comment went to my spam folder.)

On Feb. 10, more than 60 employees — including Mr. Lehrer — signed a letter asking Ms. Cooper to reconsider and calling the firing a "troubling precedent."

Brian Lehrer at the WNYC studios in 2019. His gently probing, public-spirited interviews embody the station's appeal.  Brittainy Newman/The New York Times

Things did not calm down after that. In April, WNYC laid off 14 people as it wrestled with a looming multimillion deficit. Among those let go was another internal critic and union shop steward, Christopher Robbins, and Richard Yeh, a radio veteran who had been quoted in The New York Times as criticizing the selection of Ms. Cooper. That prompted the union's formal charge of retaliation against Ms. Cooper. Ms. Sheikholeslami said the layoffs were simply part of a revamping to move WNYC toward a newsroom in which audio and digital are truly integrated.

Ms. Cooper has told the staff she wants to turn WNYC into the city's news source "of record."

And that may be the biggest challenge of all — not just for WNYC but for all local media in a changing country.

Journalists last week, for instance, faced direct challenges to their legitimacy in two of the country's biggest cities, as politicians sense the political weakness that comes with the lack of racial and ethnic representation in newsrooms. Mayor Lori Lightfoot of Chicago provoked a confrontation by offering interviews only to nonwhite reporters. And a leading candidate for New York mayor, Eric Adams, responded to The Times's investigation of alleged cronyism by suggesting that the media's focus on him was racially motivated.

But it's hard to look outward when you're at war with yourself.

WNYC's other big bet is its podcast studio, whose biggest show is Radiolab, and which, after an auspicious start with shows like 2 Dope Queens and Freakonomics Radio, has struggled for a breakout hit.

There, too, stress levels are high and accusations of bullying are flying in all directions. Ms. Vega, who has been recording from a closet while raising a small child alone through the pandemic, got into a dispute with her producer just before "The Takeaway" was to air on April 22. The tape was, of course, running, and the recording was sent to human resources, which is now investigating, according to two WNYC journalists.

After the blowup, Ms. Vega went right on the air for an interview with an expert that hinted, perhaps, at some of what ails media right now. It went online under the headline "Journalists Are Burning Out."

Case 1:21-cv-05882-CM   Document 1-3   Filed 07/08/21   Page 55 of 98

# EXHIBIT H

## AP: Rescued Long-eared Owl released in Central Park

January 3, 2018

NEW YORK (AP) — Two workers for a company that normally treats birds as pests to be eradicated instead became saviors when they rescued a Long-eared owl that had struck a building in midtown Manhattan.

Barry Beck, vice president of the pest control company Assured Environments, and employee Paul Abbatantuono, spotted the owl lying on a 14th floor setback while responding to a call last week.

The pair wrapped the injured foot-long owl in a fleece jacket and brought her via subway to the Wild Bird Fund , a non-profit that rehabilitates sick and injured wildlife in New York City.

After a couple of days of care, the owl was released in Central Park Monday under a supermoon.

Long-eared owls can be recognized by their distinctive ear tufts that point straight up like exclamation marks.

## NYPR/WNYC: She's Owl Right! Bird Who Hit a Midtown Building Flies Again

Jan 3, 2018 · by Kate Hinds

Several days after colliding with a building in midtown, a long-eared owl is back in the Manhattan treetops.

Barry Beck, vice president of the pest control company Assured Environments, and employee Paul Abbatantuono spotted the owl lying on a 14th floor setback in midtown Manhattan while responding to a call last week. The pair wrapped the injured foot-long owl in a fleece jacket and brought her via subway to the Wild Bird Fund, a non-profit that rehabilitates sick and injured wildlife in New York City.

Rita McMahon, the director of the Wild Bird Fund, says the bird arrived dazed — but that didn't last long.

"The next day she was like 'yeah, I'm ready to go,'" said McMahon. "So we waited one more day...and we wanted to be sure everything was all right."

McMahon says it's possible that the female owl was migrating to the area, and she may very well spend the winter in New York.

"Right now we have more prey than further north," she said, "because a lot of the animals there are hibernating. But here they have better food."

The owl was released into Central Park's Pinetum on Monday under a supermoon.

*(with reporting from the Associated Press)*

## AP: 'Hadestown' leads Tony Award nominations with 14 nods

By MARK KENNEDY April 30, 2019

NEW YORK (AP) — "Hadestown," singer-songwriter Anaïs Mitchell's Broadway debut, earned a leading 14 Tony Award nominations Tuesday, followed by the jukebox musical "Ain't Too Proud," built around songs by the Temptations, which received a dozen nominations.

The musical "Hadestown," which intertwines the myths of Orpheus and Eurydice and Hades and Persephone, bested more familiar names, including stage adaptations of the hit movies "Tootsie" and "Beetlejuice," which both also got best musical nods. The giddy, heartwarming "The Prom" rounds out the best new musical category.

"Hadestown" also was the only new musical on Broadway directed by a woman, Tony Award nominee Rachel Chavkin, who earned another one Tuesday.

"I'm trying not to swear, but I am so proud of the 14 nominations. There is just not a weak spot on the team. There is no place where we haven't all been working our asses off to make this show feel as ancient and as 'now' as possible, simultaneously," she said by phone.

The best-play nominees are the Northern Irish drama "The Ferryman," from Jez Butterworth; James Graham's "Ink," about Rupert Murdoch; Taylor Mac's Broadway debut, "Gary: A Sequel to Titus Andronicus"; Tarell Alvin McCraney's "Choir Boy"; and Heidi Schreck's "What the Constitution Means to Me," a personal tour of the landmark document at the heart of so many American divisions.

Des McAnuff, who directed "Ain't Too Proud," pointed to the timeliness of his musical, which charts the rise, sacrifices and challenges facing the 1950s group that sang "Baby Love" and "My Girl."

"I think when people come to the Imperial Theatre, they'll find that the story is as pertinent now as it was when they lived it," he said. "It applies to Black Lives Matter and what's going on in this country in terms of the tensions today."

## NYPR/NYC: The Tony Nominations Leave Out Some Big Names

Apr 30, 2019 · by Jennifer Vanasco

There were some surprises when the Tony Award nominations were announced Tuesday morning. The biggest was that "To Kill a Mockingbird" didn't earn a best play nomination, though it's been doing well at the box office and has a national tour scheduled.

"Network," beloved by many critics, was also skipped. And Glenda Jackson, taking on the role of King Lear, wasn't nominated for best actress in a leading role. On the other hand, "Ain't Too Proud to Beg" and "Choir Boy" received more nominations than generally expected.

The musical "Hadestown," which intertwines the myth of Orpheus and Eurydice along with that of Hades and Persephone, received 14 nominations, besting more familiar names, including stage adaptations of the hit movies "Tootsie" and "Beetlejuice," which both also got best musical nods. The giddy, heartwarming "The Prom" rounds out the best new musical category.

"Hadestown" also was the only new musical on Broadway directed by a woman, Tony Award nominee Rachel Chavkin, who earned another one Tuesday.

"I'm trying not to swear, but I am so proud of the 14 nominations," she said by phone. "There is just not a weak spot on the team. There is no place where we haven't all been working our asses off to make this show feel as ancient and as 'now' as possible, simultaneously."

Women are generally underrepresented on Broadway. There were only four shows written by women this year: Anais Mitchell wrote the book, music and lyrics for "Hadestown"; Dominique Morriseau wrote the book for "Ain't Too Proud to Beg"; and Heidi Shreck wrote (and stars in) "What the Constitution Means to Me."

It was a strong year for plays, though — there were 21 on Broadway during the 2018-2019 season. The best play nominees are the Northern Irish drama "The Ferryman," from Jez Butterworth; James Graham's "Ink," about Rupert Murdoch; Taylor Mac's Broadway debut, "Gary: A Sequel to Titus Andronicus"; Tarell Alvin McCraney's "Choir Boy"; and Schreck's "Constitution," a personal tour of the

"Tootsie" director Scott Ellis was also recognized for being able to modernize the problematic 1982 film source, about a struggling actor who impersonated a woman to improve his chances of getting a job. The show on Broadway embraces #MeToo and the push for equality.

"We made the decision that we couldn't and didn't want to put the film onstage," Ellis said after his show got 11 nods. "The core of it is still, 'How far will someone go to do what they love?' So that freed us up to explore relationships and how times have shifted and how women are demanding equality."

Theater veterans were surprised to see Aaron Sorkin's adaptation of "To Kill a Mockingbird"; "Hillary and Clinton," about Hillary Clinton's 2008 presidential campaign; and the stage adaptation of the media satire film "Network" not getting best play nods, though they did earn recognition in other categories. Many also expected the celebrated actress Glenda Jackson to be nominated for playing "King Lear" but it was not to be.

McAnuff said it has been a strong season for plays and wildly eclectic. "To me, that's what the American theater's about," he said, adding he was surprised that Sorkin wasn't recognized for his "brilliant" adaptation but "that speaks to the fact that there's so many worthy works out there."

The best original score nomination for "Tootsie" means composer and lyricist David Yazbek could be one step closer to getting back-to-back wins. His show "The Band's Visit" won that same award on its way to being crowned best new musical last year.

Laurie Metcalf got an acting nod for "Hillary and Clinton" and if she wins the Tony this year, she will be the first person to win acting Tonys three years consecutively. (She won in 2018's "Three Tall Women" and "A Doll's House, Part 2" in 2017).

A sweet "Kiss Me, Kate" and a dark "Oklahoma!" make up the best musical revival category; they were the only eligible nominees. The best play revival nominees are "Arthur Miller's All My Sons," "The Boys in the Band," "Burn This," "Torch Song" and "The Waverly Gallery."

Ali Stroker, the first actress who needs a wheelchair for mobility known to have appeared on a

landmark document at the heart of so many American divisions.

Des McAnuff, who directed "Ain't Too Proud," pointed to the timeliness of his musical, which charts the rise, sacrifices and challenges facing the 1950s group that sang "Baby Love" and "My Girl."

"I think when people come to the Imperial Theatre, they'll find that the story is as pertinent now as it was when they lived it," he said. "It applies to Black Lives Matter and what's going on in this country in terms of the tensions today."

A sweet "Kiss Me, Kate" and a dark "Oklahoma!" make up the best musical revival category; they were the only eligible nominees. The best play revival nominees are "Arthur Miller's All My Sons," "The Boys in the Band," "Burn This," "Torch Song" and "The Waverly Gallery."

McAnuff said it has been a strong season for plays and wildly eclectic. "To me, that's what the American theater's about," he said.

The awards will be presented June 9 at Radio City Music Hall in New York City, airing on CBS. James Corden, the host of CBS' "The Late Late Show" and a Tony winner himself, will host. A full list of the nominees is here.

*The Associated Press contributed to this report.*

Broadway stage, earned a Tony nomination for
"Rodgers & Hammerstein's Oklahoma!"

André De Shields earned his third Tony nomination
for playing Hermes in "Hadestown" and is gunning
for his first win in a career spanning 50 years. He
said he felt relief and gratitude for all the support.

"Living the dream is one thing, but if you don't stick
around long enough to enjoy the dream when it
becomes a reality, then what good is the dream?
So here I am. I'm living the dream for a horde of
people," he said.

Nominees for best actor in a play include Paddy
Considine from "The Ferryman," Bryan Cranston in
"Network," Jeff Daniels in "To Kill a Mockingbird,"
Adam Driver from "Burn This" and Jeremy Pope in
"Choir Boy." Pope is also up for a featured role in
"Ain't Too Proud."

The category of best actress in a play includes
Annette Bening in "Arthur Miller's All My Sons,"
Laura Donnelly in "The Ferryman," Elaine May in
"The Waverly Gallery," Janet McTeer in
"Bernhardt/Hamlet," Metcalf in "Hillary and Clinton"
and Schreck from "What the Constitution Means to
Me."

Nominated for best actor in a musical are Brooks
Ashmanskas from "The Prom," Derrick Baskin in
"Ain't Too Proud," Alex Brightman from
"Beetlejuice," Damon Daunno in "Rodgers &
Hammerstein's Oklahoma!" and Santino Fontana in
"Tootsie."

Patrick Page, who has appeared in over a dozen
Broadway shows including "Dr. Seuss' How the
Grinch Stole Christmas!," "The Lion King" and
"Spider-Man: Turn Off the Dark," earned his first
Tony nomination for playing Hades in "Hadestown."

"There have been a lot of times where I have been
in the mix and haven't been nominated. So it's just
a wonderful feeling and frankly a bit of a relief," he
said. "And especially for such a wonderful show."

Nominees for best leading actress in a musical are
Stephanie J. Block in "The Cher Show," Caitlin
Kinnunen and Beth Leavel both in "The Prom," Eva
Noblezada in "Hadestown" and Kelli O'Hara in "Kiss
Me, Kate."

Leavel, who earned a Tony in 2006 for "The Drowsy Chaperone," joked by phone that she paced "about 4 miles" waiting for the live announcement: "I got my steps in!" Her musical, about four fading stars whose desperate need for a new stage leads them to protest a small-town prom, earned seven nods. She expects an especially fun performance Tuesday night following the nominations: "It's just a special evening," she said. "We get to share this moment. It's really cool."

Block, a veteran of Broadway shows such as "The Mystery of Edwin Drood" and "Falsettos," got her third nomination for playing one of three actresses who portray the title character in "The Cher Show."

"Stepping into the life of Cher each night and getting to tell her story eight times a week is a one-of-a-kind experience I will always cherish. This show has truly changed me," she said in a statement.

Hollywood A-listers Cranston, Driver, May and Daniels made the cut but some of their starry colleagues did not, including Kerry Washington, Daniel Radcliffe, Armie Hammer, Ethan Hawke, Joan Allen, Michael Cera, Lucas Hedges and Keri Russell.

For a few theater veterans behind the scenes, the nominations were doubly good: Ann Roth was nominated for creating the costumes for both "Gary: A Sequel to Titus Andronicus" and "To Kill a Mockingbird," while William Ivey Long earned nods for both "Beetlejuice" and "Tootsie."

The awards will be presented June 9 at Radio City Music Hall in New York City, airing on CBS. James Corden, the host of CBS' "The Late Late Show" and a Tony winner himself, will host.

Ephraim Sykes, nominated for best featured actor in a musical for playing David Ruffin in "Ain't Too Proud," couldn't believe he'll be attending the telecast.

"I don't feel quite real right now," he said by phone. "When I heard my name announced, my spirit shook and my body just wanted to shut off. It's almost hard to believe that something like this can really happen."

## AP: Power restored at 46 buildings in NYC housing complex

Jul 29, 2018

NEW YORK (AP) " Power has been restored at New York City housing development where nearly four dozen buildings lost electricity service for a few hours.

The Fire Department of New York says crews were sent to Spring Creek Towers, formerly Starrett City, in Brooklyn's East New York section around 5 a.m. Sunday after all 46 buildings lost power.

WCBS-TV reports a 57-year-old old woman who was on a respirator when the power went out was found dead. Officials tell the station that the machine didn't rely on building power because it ran on its own batteries, and she may have died before the power outage.

Power was restored around 10 a.m. Several people had to be rescued from stalled elevators.

## NYPR/WNYC: Power Restored at NYC Housing Complex Where 46 Buildings Lost Electricity

July 29, 2018 - by Yasmeen Khan

All 15,000 residents of the massive Starrett City apartment complex experienced a power outage starting early Sunday morning, with the outage lasting well into the afternoon for some residents. The East New York complex, which has 46 buildings, has its own power plant separate from Con Edison.

Officials said the power issue was resolved by about 10:00 a.m., but it took several more hours in some cases for buildings to be up and running with electricity.

Beryl Thomas, a home health aide, sat on a bench outside one of the buildings around midday. She was waiting to reach her 78-year-old client who lived on the 17th floor, but the elevator was down.

Thomas said emergency workers climbed the stairs to check on her client and other vulnerable residents. The Fire Department also rescued six people trapped in stalled elevators, according to Brooksville Company, which owns the complex.

WCBS-TV reported a 57-year-old old woman who was on a respirator when the power went out was found dead. Officials told the station that the machine didn't rely on building power because it ran on its own batteries, and she may have died before the power outage.

Multiple residents said they were accustomed to a couple of outages each summer, but they said power issues usually only involved one building at a time and would last for just several minutes — nothing on the scale of Sunday's outage.

Donnie Thomas said his power was restored soon after he woke up on Sunday, though his water was off, putting a kink in his Sunday plans.

"I had planned to go to church and really look spiffy and dressy and everything," said Thomas. "And I was disappointed. Because I get up and everything is so screwed up."

Rebecca Caraballo, president of the Starrett City Tenant Association, said residents had been checking in with her all morning as she sat outside at the complex's flea market.

"I tell people all the time: Keep buckets of water in your bathroom or in your kitchen," said Caraballo. She pressed that workers of the power plant and maintenance crews were quick to respond to issues, however.

Starrett City, which is now called Spring Creek Towers, was purchased by Brooksville Company in May. A spokesman for Brooksville said the company planned to make upgrades to the power plant starting in the fall.

*With reporting from the Associated Press*

**AP: NYC invalidates 3rd graders' test scores amid investigation**
**Jul. 27th, 2015**

NEW YORK — New York City has invalidated the scores of several dozen standardized tests taken by third graders in Harlem amid allegations of testing improprieties by the school's principal.

The principal, 49-year-old Jeanene Worrell-Breeden, killed herself soon after testing was completed at Teachers College Community School. She jumped in front of the train on April 17 and died a few days later.

The allegations were made against her the same day she killed herself.

It was the first year that the school had children old enough to take the tests. They would serve as the school's first official appraisal. Many believed it was prospering.

Officials wouldn't divulge what the allegations were, but said the investigation substantiated the allegations and was closed after she died. They say a report would be issued Monday.

**NYPR/WNYC: NYC Invalidates 3rd Graders' Test Scores Amid Investigation**

Jul 27, 2015 · by Beth Fertig

An internal investigation by New York City's Department of Education found the principal of a Harlem elementary school forged students' answer sheets for this year's state English tests. The investigation was released Monday, following news reports over the weekend.

The principal, Jeanene Worrell-Breeden, 49, killed herself soon after testing was completed at Teachers College Community School. She jumped in front of a subway train on April 17 and died a few days later.

The allegations were made against her the same day she killed herself.

According to the department, the Special Commissioner of Investigations for the public schools received an email complaint on April 17, alleging that Breeden acknowledged forging "multiple answers on multiple students' answer sheets for the Third Grade English Language Arts exam, administered on April 14."

The principal explained to this unnamed complainant "that she had done so because some students have not completed their tests."

The Office of Special Investigations interviewed the complainant and confirmed the allegations in May. But because Breeden died on April 25, no further disciplinary action could be taken and the investigation was closed. An interim principal was appointed.

"This is a difficult time for the TCCS school community, and we will provide ongoing support to students, families, and teachers," department spokeswoman Devora Kaye said in a statement. "Ensuring the integrity of assessments for all New York City students is critical to measuring students' progress and holding schools accountable."

Teachers College Community School is a partnership between the city and the college. The school opened in 2011; this was the first year it had children old enough to take the state tests. It received higher than average marks from teachers and parents on the city's annual survey, and a quality review by department praised "exceptional in-house support services."

Teachers College spokesman Jim Gardner said faculty members collaborated with the elementary school, which is situated on the campus, but it was run by the city. As a result, there was little he could say about the investigation.

"We at TC were shocked and saddened by these events," he said, adding that "because this was and remains an official D.O.E. matter we will continue to refer all questions concerning the investigation to the D.O.E."

However, Nancy Streim, who worked closely with the school as TC's Associate Vice President for School and Community Partnerships, described its environment as one that sought to lower the anxiety around testing. "The school community was well aware that this was the first testing year for the school, but TCCS does not emphasize testing, as one sometimes sees in public schools," she said. "Principal Breeden would often say that if the educators are teaching well every day, then the children will be prepared for the test.

Breeden was a 25-year veteran of the city's public schools, and previously worked as a principal at two other schools. The New York Post reported that she had improperly billed the city for overtime pay while leading a school in the Bronx.

City Councilman Mark Levine, who represents the neighborhood, said in a statement that he remains a strong supporter of the school.

"The wonderful students, parents, and staff of TCCS have built a vibrant and remarkably diverse educational community that has quickly become

one of the most sought-after schools in northern Manhattan," he said. "The tragic nature of Ms. Worrell-Breeden's passing should not in any way detract from that success."

He also cautioned against assuming there was a link between her death and city policy, "until more is known about the circumstances leading up to her final days."

While the city invalidated the third graders' scores they will still move on to fourth grade this fall.

Allegations of grade fixing are pretty rare at such an early grade level. Earlier this month, the principal of John Dewey High School was removed after a city investigation concluded she had engaged in grade inflation.

*With reporting by the Associated Press*

## AP: GOP congressman from New York charged with insider trading

By TOM HAYS August 9, 2018

NEW YORK (AP) — Republican U.S. Rep. Christopher Collins of New York was arrested Wednesday on charges he fed inside information he gleaned from sitting on the board of a biotechnology corporation to his son, helping family and friends dodge hundreds of thousands of dollars in losses when one of the company's drugs failed in a medical trial.

Collins, a staunch supporter of President Donald Trump who was among the first sitting members of Congress to endorse his candidacy for the White House, pleaded not guilty to an indictment unsealed at a court in Manhattan. The indictment charges Collins, his son and the father of the son's fiancee with conspiracy, securities fraud, wire fraud and making false statements to the FBI.

Speaking to reporters in Buffalo hours after his release on bail, Collins, 68, professed his innocence and said he would remain on the ballot for re-election this fall.

"I believe I acted properly and within the law at all times," he said. "I will mount a vigorous defense in court to clear my name. I look forward to being fully vindicated and exonerated."

Prosecutors said the charges stem from Collins' decision to share with his son insider information about Innate Immunotherapeutics Ltd., a biotechnology company headquartered in Sydney, Australia, with offices in Auckland, New Zealand. Collins was the company's largest shareholder, with nearly 17 percent of its shares, and sat on its board.

According to the indictment, Collins was attending the Congressional Picnic at the White House on June 22, 2017, when he received an email from the company's chief executive saying that a trial of a drug the company developed to treat multiple sclerosis was a clinical failure.

## NYPR/WNYC: New York Congressman Indicted on Charges of Insider Trading

Aug 8, 2018 · by Mara Silvers

Republican U.S. Rep. Christopher Collins of western New York state was arrested Wednesday on charges he fed inside information he gleaned from sitting on the board of a biotechnology company to his son, helping themselves and others dodge hundreds of thousands of dollars in losses when bad news came out.

Collins, 68, is a staunch supporter of President Donald Trump who was among the first two sitting members of Congress to endorse his candidacy for the White House.

Prosecutors allege that Cameron Collins, the son of the Republican representative, was also involved in insider trading. The indictment additionally names Stephen Zarksy, the father of Cameron Collins's fiancee, as a defendant.

All three men surrendered to the FBI in Manhattan on Wednesday morning, according to the Southern District. Collins appeared in federal court this afternoon and was released on $500,000 bond.

The indictment mentions six unnamed conspirators who benefited from the information, and alleges that the defendants and their conspirators used insider information about Innate Immunotherapeutics Limited to help avoid more than $768,000 in losses by selling their stock in the company at a prudent time.

The biotechnology company, which is based in Sydney, Australia, failed a trial for a drug developed to treat secondary progressive multiple sclerosis, causing the company's stock to plummet last June. The indictment alleges that Chris and Cameron Collins, as well as Zarksy, advised other shareholders to trade their stock before the "public release of the negative Drug Trial results, and were timed to avoid losses that they would have suffered once that news became public."

Collins responded to the email saying: "Wow. Makes no sense. How are these results even possible???" the indictment said.

It said he then called his son, Cameron Collins, and, after several missed calls, they spoke for more than six minutes.

The next morning, according to the indictment, Cameron Collins began selling his shares, unloading enough over a two-day period to avoid $570,900 in losses before a public announcement of the drug trial results. After the announcement, the company's stock price plunged 92 percent.

Prosecutors said the son passed the information to a third defendant, Stephen Zarsky. Their combined trades avoided more than $768,000 in losses, authorities said. They said Zarsky traded on it and tipped off at least three others.

U.S. Attorney Geoffrey S. Berman, a Republican, said Collins was supposed to keep the trial results secret.

"Instead, he decided to commit a crime," he said. "Representative Collins, who, by virtue of his office, helps write the laws of this country, acted as if the law did not apply to him."

Collins, a conservative first elected in 2012 to represent parts of western New York between Buffalo and Rochester, has vehemently denied wrongdoing. When the House Ethics Committee began investigating the stock trades a year ago, his spokeswoman called it a "partisan witch hunt."

All three defendants pleaded not guilty and were freed on $500,000 bail.

In his Buffalo news conference, Collins acknowledged being disappointed that Innate's drug trials didn't go well.

"We firmly believed we were on the verge of a medical breakthrough," he said.

"We will answer the charges filed against Congressman Collins in court and will mount a vigorous defense to clear his good name," his attorneys, Jonathan Barr and Jonathan New, said in a statement Wednesday. "It is notable that even the government does not allege that Congressman Collins traded a single share of Innate Therapeutics stock. We are confident he will be completely vindicated and exonerated."

The House Ethics Committee has also looked into Collins's involvement with Innate, including allegations that he improperly used his office to advocate for the company's interests. When the committee began investigating the stock trades a year ago, his spokeswoman called it a "partisan witch hunt."

Collins, whose district encompasses a section of western New York State, was first elected to Congress in 2012. He's facing re-election this fall against Democratic challenger Nathan McMurray. McMurray's campaign declined to immediately comment on the charges to WNYC.

*With reporting by the Associated Press. Updated with information about Collins' court appearance at 5 p.m.*

But he said that even after learning of the setback, "I held on to my shares rather than sell them" as the law required.

He said the decision not to sell cost him millions of dollars.

"That's OK," he said. "That's the risk I took."

Collins has remained a vocal Trump supporter, most recently calling for an end to special counsel Robert Mueller's probe into possible campaign collusion and blaming Barack Obama's administration for failing to push back on Russia.

On Wednesday, House Speaker Paul Ryan, a Republican, said he was removing Collins from the House Energy and Commerce Committee, calling insider trading "a clear violation of the public trust."

In a written statement Wednesday, House Minority Leader Nancy Pelosi, D-Calif., said the charges against Collins "show the rampant culture of corruption and self-enrichment among Republicans in Washington today."

Collins ran unopposed in the Republican primary and holds what's largely considered a safe Republican seat in a state that went to Democratic presidential nominee Hillary Clinton in 2016. He's being challenged in November by Democrat Nate McMurray.

McMurray said Collins has brought shame to the region, but he stopped short of saying he should resign.

"That's his decision to make. I'll leave it up to him, but I know what I would do if I was in his place," said McMurray, the town supervisor in the Buffalo suburb of Grand Island.

The advocacy group Public Citizen filed a request for an investigation of Collins' stock dealings with the Office of Congressional Ethics and the Securities and Exchange Commission in January 2017.

Tom Price, who was Trump's first secretary of the Department of Health and Human Services, also came under scrutiny for his purchases of Innate stock while he was a Republican member of Congress from Georgia.

Democrats made an issue of Price's purchase at his Senate confirmation hearings in early 2017, after the Wall Street Journal reported that company officials had said Price was allowed to buy the stocks at a low price. Price, who bought about 400,000 shares of the stock, said he'd learned of the firm through Collins but said the price he received was available to any investor.

Price resigned as health secretary last September under criticism for taking pricey charter flights at taxpayers' expense.

## AP: AC Mayor: State Takeover Plan 'A Fascist Dictatorship'

*February 22, 2016*

*ATLANTIC CITY, N.J. (AP)* — Atlantic City Mayor Don Guardian says a proposed state takeover of his city is "a fascist dictatorship."

He says he is lining up other state lawmakers to introduce a different financial recovery bill that would be a true partnership between the cash-strapped city and the state.

Senate President Steve Sweeney has introduced a bill that would give the state vast control over Atlantic City's finances, including the right to cancel union contracts, sell city assets and land, and declare bankruptcy.

Gov. Chris Christie has supported a state takeover, saying the gambling resort spends too much and needs to get its finances in order.

The mayor says the city could run out of cash within the next two months.

State officials had no immediate response to Guardian's comments.

## WNYC: Atlantic City Mayor Calls State Takeover Plan a 'Dictatorship'

Feb 22, 2016 · by Joseph Capriglione

A plan for the state to take over cash-strapped Atlantic City amounts to a "dictatorship" that would violate the civil rights of city residents, according to Mayor Don Guardian.

The Republican mayor said a bill being pushed by Democratic Senate President Steve Sweeney would usurp all decision-making capabilities from Atlantic City's government and make the mayor's job purely ceremonial.

"I no longer would have any authority to make any decisions over the operation of the city," Guardian told WNYC. "City Council would be stripped of all their financial responsibilities."

Sweeney's proposal gives the state vast control over the gambling resort's finances, including the right to cancel union contracts and sell city assets and land. Gov. Chris Christie has expressed support for a state takeover, saying Atlantic City spends too much money and needs to get its finances in order.

Guardian doesn't disagree with the governor's assessment, and had previously supported a greater degree of state intervention in Atlantic City. He even appeared with the governor and Sweeney at a news conference announcing the state takeover. But Guardian said he changed his mind because he believes the state's current proposal takes too much power away from local officials. He said it could set a dangerous precedent in the state.

"It's a slap in the face to democracy," said Guardian. "If it happens in Atlantic City, it's only a matter of time before it happens to the Patersons and the Newarks and...all the other urban areas in our community."

Guardian said he's trying to line up other state lawmakers to introduce a different financial recovery bill that would represent a true "partnership" between Atlantic City and the state.

Guardian spoke with WNYC's *All Things Considered* host Jami Floyd.

*With reporting from the Associated Press*

## AP: Exec who jacked up price of a lifesaving drug is arrested

TOM HAYS - *December 17, 2015*

NEW YORK (AP) — A boyish-looking entrepreneur who became the new face of corporate greed when he jacked up the price of a lifesaving drug fiftyfold was led away in handcuffs by the FBI on unrelated fraud charges Thursday in a scene that left more than a few Americans positively gleeful.

Martin Shkreli, a 32-year-old former hedge fund manager and relentless self-promoter who has called himself "the world's most eligible bachelor" on Twitter, was arrested in a gray hoodie and taken into federal court in Brooklyn, where he pleaded not guilty. He was released on $5 million bail.

If convicted, he could get up to 20 years in prison. He left court without speaking to reporters. His attorneys had no immediate comment.

Hours later, Shkreli tweeted: "Glad to be home. Thanks for the support."

Online, many people took delight in his arrest, calling him a greedy, arrogant "punk" who gave capitalism a bad name and got what was coming to him. Some cracked jokes about lawyers jacking up their hourly fees 5,000 percent to defend him in his hour of need.

Prosecutors said that between 2009 and 2014, Shkreli lost some of his hedge fund investors' money through bad trades, then looted Retrophin, a pharmaceutical company where he was CEO, for $11 million to pay back his disgruntled clients.

Shkreli "engaged in multiple schemes to ensnare investors through a web of lies and deceit," U.S. Attorney Robert Capers said in a statement.

Shkreli was charged with securities fraud and conspiracy. A second defendant, lawyer Evan Greebel, of Scarsdale, New York, was charged with conspiracy and also pleaded not guilty.

## WNYC: Vilified Pharma CEO Arrested on Fraud Charges

Dec 17, 2015 · by Lee Hernandez

The drug entrepreneur who caused an uproar after raising the price of an HIV drug by more than 5,000 percent has been arrested on securities fraud charges.

Martin Shkreli, CEO of Turing Pharmaceuticals, marked up the price of Daraprim, a 62-year-old drug used to treat people with compromised immune systems.

Bloomberg Business reports his arrest in Manhattan this morning is unrelated to drug costs. It stems from a bio-technology firm he founded called Retrophin, Inc.

"The allegations are essentially that he took funds, both cash and stock from Retrophin, which is a publicly traded company and used that to pay off unrelated business debts," said Bloomberg Business reporter Keri Gieger. "So it's a very simple case of taking money from a company that he was running to pay off debts that he owed to somebody else that was not company related and without the permission of the company."

Calls to an attorney that has represented Shkreli in the past were not immediately returned to the Associated Press.

Shkreli said the company would cut Daraprim's price last month, however, Turing reneged on its pledge. Instead, the company is reducing what it charges hospitals for Daraprim by as much as 50 percent. Most patients' co-payments will be capped at $10 or less a month. But insurance companies will be stuck with the bulk of the tab, potentially driving up future treatment and insurance costs.

Turing, which has offices in New York and Switzerland, bought the U.S. rights to sell Daraprim in August, when it had no competition. Daraprim is one of numerous old drugs with limited competition whose makers have raised prices sharply.

*With reporting from the Associated Press.*

A spokesman for Shkreli released a statement saying he denies the charges and "expects to be fully vindicated."

"It is no coincidence that these charges, the result of investigations which have been languishing for considerable time, have been filed at the same time of Shkreli's high-profile, controversial and yet unrelated activities," said spokesman Craig Stevens.

In September, Shkreli was widely vilified after a drug company he founded, Turing Pharmaceuticals, spent $55 million for the U.S. rights to sell a medicine called Daraprim and promptly raised the price from $13.50 to $750 per pill.

The 62-year-old drug is the only approved treatment for toxoplasmosis, a rare parasitic disease that mainly strikes pregnant women, cancer patients and AIDS patients.

The move sparked outrage on the presidential campaign trail and helped prompt a Capitol Hill hearing on drug prices. Headlines called the Brooklyn-born Shkreli such thing as "America's most hated man," the "drug industry's villain" and "biotech's bad boy" — and those were just some of the more printable names.

Hillary Clinton called it price-gouging and said the company's behavior was "outrageous." Donald Trump called Shkreli "a spoiled brat." Bernie Sanders returned a donation from Shkreli.

Prosecutors said the investigation that led to Shkreli's arrest dated back to last year, before the furor over the drug-price increase.

Shkreli defended the increase by saying that insurance and other programs would enable patients to get the drug and that the profits would help fund research into new treatments.

But he also made an unapologetic business-is-business argument for the price jump.

In fact, he recently said he probably should have raised it more.

"No one wants to say it, no one's proud of it, but this is a capitalist society, a capitalist system and capitalist rules," he said in an interview at the Forbes Healthcare Summit this month. "And my investors expect me to maximize profits, not to minimize them or go half or go 70 percent but to go to 100 percent of the profit curve."

Amid the uproar, Shkreli said Turing would cut the price of Daraprim. Last month, however, Turing reneged. Instead, the company is reducing what it charges hospitals for Daraprim by as much as 50 percent.

While most patients' copayments will be $10 or less a month, insurance companies will be stuck with the bulk of the tab, potentially driving up future treatment and insurance costs.

On Thursday, Robert Weissman, president of the watchdog group Public Citizen, said Shkreli got "a deserved comeuppance."

"Al Capone was brought down for tax evasion, but he committed many worse crimes," Weissman said. "So if Shkreli's arrested for securities violations, it's a comparable justice."

Shkreli is known as a prolific user of Twitter and often livestreams his work day over the Internet, inviting people to chat with him at his desk. He refers to those who follow him online as his "fans."

Recently it emerged that he bought the only copy of a Wu-Tang Clan album titled "Once Upon a Time in Shaolin," which the hip-hop group sold on the condition that it not be released publicly. He said he paid $2 million.

The FBI's New York office said on Twitter that agents did not seize Shkreli's album. Said Capers, the chief federal prosecutor: "We're not aware of how he raised the funds to buy the Wu-Tang album."

Last month, Shkreli was named chairman and CEO of KaloBios Pharmaceuticals after buying a majority stake in the struggling cancer drug developer. After his arrest, its stock fell by more than half Thursday before trading in the company was suspended.

___

Associated Press writers Larry Neumeister and Jennifer Peltz in New York and Linda A. Johnson in Trenton, New Jersey, contributed to this report.

Case 1:21-cv-05882-CM   Document 1-3   Filed 07/08/21   Page 75 of 98

# EXHIBIT I

## AP: 2 Massachusetts residents charged in U.S. Capitol riot

Jan. 19th, 2021

BOSTON (AP) — Two Massachusetts residents, including a town meeting member who organized buses to take Trump supporters to Washington ahead of the siege at the U.S. Capitol, were arrested Tuesday in connection with the riot, authorities said.

Suzanne Ianni, a 59-year-old Natick town meeting member, and Mark Sahady, 46, of Malden, were arrested by federal agents at their homes, the FBI said. They are charged with knowingly entering or remaining in any restricted building or grounds without lawful authority and disorderly conduct on Capitol grounds, authorities said.

Authorities said Ianni is involved with Super Happy Fun America, a group that organized a "straight pride" parade in Boston in 2019 that was meant to be a counterpoint to gay pride parades. She worked with the group to organize buses to take people to Washington ahead of the rally and riot on Jan. 6, authorities said. Sahady is the group's vice president, authorities said in court documents.

Both of them were identified in a picture of a group of people that Super Happy Fun America posted on Twitter with the caption: "Bus 1 of 11 coming to Washington DC See you there!" authorities said. They were also photographed together inside the Capitol, authorities said.

An email seeking comment was sent to Ianni's lawyer. An attorney for Sahady declined to comment.

## WBUR: 2 Mass. Residents Arrested By FBI, Charged In U.S. Capitol Riots

By Deborah Becker

Jan. 19th, 2021

Two Massachusetts residents were arrested by FBI agents Tuesday and charged in connection with the riot at the U.S. Capitol earlier this month.

Suzanne Ianni, 59, of Natick, and Mark Sahady, 46, of Malden, were both charged with disorderly conduct and knowingly entering or remaining in a restricted building or grounds without lawful authority, federal authorities said. Both appeared in Boston federal court Tuesday afternoon.

Sahady was held pending a detention hearing later this week. Ianni was released on her own recognizance under several conditions. Among them, Ianni was to remain in Massachusetts, surrender her passport, undergo mental health treatment and not contact other victims or witnesses in the case. The judge also ordered Ianni not to organize protests or rallies, or go near the State House for "the foreseeable future."

According to the criminal complaint, Ianni, a Natick Town Meeting member, was described as being actively involved with the group "Super Happy Fun America," (SHFA) whose members include far-right provocateurs and who previously organized the so-called "Straight Pride Parade" in Boston in 2019. Sahady is the group's vice president, authorities said in court documents.

Assistant U.S. Attorney for Massachusetts William Bloomer asked that Ianni be ordered to stay

## NBCBoston: Natick Town Meeting Member, Straight Pride Parade Organizer Charged in Capitol Riot

By Marc Fortier and Eli Rosenberg

Published January 19, 2021

Two Massachusetts residents, including a town meeting member who organized buses to take Trump supporters to Washington ahead of the Jan. 6 siege at the U.S. Capitol, were arrested Tuesday in connection with the riot, authorities said.

Natick town meeting member Suzanne Ianni, 59, was arrested Tuesday morning and faces charges of knowingly entering or remaining in any restricted building or grounds without lawful authority and disorderly conduct on capitol grounds, according to the FBI.

Ianni was arraigned in federal court and released on personal recognizance. It's unclear when she's due back in court.

A second Massachusetts resident, Mark G. Sahady, 46, of Malden, was also arrested Tuesday morning on the same two charges, the agency said. Sahady is vice president of Super Happy Fun America, the group that organized the "straight pride" parade in Boston in 2019. He is also a member of the right-wing group "Resist Marxism."

In photos taken on the day of the Capitol riot, the FBI said Ianni and Sahady could be seen among a riotous mob of Trump supporters who stormed the Capitol. One photo showed them both inside the Capitol building.

The FBI said Ianni, who is also a member of Super Happy Fun America, reportedly organized buses taking members of the

away from the State House because "we expect demonstrations there over the next week or so."

Ianni appeared visibly shaken during the remote hearing and agreed to the conditions of her release. Her attorney, Henry Fasoldt, said he consulted with her about the conditions and "in principle" she was not opposed.

U.S. District Court Judge Jennifer Boal said Ianni will have to appear at away from the State House because "we expect demonstrations there over the next week or so."

U.S. District Court Judge Jennifer Boal said Ianni will have to appear at a virtual hearing in Washington, D.C., later this month. She faces up to one year in federal prison, and up to $100,000 in fines.

Both cases will be prosecuted by the U.S. Attorney's Office for the District of Columbia.

An attorney for Sahady, Jane Peachy, pointed out during his court appearance Tuesday that Ianni faced the same charges and was released, adding there was no evidence to suggest Sahady posed a threat.

But Bloomer told the court that because of Sahady's leadership role in SHFA, as well as statements he made when he was arrested Tuesday, the government believed he posed a public safety risk and should be held. Bloomer said Sahady told his mother not to turn over his cell phone and not to allow authorities to search his room.

"This defendant was part of an organized horde that resulted in the murder of a police officer, the deaths of four others and injuries to 60

group from Massachusetts to Washington, D.C., on Jan. 6.

Ianni said in a TV interview that there were 11 buses with about 300 members of the group.

Both Ianni and Sahady were identified in a picture of a group of people that Super Happy Fun America posted on Twitter with the caption: "Bus 1 of 11 coming to Washington DC See you there!" authorities said.

A town meeting member from Natick, Massachusetts, as well as a Malden man are facing charges after photos emerged of them inside the U.S. Capitol during the riot on Jan. 6, according to the FBI.

Ianni did not comment outside federal court in Boston Tuesday. An email seeking comment was sent to her lawyer.

Despite the photographic evidence, Sahady's attorney said he believed the government's case against his client was "weak."

"I think it's a political trial and a travesty of justice," said Sahady's lawyer, Rinaldo Del Gallo. "There is a photo of Mark Sahady in the interior of the Capitol, in an area that is usually open to the public, and that's pretty weak evidence."

Ianni didn't want to talk about her trip to Washington when asked about it outside her house by NBC10 Boston last week.

But other people in town did.

"We're not going to tolerate this," said Natick resident Ben Jackson, who wrote a letter to town officials asking them to explore legal avenues to remove Ianni from her elected position.

others," Bloomer said as he argued for Sahady's detention. He did not suggest conditions for Sahady's release.

Attorney Rinaldo Del Gallo, who will take over representing Sahady after Tuesday, said Sahady did what anyone charged with a federal crime should do and not turn over potential evidence.

"The only evidence is that he organized bus trips and other people did bad things," Del Gallo told the court. "That's not compelling, and it's dangerous because you're punishing people for First Amendment activities."

"Absolutely not," Bloomer interjected.

Del Gallo argued Sahady did not do anything illegal, but was exercising his First Amendment free speech rights on Jan. 6.

"Although I am a progressive Democrat that opposes many things that Mr. Sahady supports, I am a staunch defender of his right to free speech and to voice his political opinion," Del Gallo said in an emailed statement Tuesday. "Mr. Mark Sahady is a war veteran, a patriot and a supporter of President Trump. While these three things may have become unfashionable of late, they are not criminal."

**Photos Of Defendants On Bus To Washington**

In the criminal complaint in the case, FBI Special Agent Brian Gutierrez said law enforcement

He also started a petition that has hundreds of signatures.

A Natick town meeting member is under fire after photos showed her inside the US Capitol.

"She is a member of town government, and it's so important that our town government represents our town well," Jackson said.

Natick's town moderator said there is no provision in the charter for recalling a town meeting member.

The town said it is reviewing its options.

"I don't know that we'll be able to force her out, but I do know that if she chooses to run again, I do know if she chooses to maintain her seat, she will not win re-election," Jackson said. "We will make sure this is her final term in office in Natick."

*The Associated Press contributed to this report.*

obtained information from
Sahady's and Ianni's online posts.

According to court documents,
SHFA made several social media
posts about its plans to be in
Washington, D.C., on Jan. 6.
Authorities said a post to Twitter
showed a photo of Sahady and
Ianni on a bus traveling from
Massachusetts to the nation's
capital.

That post's caption read: "Bus 1 of
11 coming to Washington DC See
you there!" authorities said. Both
Ianni and Sahady were also
photographed together inside the
Capitol, authorities said.

"Open source information further
uncovered that IANNI organized
the buses for Super Happy Fun
America to transport individuals to
Washington, D.C. for the January
6, 2021 event," the criminal
complaint said. "Specifically,
IANNI spoke to a local news
station and was interviewed for a
public article stating that she was
the 'lead organizer of the 11 buses
that left Massachusetts on
Tuesday for the ride to
Washington.' "

Massachusetts U.S. Attorney
Andrew Lelling said the two could
face more charges from his office.
Lelling previously said his office is
looking into any planning for the
U.S. Capitol attack that happened
in Massachusetts.

"If we wanted to charge someone
here in Massachusetts, we'd
basically have to show that they
left here with the intent to cross
state lines to D.C. and engage in

some kind of mayhem in D.C.,"
Lelling told WBUR's *Radio Boston*

Tuesday. "We don't have that with these two defendants — at least not yet. The investigation is still active."

Last week, the Natick Select Board said it had no authority to remove Ianni from her post as a Town Meeting member in response to a petition calling for her dismissal after she posted about her organizing efforts.

Natick Select Board Chair Jonathan Freedman released an email statement in support of the FBI's actions, adding that there should be "accountability for those who acted unlawfully and for the leaders and others who encouraged or supported such actions by words and deeds."

The statement also said that because Town Meeting members are elected by voters, they are not employees who can be removed by town officials. However, Freedman noted that "any future actions that may be contemplated or undertaken by any entity regarding Ms. Ianni's position as a Natick Town Meeting Member will be guided by the applicable legal statutes."

Ben Jackson, a Natick resident who organized the petition drive against Ianni, argued that she should be removed because of her participation in the events in D.C. and because she violated coronavirus safety protocols. Jackson said he hopes the town

takes further action following Ianni's arrest Tuesday.

"It's a great first step," Jackson said. "But it doesn't remove her

from government, so it can't be the last step."

*With additional reporting from The Associated Press*

AP: Dying winds give crews hope in Northern California fires

Sep. 29th, 2020

SAN FRANCISCO (AP) — Easing winds gave California firefighters a break Tuesday as they battled a destructive wildfire that was driven by strong winds through wine country north of San Francisco and another rural blaze that killed three people.

Breezes replaced the powerful gusts that sent the Glass Fire raging through Napa and Sonoma counties Sunday and Monday, scorching more than 66 square miles (170 square kilometers).

At least 95 buildings have burned in wine country, including homes and winery installations. A wildfire burning farther north in rural Shasta County has destroyed another 146 buildings.

The fire in wine country pushed through brush that had not burned for a century, even though surrounding areas were incinerated in a series of blazes in recent years.

As the winds eased Monday evening, firefighters were feeling "much more confident," said Ben Nicholls, a division chief with the California Department of Forestry and Fire Protection, known as Cal Fire.

"We don't have those critical burning conditions that we were experiencing those last two nights," he said.

The Glass Fire in wine country is one of nearly 30 wildfires burning around California. The National Weather Service warned that hot, dry conditions with strong Santa Ana winds could continue posing a fire danger in Southern California through Tuesday afternoon.

In a forested far northern part of the state, more than 1,200 people were evacuated in Shasta County for the Zogg Fire, which has burned at least 62 square miles (160 square kilometers).

Three people have died in the fire, Shasta County Sheriff Eric Magrini said Monday. He gave no details but urged people who receive evacuation orders: "Do not wait."

KQED: Dying Winds Offer Small Hope in All-Out Battle Against Fierce Northern California Blazes

Sep 29, 2020 By Matthew Green

Easing winds gave California firefighters a welcome break Tuesday as crews continued battling a destructive wildfire in wine country that ignited Sunday on the western side of the Napa Valley and burned into Santa Rosa.

Breezes replaced the powerful gusts that sent the Glass Fire raging through Napa and Sonoma counties over the past two days, scorching more than 46,600 acres amid bone-dry conditions. As of Tuesday evening, the blaze was 2% contained.

As winds slowed Monday evening, firefighters were feeling "much more confident," said Cal Fire Division Chief Ben Nicholls. "We don't have those critical burning conditions that we were experiencing those last two nights."

The fire has so far destroyed at least 80 single-family residences — 28 in Sonoma County and 52 in Napa County — and more than 30 other structures, Cal Fire reported Tuesday morning. Nearly 1,500 personnel are currently battling the blaze, including federal and state firefighters, as well as first responders from local departments throughout California.

"I just want to let everyone know that every firefighter that could work, came to work and went to work and most of them are still out there supporting the incident," said Santa Rosa Fire Chief Tony Gossner at a Tuesday morning press briefing. "It's been a long two days for everyone."

"We're going to be in this for a couple of weeks, is my take on this. Which means it's going to be kinda long and it's going to be painful for those that are dealing with it," Gossner added, urging residents to "take a deep breath," heed evacuation warnings and look out for their neighbors.

Fire crews on Tuesday continued to focus their efforts on protecting the densely populated neighborhoods in the east Santa Rosa area along the upper part of Calistoga

Numerous studies in recent years have linked bigger wildfires in America to climate change from the burning of coal, oil and gas. Scientists say climate change has made California much drier, meaning trees and other plants are more flammable.

Residences are widely scattered in Shasta County, which was torched just two years ago by the deadly Carr Fire — infamously remembered for producing a huge tornado-like fire whirl.

The Pacific Gas & Electric utility had cut power to more than 100,000 customers in advance of gusty winds and in areas with active fire zones. The utility's equipment has caused previous disasters, including the 2018 Camp Fire that killed 85 people and devastated the town of Paradise in the Sierra Nevada foothills.

By Monday night, the utility said it had restored electricity to essentially all of those customers. However, PG&E said about 24,000 people remained without power in areas affected by two fires in Napa, Sonoma, Shasta and Tehama counties.

So far in this year's historic fire season, more than 8,100 California wildfires have killed 29 people, scorched 5,780 square miles (14,970 square kilometers) and destroyed more than 7,000 buildings.

The Glass Fire began Sunday as three fires merged and drove into vineyards and mountain areas, including part of the city of Santa Rosa. About 70,000 people were under evacuation orders, including the entire 5,000-plus population of Calistoga in Napa County.

Some people were injured and Sonoma County sheriff's deputies had to rescue people who ignored evacuation orders, officials said.

Sonoma County Supervisor Susan Gorin, who lives in Santa Rosa, said she was stuck in two hours of heavy traffic Monday night to reach safety.

Gorin's home was damaged in another fire three years ago and she was rebuilding it. She saw three neighboring houses in flames as she fled.

Road and the Highway 12 corridor, said Cal Fire Battalion Chief Mark Brunton, noting "good success" establishing fire breaks and containing flames in nearby Trione-Annadel State Park.

The fire had receded considerably on the lower part of Calistoga Road, which he said was "looking pretty good." By Tuesday afternoon, evacuation orders had been downgraded to warnings in a number of nearby Santa Rosa neighborhoods.

In eastern Sonoma County, the fire had reached Sugarloaf Ridge State Park, where crews were working to connect old control lines from the 2017 North Bay fires to block its spread, Brunton said. But ongoing smoky conditions, he added, were continuing to prevent aircraft from supporting suppression efforts.

In rural Napa County, crews on Tuesday were still fighting to protect the community of Angwin, nestled in the steep hills above the Napa Valley, in what Brunton called a "run-and-gun battle" against the blaze as it continued spreading toward Pope Valley, east of Calistoga. All residents in and around the area were ordered that morning to evacuate. Clearer air, however, was allowing aircraft to begin "aggressively" supporting ground crews there, he said.

More than 68,000 people in Sonoma and Napa counties had already been evacuated from their homes as of Monday evening, Cal Fire said, with more evacuations likely in the coming days. On Monday evening, the city of Calistoga in coordination with Napa County, expanded mandatory evacuation orders that now include that entire city.

The Glass Fire is raging through brush that has not burned for a century, even as its flames spread in between areas that were incinerated in a series of massive blazes in recent years.

"This is all unburned vegetation that did not burn in 2017," said Cal Fire Incident Commander Billy See, referring to the devastating Tubbs, Nuns and Adobe fires. "This fire is 42,000 acres of change at this point, sitting in the wildland interface area. Here in California, with all these interface areas, these fires become very disastrous with the amount of structures and populace impacted."

"We're experienced with that," she said of the fires. "Once you lose a house and represent thousands of folks who've lost homes, you become pretty fatalistic that this is a new way of life and, depressingly, a normal way of life, the megafires that are spreading throughout the West."

Gorin said it appeared the fire in her area was sparked by embers from the Glass Fire.

Ed Yarbrough, a wildfire evacuee from St. Helena in Napa County, watched firefighters douse flames across from his house Monday.

"I can see in the distance that it looks like it's intact," he said but said spot fires were still being doused.

"So I know we're not really out of the woods yet, and the woods can burn," he said.

The fires came as the region approaches the anniversary of the 2017 fires, including one that killed 22 people. Just a month ago, many of those same residents were evacuated from the path of a lightning-sparked fire that became the fourth-largest in state history.

"Our firefighters have not had much of a break, and these residents have not had much of a break," said Daniel Berlant, an assistant deputy director with Cal Fire. Officials did not have an estimate of the number of homes destroyed or burned, but the blaze engulfed the Chateau Boswell Winery in St. Helena and at least one five-star resort.

Sonoma County Sheriff Mark Essick acknowledged that many residents in the area have now had to evacuate multiple times in the last three years, and are likely dealing with serious "fire fatigue." "We are nearing the three-year mark of the Tubbs Fire that devastated our community," he said. "[The Glass Fire] is the fourth major fire in our community since 2017."

A Red Flag Warning issued by the National Weather Service for increased fire danger in the area due to hot and windy weather expired late Monday as winds died down, but above-average temperatures are expected to remain for the rest of the week.

The Glass Fire is one of nearly 30 wildfires burning across California. That includes the Zogg Fire, another fierce blaze farther north in rural Shasta County that also ignited on Sunday and has already charred more than 40,300 acres, killed three people and destroyed some 150 structures.

Gov. Gavin Newsom on Monday night issued an emergency proclamation for Napa, Sonoma and Shasta counties. The governor has also declared a statewide emergency due to the widespread fires and extreme weather conditions, activated the State Operations Center to its highest level and signed an executive order to streamline recovery efforts in communities impacted by fires.

Additionally, Newsom said he sent a letter to President Trump requesting a Presidential Major Disaster Declaration to assist state and local wildfire response and recovery efforts in Fresno, Los Angeles, Madera, Mendocino, San Bernardino, San Diego and Siskiyou counties.

The Zogg Fire is burning in a heavily forested area, where more than 1,200 people have been evacuated.

Shasta County Sheriff Eric Magrini on Monday confirmed the deaths of three people in the fire, but offered no details. He strongly urged people who receive evacuation orders to leave immediately: "Do not wait," he warned.

Residences are widely scattered in Shasta County, which was torched just two years ago by the deadly Carr Fire —

So far in this year's historic fire season, more than 8,100 California wildfires have killed 29 people, scorched 5,780 square miles and destroyed more than 7,000 buildings. The causes of the new fires are under investigation.

"It's been a long season," said Billy See, from Cal Fire. "Most of [these firefighters] have been going since the middle of July, without rest, from fire to fire to fire here in the northern part of the state."

*KQED's Lakshmi Sarah contributed to this story, with additional reporting from the Associated Press.*

infamously remembered for producing a huge tornado-like fire whirl.

**AP: Virus testing lab suspended by state after false positives**

**WBUR: State Halts COVID Testing At Orig3n After Hundreds Of False Positives**

Sep. 8th, 2020

Sep. 7th, 2020 - WBUR Newsroom

BOSTON (AP) — A Boston-based coronavirus testing lab that counts dozens of nursing homes among its clients has been suspended by the state after it returned nearly 400 false positive tests, state officials say.

The Massachusetts Department of Public Health opened an investigation in early August after it became aware of an unusually high positive rate of COVID-19 tests reported by Orig3n Laboratory, the agency said in a statement Tuesday.

Retests found at least 383 false positives that were actually negative.

The state late last month notified Orig3n of "three significant certification deficiencies that put patients at immediate risk of harm," including failure of the lab's director to provide overall management and a failure to document the daily sanitizing of equipment used for coronavirus testing.

The state issued the genetics lab a statement of deficiency last Friday, and the lab must now respond with a written plan of correction by Sept. 14, according to the department.

An Orig3n spokesman told Gannett New England, which first reported the story last week, that the false positives were due to "human error" at the beginning of the laboratory testing process that caused some tests to become contaminated.

The spokesperson, Tony Plohoros, said the lab is working with state health officials to correct problems at the facility.

About 60 nursing homes have been clients of the lab, state authorities said.

The state has suspended Boston-based DNA testing firm Orig3n from performing coronavirus tests after it allegedly provided 383 false positives.

The DNA testing lab received emergency authorization from the FDA in April to perform COVID-19 testing. Massachusetts Department of Public Health spokeswoman Ann Scales said the department began looking into Orig3n in early August because the company was reporting an "unusually high positivity rate."

Orig3n has not performed any COVID-19 testing on Massachusetts specimens since Aug. 8, per the state's request.

At the end of last month, DPH shared its findings with Orig3n and named three "significant certification deficiencies" that put patients at risk. DPH found that the lab director failed to provide management, the lab did not include a control material in the extraction phase of testing, and the lab did not adhere to requirements like documenting sanitization of its equipment.

Orig3n is now expected to respond with a plan of correction by Sept. 14, according to DPH, or face sanctions.

An Orig3n spokesman told Gannett New England, which first reported the story last week, that the false positives were due to "human error" at the beginning of the laboratory testing process that caused some tests to become contaminated.

The spokesperson, Tony Plohoros, said the lab is working with state health officials to correct problems at the facility.

About 60 nursing homes have been clients of the lab, state authorities said. Earlier this year, Orig3n donated a thousand coronavirus tests to people experiencing homelessness in Boston.

*With additional reporting from The Associated Press*

## AP: The Latest: US advises travelers to avoid all of China

January 27, 2020

6:30 a.m.

The U.S. State Department says it has ordered it employees in Wuhan to leave the city and is offering seats on a charter flight to U.S. citizens who also want to leave.

State department officials said Monday in a statement that the flight to Ontario, California, is expected to leave Wuhan on Wednesday morning local time. Priority will be given to citizens who are most at risk of contracting the virus

Alaska health officials say the flight is expected to make a refueling stop at Ted Stevens International Airport in Anchorage and that about 240 Americans are expected to be aboard.

The Alaska Department of Health and Social Services says the passengers will be screened for the illness before they leave Wuhan by U.S. and Chinese health officials. Anyone with symptoms will not be allowed to board the aircraft.

The department in a statement says they will be screened again at Anchorage.

## SF Chronicle: US to evacuate staff in Wuhan, center of coronavirus outbreak, on flight to Southern California

by Tatiana Sanchez - Jan. 27, 2020

The U.S. State Department said it plans to evacuate its staff and some private citizens out of the Chinese city of Wuhan — the epicenter of the growing coronavirus outbreak — on a flight to Ontario, California.

The original plan was for the plane to land in San Francisco, but the flight will instead be routed to Southern California.

State department officials said Monday in a statement that the flight to Ontario, California, is expected to leave Wuhan on Wednesday morning local time. Priority will be given to citizens who are most at risk of contracting the virus.

The flight is expected to make a refueling stop at Ted Stevens International Airport in Anchorage, according to Alaska health officials. About 240 Americans are expected to be aboard.

The Alaska Department of Health and Social Services says the passengers will be screened for the illness before they leave Wuhan by U.S. and Chinese health officials. Anyone with symptoms will not be allowed to board the aircraft.

The department in a statement says they will be screened again at Anchorage.

Five people in the United States — two in Southern California and one each in Arizona, Washington state and Illinois — have been diagnosed with the respiratory virus that has killed 81 people and sickened more than 2,700. Symptoms include mild to severe respiratory illness, including fever, cough and difficulty breathing, according to the Centers for Disease Control and Prevention.

While there have been no cases confirmed in the Bay Area, health officials in Alameda County were testing fewer than 10 people for the potentially

deadly illness. The department had no new information to report Sunday, a spokeswoman said.

The CDC confirmed a traveler from Wuhan tested positive for the virus in Southern California, the Orange County Health Care Agency announced late Saturday. The patient, a man in his 50s, is in isolation at a hospital and in good condition, the agency said.

Los Angeles public health officials said Sunday that a person diagnosed and hospitalized there also was a traveler from Wuhan.

The CDC has been screening airplane travelers arriving from Wuhan at five international airports in the United States: San Francisco, Atlanta, Los Angeles, Chicago's O'Hare and New York's John F. Kennedy.

The Associated Press contributed to this report.

*Tatiana Sanchez is a San Francisco Chronicle staff writer. Email:* tatiana.sanchez@sfchronicle.com *Twitter:* @TatianaYSanchez

## AP: Factories pivot to fight coronavirus, but challenges abound

By TOM KRISHER - March 21, 2020

DETROIT (AP) — Factories that crank out cars and trucks looking into making much-needed ventilators. Distilleries intended for whiskey and rum to instead turn out hand sanitizers and disinfectants. And an electronics maker that builds display screens repurposed for surgical masks.

All are answering the call of duty amid a pandemic that has so far claimed more than 11,000 lives and sickened 260,000 people globally.

But redirecting plants to make completely different products will take a long time and a huge effort — possibly too long for some companies to help with medical gear shortages that are becoming more acute every day.

"When you are repurposing a factory, it really depends on how similar the new product is to the existing products in your product line," said Kaitlin Wowak, a professor at the University of Notre Dame who focuses on industrial supply chains. "It's going to be a substantial pivot to start producing an entirely different item."

On Friday, President Donald Trump said he invoked the Korean War-era Defense Production Act, which allows the government to marshal the private sector to fight the COVID-19 pandemic. But he did not give examples as to how he was using it.

At a news conference Saturday, Trump singled out GM and Ford as among the many businesses that have asked to start making medical gear like ventilators, the need for which he said has grown into the hundreds of thousands.

"Nobody's ever heard of a thing like that. With that being said, General Motors, Ford, so many companies — I had three calls yesterday directly, without having to institute like `You will do this' — these companies are making them right now," Trump said.

Neither automaker, however, is building ventilators at present. GM announced on Friday that it is working with ventilator maker Ventec Life Systems

## Facebook, Flexport among Bay Area companies donating medical equipment

Janelle Bitker, Rachel Swan by March 22, 2020

Bay Area health care workers have been pleading for more protective gear, saying some hospitals are forcing them to reuse masks because the nation is running out. A few local companies have responded with massive donations.

They range from the famous, like Facebook, the giant Menlo Park social network, to the less well known, like Flexport, a San Francisco startup ideally positioned to assist because its software helps with global supply chains.

Facebook has already donated 375,000 masks and 867,000 pairs of gloves to county officials in Alameda, Contra Costa, Marin, San Francisco, San Mateo, Santa Clara and Santa Cruz counties, who are expected to distribute them to hospitals.

"As the situation continues to change, our commitment to our community will only get stronger," Facebook chief operating officer Sheryl Sandberg wrote to employees in an internal memo Saturday.

Last week, Flexport donated 60,000 masks and other supplies to San Francisco health care workers, and Pacific Gas and Electric Co. said it would donate 950,000 masks to hospitals across the state.

Facebook also said it has donated $650,000 worth of food to more than a dozen Bay Area senior centers, schools and other organizations, including Food Runners SF, Peninsula Volunteers Meals on Wheels and the East Palo Alto Senior Center. Meanwhile, the company sent $250,000 to the Sequoia Union High School District in San Mateo County to pay for 2,000 Wi-Fi hotspots and a year of Wi-Fi for low-income students who need to complete their work online during shelter in place but don't have a reliable connection.

The company, which is the dominant employer in its headquarters city but also has large offices in San Francisco, Mountain View and other Bay Area cities, also pledged to give $500,000 to multiple

to ramp up production. The automaker said it would help with logistics, purchasing and manufacturing, but stopped short of saying it would make ventilators in its own factories, which have been idled for two weeks after workers who'd been fearful of contagion put pressure on the company.

Crosstown rival Ford, which also suspended factory production along with other automakers with operations in North America, confirmed that it too was in discussions with the Trump administration about helping.

"We're looking at feasibility," Ford spokesman T.R. Reid said. "It may be possible, but it's not you go from Rangers (small pickups) one day to ventilators the next. We're figuring out what is possible now."

Ford and Rolls-Royce PLC also are working with the British government to see if they can switch over their factories.

"We are keen to do whatever we can to help the government and the country at this time and will look to provide any practical help we can," Rolls-Royce said in a statement.

Although the government can steer factories to overcome shortages, makers of heavy goods such as cars and trucks can't just flip a switch and produce something else.

It would be difficult to get ventilator or even surgical mask designs, line up parts supplies and train workers to make them in a short period, said Jorge Alvarado, a professor in the Engineering Technology and Industrial Distribution Department at Texas A&M University. And auto plants generally aren't clean enough to make medical equipment.

Companies also would have to find mask or ventilator manufacturers willing to share knowledge, expertise and even factory workers to transfer production elsewhere, Alvarado said.

During World War II, automakers were more easily able to shift to making tanks and planes because they are close relatives to cars and trucks, Alvarado said. Auto factory equipment such as robots and assembly lines aren't really compatible with smaller items such as ventilators, he said.

homelessness prevention organizations in the Bay Area — and promised more local support.

"We greatly appreciate Facebook's support in helping us to make sure our front-line health workers are protected as they do the critical work to save lives," said San Francisco Mayor London Breed. "I'm proud that the city is coming together in the face of this unprecedented crisis, and I know we will get through this incredibly challenging time."

The donation from Flexport, which uses software to make international trade more efficient, includes 60,000 surgical masks, 34,000 gloves, 2,000 surgical gowns and 50 thermometers. Breed announced the delivery Saturday in conjunction with Supervisor Catherine Stefani, who served as an intermediary.

Officials said they would put the supplies to immediate use in San Francisco's Emergency Operations Center.

"Our front-line health care workers and first responders are doing heroic work to protect people and save lives during this crisis," Breed said, noting the need for more equipment as the city braces for a surge of COVID-19 cases.

Hospitals throughout the country are confronting a scarcity of masks and other gear, which became so dire in Washington state that medical workers made 500 masks out of vinyl, tape, foam and elastic purchased at Home Depot. The Centers for Disease Control and Prevention updated its guidelines, allowing workers to use bandannas, scarves and homemade masks as a last resort.

Experts cited several reasons for the shortage, including the rapidly spreading virus — which quickly stripped hospitals of their supplies — and a consumer buying spree. Also, hospitals rely on manufacturers from China and Italy for their supplies, said Brent Andrew, spokesman for San Francisco General. Both countries were hit hard by the coronavirus, which led to disruptions.

In San Francisco and elsewhere, concerned citizens have rallied hospital donations online while elected officials work behind the scenes.

"I was thrilled — but not surprised — to hear that Flexport is stepping up to deliver thousands of much-needed surgical gowns, gloves, masks, and

Other industries may be better equipped to help with the virus. Rum producer Bacardi, for example, said its distillery in Puerto Rico has shifted to making ethanol needed to produce hand sanitizer. Small U.S. distilleries such as Eight Oaks Farm in Pennsylvania are converting operations to make alcohol-based disinfectant. It will charge whatever people want to donate.

Germany-based Beiersdorf, known for skin care products such as the Nivea and Coppertone brands, and Luxury giant LVMH are preparing to make medical disinfectants in Europe for hospitals, police and firefighters. French cosmetics giant L'Oreal says it is making sanitizer gel.

Electronics maker Sharp Corp. said it will start making surgical masks using a plant in central Japan that usually makes displays. And Michigan-based office furniture company Steelcase is exploring ways to use its factories to make health care items, studying whether it can make masks and protective equipment or partitions for hospitals.

"This is an extraordinary crisis that necessitates extraordinary measures and actions from both the public and private sectors," the company said in a statement.

Even though it may take time and a monumental effort to switch factories to medical products, that may have to be done if the virus outbreak lasts for several months or longer, said Notre Dame's Wowak.

"I think given the circumstance and how critical it is for these surgical masks, ventilators and gloves, I think there is going to be a lot of organizations, government, private, trying to increase (factory) capacity," she said. "Maybe the government recognizes how critical of an issue this is."

more to our local efforts to flatten the curve," Stefani said. "When we all step up, there's no challenge too great for San Francisco."

Around the country, factories that crank out cars and trucks were looking into making much-needed ventilators. Distilleries intended for beer, whiskey and rum transformed to instead turn out hand sanitizers and disinfectants. And an electronics maker that builds display screens was repurposed for surgical masks.

All are answering the call of duty amid a pandemic that has so far claimed more than 14,000 lives and sickened 335,000 people globally.

But redirecting plants to make completely different products will take a long time and a huge effort — possibly too long for some companies to help with medical gear shortages that become more acute every day.

"When you are repurposing a factory, it really depends on how similar the new product is to the existing products in your product line," said Kaitlin Wowak, a professor at the University of Notre Dame who focuses on industrial supply chains. "It's going to be a substantial pivot to start producing an entirely different item."

On Friday, President Trump said he invoked the Korean War-era Defense Production Act, which allows the government to marshal the private sector to fight the COVID-19 pandemic. But he did not give examples as to how he was using it.

No automakers, however, are building ventilators at present. GM announced on Friday that it is working with ventilator maker Ventec Life Systems to ramp up production. The automaker said it would help with logistics, purchasing and manufacturing, but stopped short of saying it would make ventilators in its own factories, which have been idled for two weeks after workers who'd been fearful of contagion put pressure on the company.

Crosstown rival Ford, which also suspended factory production along with other automakers with operations in North America, confirmed that it too was in discussions with the Trump administration about helping.

"We're looking at feasibility," Ford spokesman T.R. Reid said. "It may be possible, but it's not 'you go

from Rangers (small pickups) one day to ventilators the next.' We're figuring out what is possible now."

Other industries may be better equipped to help with the virus. Rum producer Bacardi, for example, said its distillery in Puerto Rico has shifted to making ethanol needed to produce hand sanitizer. Anheuser-Busch said Saturday it would start producing and distributing sanitizer.

Even though it may take time and a monumental effort to switch factories to medical products, that may have to be done if the virus outbreak lasts for several months or longer, said Notre Dame's Wowak.

"I think given the circumstance and how critical it is for these surgical masks, ventilators and gloves, I think there is going to be a lot of organizations, government, private, trying to increase (factory) capacity," she said. "Maybe the government recognizes how critical of an issue this is."

*San Francisco Chronicle staff writer Dominic Fracassa and the Associated Press contributed to this report.*

*Janelle Bitker and Rachel Swan are San Francisco Chronicle staff writers. Email: janelle.bitker@sfchronicle.com, rswan@sfchronicle.com Twitter: @janellebitker, @rachelswan*

AP: Amazon looks to self-driving future by acquiring Zoox

By JOSEPH PISANI and TOM KRISHER

June 26, 2020

NEW YORK (AP) — Amazon said Friday that it is buying self-driving technology company Zoox, which is developing an autonomous vehicle for a ride-hailing service that people would request on their phones.

Seattle-based Amazon did not disclose how much it is paying for Zoox, which was founded six years ago in Foster City, California. Analysts pegged the purchase price at over $1 billion.

The online retailing giant said Zoox will keep running as a separate business and continue to develop its own autonomous vehicle.

"We're excited to help the talented Zoox team to bring their vision to reality in the years ahead," said Amazon's Jeff Wilke, who runs the company's retail business.

The deal could drive Amazon into an entirely new business: transporting people from one place to another. But some industry analysts think Amazon's ultimate goal is to repurpose the Zoox vehicle for its core business, delivering packages to shoppers.

"My guess would be in the near term that Amazon is probably more interested in taking that platform and adapting it as an alternative or complement to its existing fleet of delivery vans," said Sam Abuelsamid, principal analyst for Guidehouse Insights, who follows autonomous vehicle developments.

Abuelsamid said Zoox has a good autonomous system and was planning to deploy a ride-hailing service next year. It's also building its own vehicle that can travel in two directions — both ends can be the front and the back — making it ideal for urban deliveries. He sees Amazon converting the small vehicles into mobile lockers that would stop at

SF Chronicle: Bay Area self-driving startup Zoox bought by Amazon for reported $1.2 billion

Jun. 26th, 2020

Amazon announced Friday it is buying Bay Area self-driving-car startup Zoox, as the internet giant makes its strongest foray yet into the autonomous vehicle market.

The 6-year-old Foster City company will continue to run as a stand-alone business. CEO Aicha Evans and co-founder and Chief Technical Officer Jesse Levinson will remain at the helm.

"Amazon's support will markedly accelerate our path to delivering safe, clean, and enjoyable transportation to the world," Levinson said in an announcement on an Amazon blog.

The announcement did not disclose the terms of the deal, but the Financial Times previously reported that it would cost Amazon $1.2 billion, a price also cited by Crunchbase.

"Zoox is working to imagine, invent, and design a world-class autonomous ride-hailing experience," Jeff Wilke, Amazon's CEO of global consumer, said in the announcement.

The deal could drive Amazon into an entirely new business: transporting people from one place to another. But some analysts think Amazon's ultimate goal is to repurpose the Zoox vehicle for its core business, delivering packages to shoppers.

Sam Abuelsamid, principal analyst for Guidehouse Insights, who follows autonomous vehicle developments, says Zoox has a good autonomous system and was planning to deploy a ride-hailing service next year.

"My guess would be in the near term that Amazon is probably more interested in taking that platform and adapting it as an alternative or complement to its existing fleet of delivery vans," Abuelsamid said.

Zoox also is building its own vehicle that can travel in two directions, making it ideal for urban

delivery sites for people to pick up packages.

Amazon didn't directly answer a question about whether autonomous package delivery is its goal, but said Zoox would "continue working toward their mission to transform mobility as a service by developing a fully autonomous, purpose built vehicle."

The company cautioned that widespread use of autonomous vehicles is still years away and will require a substantial capital investment in a crowded field. The deal puts Amazon, which has grown rapidly from its start as an online bookseller 25 years ago, in competition with Google's self-driving technology spinoff called Waymo, and General Motors' Cruise autonomous vehicle unit.

Autonomous delivery would fit with Amazon's plans to deliver more of its packages on its own and rely less on UPS and the U.S. Postal Service. In recent years it has expanded its fleet of planes, built package sorting hubs at airports and launched a program that lets people start businesses that deliver packages in vans stamped with the Amazon logo.

The investment could complement the $700 million that Amazon put into electric vehicle startup Rivian in 2019. Rivian, with operations in suburban Detroit and California, has a contract to make 100,000 electric delivery vans for Amazon. The company also has a factory in Normal, Ill., with extra capacity that could be used to build the Zoox vehicles for Amazon, Abuelsamid said.

Amazon's acquisition changes the landscape in the autonomous vehicle business by bringing in a deep-pocketed competitor, Abuelsamid said. It increases pressure on smaller companies that are building delivery vehicles, he said.

The Zoox acquisition isn't Amazon's first foray into autonomous vehicles. Early in 2019, it joined other investors in a $530 million stake in Aurora Innovation. Aurora recently has focused on a self-driving system for heavy trucks.

Amazon has used autonomous technology to get orders to shoppers: self-driving robots shuffle products around its warehouses and a cooler-sized

deliveries. Abuelsamid sees Amazon converting the small vehicles into mobile lockers that would stop at delivery sites for people to pick up packages.

Zoox is not Amazon's first venture into the autonomous vehicle area: The company sank $700 million into electric vehicle startup Rivian last year.

The Chronicle reported in January that Zoox had recruited 700 engineers from well-known tech companies and reached a private market valuation of $3.2 billion. Since then, however, Zoox — like most other companies — has had to navigate economic challenges caused by the coronavirus pandemic. In April, Zoox cut about 10% of its workforce, according to The Information.

The deal puts Amazon in competition with Google's self-driving technology spin-off called Waymo, and General Motors' Cruise autonomous vehicle unit.

Autonomous delivery would fit with Amazon's plans to deliver more of its packages on its own and rely less on UPS and the U.S. Postal Service.

Amazon has already used autonomous technology to get orders to shoppers: Self-driving robots shuffle products around its warehouses, and a cooler-size robot with six wheels has delivered orders in a Seattle suburb. It's also working on self-piloted drones that fly small goods to customers' homes.

*The Associated Press contributed to this report.*

Chase DiFeliciantonio is a San Francisco Chronicle staff writer. Email: chase.difeliciantonio@sfchronicle.com Twitter: chasedefelice

FILED: NEW YORK COUNTY CLERK 06/15/2021 03:57 PM
NYSCEF DOC. NO. 19
Case 1:21-cv-05882-CM   Document 1-3   Filed 07/08/21   Page 95 of 98

INDEX NO. 652968/2021
RECEIVED NYSCEF: 06/15/2021

robot with six wheels has delivered orders in a Seattle suburb. It's also working on self-piloted drones that fly small goods to customers' homes.

The deal comes at a time when the power of Amazon and other technology stalwarts such as Google, Facebook and Apple have drawn increasing scrutiny from U.S. lawmakers and antitrust regulators. The pandemic-stricken economy is making it more difficult for startups to raise money to continue work, creating opportunities for the industry's still-thriving giants to make acquisitions at bargain prices.

Privately held Zoox received $990 million in funding from investors, according to Crunchbase, which tracks investments in startups.

____

AP Technology Writer Michael Liedtke contributed from San Ramon, California. Krisher reported from Detroit.

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840
(rev. 07/29/2019)

New York Supreme COURT, COUNTY OF New York

Index No: 652968/2021          Date Index Issued: 05/05/2021

| | **For Court Use Only:** |
|---|---|

**IAS Entry Date**

| **CAPTION** | Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet. |
|---|---|

Fred Mogul

**Judge Assigned**

Plaintiff(s)/Petitioner(s)

-against-

New York Public Radio, WNYC, Audrey Cooper

**RJI Filed Date**

Defendant(s)/Respondent(s)

## NATURE OF ACTION OR PROCEEDING: Check only one box and specify where indicated.

### COMMERCIAL

- ☐ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ☒ Contract
- ☐ Insurance (where insurance company is a party, except arbitration)
- ☐ UCC (includes sales and negotiable instruments)
- ☐ Other Commercial (specify): _____

**NOTE:** For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the **COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C)**.

### REAL PROPERTY:   Specify how many properties the application includes: _____

- ☐ Condemnation
- ☐ Mortgage Foreclosure (specify):   ☐ Residential   ☐ Commercial

  Property Address: _____

  **NOTE:** For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the **FORECLOSURE RJI ADDENDUM (UCS-840F)**.

- ☐ Tax Certiorari - Section:          Block:          Lot:
- ☐ Tax Foreclosure
- ☐ Other Real Property (specify): _____

### OTHER MATTERS

- ☐ Certificate of Incorporation/Dissolution   [see **NOTE** in **COMMERCIAL** section]
- ☐ Emergency Medical Treatment
- ☐ Habeas Corpus
- ☐ Local Court Appeal
- ☐ Mechanic's Lien
- ☐ Name Change
- ☐ Pistol Permit Revocation Hearing
- ☐ Sale or Finance of Religious/Not-for-Profit Property
- ☐ Other (specify): _____

### MATRIMONIAL

- ☐ Contested

  **NOTE:** If there are children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum (UCS-840M)**.

  For Uncontested Matrimonial actions, use the Uncontested Divorce RJI **(UD-13)**.

### TORTS

- ☐ Asbestos
- ☐ Child Victims Act
- ☐ Environmental (specify): _____
- ☐ Medical, Dental, or Podiatric Malpractice
- ☐ Motor Vehicle
- ☐ Products Liability (specify): _____
- ☐ Other Negligence (specify): _____
- ☐ Other Professional Malpractice (specify): _____
- ☐ Other Tort (specify): _____

### SPECIAL PROCEEDINGS

- ☐ CPLR Article 75 (Arbitration)   [see **NOTE** in **COMMERCIAL** section]
- ☐ CPLR Article 78 (Body or Officer)
- ☐ Election Law
- ☐ Extreme Risk Protection Order
- ☐ MHL Article 9.60 (Kendra's Law)
- ☐ MHL Article 10 (Sex Offender Confinement-Initial)
- ☐ MHL Article 10 (Sex Offender Confinement-Review)
- ☐ MHL Article 81 (Guardianship)
- ☐ Other Mental Hygiene (specify): _____
- ☐ Other Special Proceeding (specify): _____

## STATUS OF ACTION OR PROCEEDING:   Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | | |
|---|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ☒ | ☐ | If yes, date filed: | 05/05/2021 |
| Has a summons and complaint or summons with notice been served? | ☒ | ☐ | If yes, date served: | 05/13/2021 |
| Is this action/proceeding being filed post-judgment? | ☐ | ☒ | If yes, judgment date: | |

## NATURE OF JUDICIAL INTERVENTION:   Check one box only and enter additional information where indicated.

- ☐ Infant's Compromise
- ☐ Extreme Risk Protection Order Application
- ☐ Note of Issue/Certificate of Readiness
- ☐ Notice of Medical, Dental, or Podiatric Malpractice     Date Issue Joined: _____
- ☐ Notice of Motion     Relief Requested: _____     Return Date: _____
- ☐ Notice of Petition     Relief Requested: _____     Return Date: _____
- ☐ Order to Show Cause     Relief Requested: _____     Return Date: _____
- ☐ Other Ex Parte Application     Relief Requested: _____
- ☐ Poor Person Application
- ☒ Request for Preliminary Conference
- ☐ Residential Mortgage Foreclosure Settlement Conference
- ☐ Writ of Habeas Corpus
- ☐ Other (specify): _____

**RELATED CASES:** List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PARTIES:** For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**.

| Un-Rep | Parties (List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant; 3rd party plaintiff, etc.) | Attorneys and/or Unrepresented Litigants (For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email.) | Issue Joined (For each defendant, indicate if issue has been joined.) | Insurance (For each defendant, indicate insurance carrier, if applicable.) |
|---|---|---|---|---|
| ☐ | Name: Mogul, Fred<br><br>Role(s): Plaintiff/Petitioner | LUNA DROUBI, Beldock Levine & Hoffman LLP, Beldock Levine & Hoffman LLP 99 Park Avenue, PH/26th Floor, New York, NY 10016, 2122775875, ldroubi@blhny.com | ☒ YES ☐ NO | |
| ☐ | Name: New York Public Radio<br><br>Role(s): Defendant/Respondent | WENDY BUTLER, JONES DAY, 250 VESEY ST. , NEW YORK, NY 10281, wbutler@jonesday.com | ☐ YES ☒ NO | |
| ☐ | Name: WNYC<br><br>Role(s): Defendant/Respondent | WENDY BUTLER, JONES DAY, 250 VESEY ST. , NEW YORK, NY 10281, wbutler@jonesday.com | ☐ YES ☒ NO | |
| ☐ | Name: Cooper, Audrey<br><br>Role(s): Defendant/Respondent | WENDY BUTLER, JONES DAY, 250 VESEY ST. , NEW YORK, NY 10281, wbutler@jonesday.com | ☐ YES ☒ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated:  06/15/2021

_____          _____
                                           LUNA DROUBI
                                             Signature

_____          _____
        5004304                          LUNA DROUBI
Attorney Registration Number              Print Name

*This form was generated by NYSCEF*

UCS-840C
3/2011

**SUPREME COURT OF THE STATE OF NEW YORK**

**COUNTY OF** New York

|  |
|---|
| X |

Fred Mogul

**Plaintiff(s)/Petitioner(s)**

-against-

New York Public Radio, WNYC, Audrey Cooper

**Defendant(s)/Respondent(s)**
X

**Index No:** 652968/2021

**RJI No. (if any):**

## COMMERCIAL DIVISION

**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

- ☒ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

- ☐ Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

- ☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

- ☐ Shareholder derivative actions — without consideration of the monetary threshold

- ☐ Commercial class actions — without consideration of the monetary threshold

- ☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

- ☐ Internal affairs of business organizations

- ☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

- ☐ Environmental insurance coverage

- ☐ Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

- ☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

- ☐ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) and (c).**

**Dated:** 06/15/2021

LUNA DROUBI

**SIGNATURE**

LUNA DROUBI

**PRINT OR TYPE NAME**

*This form was generated by NYSCEF*