# EXHIBIT 1

AGREEMENT

by and between

NEW YORK PUBLIC RADIO

and

SCREEN ACTORS GUILD –
AMERICAN FEDERATION OF TELEVISION AND
RADIO ARTISTS, NEW YORK LOCAL

effective

JULY 1, 2018 through JUNE 30, 2022

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS | 4 |
| ARTICLE II | RECOGNITION | 5 |
| ARTICLE III | UNION SECURITY AND CHECK OFF | 7 |
| ARTICLE IV | PERFORMANCE OF BARGAINING UNIT WORK BY OTHERS | 8 |
| ARTICLE V | EMPLOYER RIGHTS | 9 |
| ARTICLE VI | EMPLOYEE LISTS | 10 |
| ARTICLE VII | PROBATIONARY PERIOD | 10 |
| ARTICLE VIII | COMPENSATION | 11 |
| ARTICLE IX | HOURS | 14 |
| ARTICLE X | OVERTIME AND NIGHT SHIFT DIFFERENTIAL | 14 |
| ARTICLE XI | TEMPORARY UPGRADES | 16 |
| ARTICLE XII | HOLIDAYS | 19 |
| ARTICLE XIII | ANNUAL LEAVE | 21 |
| ARTICLE XIV | SICK LEAVE | 23 |
| ARTICLE XV | SHORT TERM DISABILITY | 25 |
| ARTICLE XVI | PARENTAL LEAVE | 26 |
| ARTICLE XVII | OTHER PAID LEAVES | 29 |
| ARTICLE XVIII | LEAVE WITHOUT PAY | 31 |
| ARTICLE XIX | HEALTH AND RETIREMENT | 32 |
| ARTICLE XX | TAX SHELTER ANNUITY | 34 |
| ARTICLE XXI | GRIEVANCE AND ARBITRATION PROCEDURE | 34 |
| ARTICLE XXII | DISCIPLINARY MEETINGS | 35 |
| ARTICLE XXIII | LAYOFFS/SEVERANCE | 35 |
| ARTICLE XXIV | BULLETIN BOARDS | 38 |
| ARTICLE XXV | UNION ACCESS AND RELEASE TIME | 39 |
| ARTICLE XXVI | HOSTS AND REPORTERS | 40 |
| ARTICLE XXVII | REPORTER/PRODUCER | 42 |
| ARTICLE XXVIII | EDITORIAL PROCESS PROTECTIONS | 42 |
| ARTICLE XXIX | CAREER DEVELOPMENT | 43 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| ARTICLE XXX | PERFORMANCE STATEMENTS AND PERSONNEL FILES | 43 |
| ARTICLE XXXI | POSTING | 44 |
| ARTICLE XXXII | NO STRIKE/NO LOCKOUT | 45 |
| ARTICLE XXXIII | PERFORMANCE OF WORK FOR UNCOVERED ENTITIES | 45 |
| ARTICLE XXXIV | USE OF INTERNET/OTHER PLATFORMS | 45 |
| ARTICLE XXXV | MINIMUM TERMS | 46 |
| ARTICLE XXXVI | LABOR MANAGEMENT COMMITTEE | 46 |
| ARTICLE XXXVII | PART TIME EMPLOYEES | 47 |
| ARTICLE XXXVIII | TEMPORARY AND PER DIEM EMPLOYEES | 47 |
| ARTICLE XXXIX | GROUP RECOGNIZED IN DECEMBER 2018 | 52 |
| ARTICLE XL | DURATION | 54 |
| ARTICLE XLI | SAVINGS CLAUSE | 54 |
| SIDELETTER #1 | RE: GRANDFATHERED MEDICAL AND TAX SHELTERED ANNUITY | 56 |
| SIDELETTER #2 | RE: ENGINEERS COMP TIME | 59 |
| SIDELETTER #3 | RE: PRODUCTIVITY BONUS | 61 |
| SIDELETTER #4 | RE: EMPLOYEE CONTRIBUTIONS ON PRE-TAX BASIS | 63 |
| SIDELETTER #5 | RE: HIGH DEFINITION RADIO | 65 |
| SIDELETTER #6 | RE: VOICE TRACKING | 67 |
| SIDELETTER #7 | RE: NON-DISCRIMINATION | 69 |
| SIDELETTER #8 | RE: REPORTER II SALARY CONVERSION | 71 |
| SIDELETTER #9 | RE: RESERVATION OF RIGHTS REGARDING WNYC STUDIOS | 73 |
| INTERNET JURISDICTION AGREEMENT | | 75 |

-- 3 --

4837-5797-4450.1

**AGREEMENT**

**AGREEMENT**, made and entered into effective as of the 1st day of July, 2018, by and between New York Public Radio, 160 Varick Street, New York, New York 10013, organized under the laws of the state of New York (the "Employer," "Company," or "NYPR") and Screen Actors Guild - American Federation of Television and Radio Artists, New York Local, 1900 Broadway, New York, New York 10023 (the "Union" or "SAG-AFTRA") effective July 1, 2018 to and including June 30, 2022.

**WHEREAS**, the Employer and the Union have entered into collective bargaining and desire to reduce the results thereof to writing;

**NOW, THEREFORE**, it is mutually agreed as follows:

### ARTICLE I

### DEFINITIONS

<u>Section 1.</u>     For purposes of this Agreement the "Employer" shall be defined as radio broadcast station WNYC-AM (frequency 820 AM), WNYC-FM (frequency 93.9 FM), WQXR-FM (frequency 105.9 FM), and the Gothamist.  The Employer shall exclude all other businesses or entities of or affiliated with NYPR such as those involving satellite radio, the internet, except for as specifically outlined in Article II, Section 1, and joint ventures.

<u>Section 2.</u>     For purposes of this Agreement "Employee" shall be defined as a person in a job title listed in Article II, Recognition.

4837-5797-4450.1

## ARTICLE II

## <u>RECOGNITION</u>

<u>Section 1</u>.      The Employer recognizes the Union as the exclusive bargaining representative of employees in the following job titles:

(a)      Assistant Archivist
Assistant Producer
Associate Producer
Broadcast Engineer
Community Engagement Associate
Concert Engineer
Copywriter
Digital Audio Network Engineer
Facilities Assistant
Facilities Coordinator
Facilities Maintenance Engineer
Host
Listener Services Associate
Maintenance Engineer
Membership Officer
Music Coordinator
Producer I
Production Assistant
Receptionist
Reporter I
Reporter II
Reporter/Producer
Sales Assistant
Sales Associate/Coordinator
Senior Archivist
Senior Broadcast Engineer

4837-5797-4450.1

Senior Copywriter

Senior Facilities Maintenance Engineer

Senior Listener Services Associate

Senior Maintenance Engineer

Senior Membership Officer

Senior Reporter

Traffic & Continuity Coordinator

(b)     In addition, any employee in the above titles or in the following job titles, or employees doing substantially identical work, performing work for the digital aspects of WQXR and WNYC, or on Gothamist, shall be part of the bargaining unit:

Data Journalist

Interaction Designer

Senior Interaction Designer

Digital Producer

(c)     Any employee in the below job titles, or employees doing substantially identical work, regardless of which aspect of NYPR they perform work for, shall be part of the bargaining unit:

Broadcast Engineer

Video Producer

Senior Video Producer

Social Media Producer

Social Lead/Senior Social Media Producer

Section 2.     All managerial, supervisory or confidential employees such as, but not limited to, the President, the Executive Vice President, Vice Presidents, Senior Directors, Directors, Deputy Directors, Assistant Directors, Executive Producers,

Producers, Managers, all Finance, Human Resources, IT and, except for as specifically outlined in Article II, Section 1(b), staff whose work is performed primarily for digital platforms, as well as any administrative position reporting directly to the President (or his/her administrative assistant) or a Vice President, shall not be covered by this Agreement.

Section 3.     Employees hired on a temporary basis such as for vacation relief, to replace employees on child care leave, or to meet temporary needs for increased personnel shall not be deemed staff employees, provided they do not remain in such employment status for a period in excess of one (1) year.

Section 4.     In the event of a dispute concerning the recognition status under this Agreement of a job title not specifically listed in Section 1 herein, such dispute shall be submitted to a grievance and arbitration for final resolution pursuant to the provisions of Article XXI, Grievance and Arbitration Procedure.

Section 5.     The Employer shall notify the Union at least ten (10) work days before adding, deleting or revising a bargaining unit job title.

**ARTICLE III**

**UNION SECURITY AND CHECK OFF**

Section 1.     Union Security:  During the term of this Agreement, all employees shall be members of SAG-AFTRA in good standing, or become members in good standing not later than the 31st day after the date hired, or the effective date of this Agreement, whichever is later, and shall remain members in good standing in SAG-

AFTRA as a condition of continued employment.  SAG-AFTRA shall not impose unreasonable initiation fees, dues, or assessments, and shall grant reasonable conditions for payment of initiation fees and dues to employees joining SAG-AFTRA for the first time.

Section 2.    Dues Check-Off:  After receipt of a signed dues check-off authorization in a form required by law, the Employer shall deduct from an employee's pay, such amount and/or percentage of the employee's pay, designated in a notice from SAG-AFTRA, as union membership dues.  Within twenty (20) days after the end of each month, the Employer shall remit to the Union, by check drawn to the order of SAG-AFTRA, the total amount of all deductions made during said month for all such employees.  At the time of such remittance, and together therewith, the Employer shall also furnish to SAG-AFTRA a record setting forth the names of the employees on whose account deductions were made, their respective earning during the month, and the amount of deductions for each employee during the month.

Section 3.    Indemnity:  SAG-AFTRA shall indemnify and save the Company harmless from any claims, suits, judgments, attachments and from any other form of liability as a result of making any deduction in accordance with the foregoing authorizations and assignments.

## ARTICLE IV

## PERFORMANCE OF BARGAINING UNIT WORK BY OTHERS

Nothing in this Agreement shall preclude the President, the Executive Vice President, Vice Presidents, Executive Directors, Senior Directors, Directors, Deputy

4837-5797-4450.1

Directors and Senior Managers (and persons occupying similar managerial positions) from performing bargaining unit work; nothing in this Agreement shall preclude Executive Producers and Producers (and persons occupying similar managerial positions) from performing On Air work (including board operations work) or work relating to their position; and, nothing in this Agreement shall preclude all other excluded employees from performing bargaining unit work relating to their position.

**ARTICLE V**

**<ins>EMPLOYER RIGHTS</ins>**

It is the right of the Employer to determine the standards of services; determine the standards of selection for employment; direct its employees; take disciplinary action; relieve employees from duty because of lack of work or other legitimate reasons; maintain the efficiency of its operations; determine the methods, means (e.g., voice tracking (elapsed time of work, not duration of program or shift) is permitted and contemplated) and personnel by which its operations are to be conducted; establish reasonable rules and regulations not inconsistent with the terms of this Agreement; determine or revise the content of job titles; take all necessary actions to carry out its mission in emergencies; and exercise complete control and discretion over its organization and technology of performing its work.  The Employer shall provide SAG-AFTRA with a copy of any written rule or regulation applicable to bargaining unit employees, but the failure to provide any such rule or regulation to SAG-AFTRA shall not affect the right of the Employer to enforce it.

# ARTICLE VI

## EMPLOYEE LISTS

The Employer shall make available to the Union the name, title, and date of employment of all employees in job titles covered by this Agreement each pay period.

# ARTICLE VII

## PROBATIONARY PERIOD

Section 1.    Employees shall be subject to a probationary period of one year. During an employee's probationary period, the Employer, in its sole discretion, may discipline or discharge the employee, and such discipline or discharge shall not be subject to grievance or arbitration under Article XXI, Grievance and Arbitration Procedure.  At the conclusion of the employee's probationary period, any discipline and disciplinary notices to which the employee was subject during the probationary period shall be stricken from the employee's record.

Section 2.    The probationary period for existing full-time employees who are promoted, transferred, or subject to a change in job title, shall be three (3) months, which may be reduced or waived, in writing, at the discretion of the Employer.

Section 3.    If an employee works on a temporary or part-time basis in a job title covered by this Agreement for the equivalent period of the probationary period and if the employee is then hired as a full-time employee in the same job title, then the probationary period shall be reduced or waived.

**ARTICLE VIII**

**COMPENSATION**

Section 1.    Minimum Salary Per Annum:  Increases in minimum compensation are only applicable to employees hired after the effective date of the increases.

| JOB TITLE | 7/1/2018 | 7/1/2019 | 7/1/2020 | 7/1/2021 |
|---|---|---|---|---|
| Assistant Archivist | $61,731 | $63,583 | $65,490 | $67,455 |
| Assistant Producer | $56,263 | $57,951 | $59,689 | $61,480 |
| Associate Producer | $63,935 | $65,853 | $67,829 | $69,864 |
| Broadcast Engineer | $50,434 | $51,947 | $53,505 | $55,111 |
| Community Engagement Associate | $53,250 | $54,847 | $56,493 | $58,188 |
| Concert Engineer (Hourly) | $36.05 | $37.13 | $38.25 | $39.39 |
| Copywriter | | | | |
| Data Journalist | $77,250 | $79,568 | $81,955 | $84,413 |
| Digital Network Audio Engineer | $62,777 | $64,661 | $66,601 | $68,599 |
| Digital Producer | $70,000 | $72,100 | $74,263 | $76,491 |
| Facilities Assistant | $40,252 | $41,460 | $42,704 | $43,985 |
| Facilities Coordinator | $49,522 | $51,008 | $52,538 | $54,114 |
| Facilities Maintenance Engineer | | $51,008 | $52,538 | $54,114 |
| Host | $90,000 | $92,700 | $95,481 | $98,345 |
| Interaction Designer | $72,000 | $74,160 | $76,385 | $78,676 |
| Listener Services Associate | $50,857 | $52,383 | $53,954 | $55,573 |
| Maintenance Engineer | $57,349 | $59,070 | $60,842 | $62,667 |
| Membership Officer | $49,160 | $50,635 | $52,154 | $53,718 |

4837-5797-4450.1

| JOB TITLE | 7/1/2018 | 7/1/2019 | 7/1/2020 | 7/1/2021 |
|---|---|---|---|---|
| Music Coordinator | $44,662 | $46,002 | $47,382 | $48,803 |
| Producer I | $70,000 | $72,100 | $74,263 | $76,491 |
| Production Assistant | $49,772 | $51,265 | $52,803 | $54,387 |
| Receptionist | $36,641 | $37,740 | $38,873 | $40,039 |
| Reporter/Producer | $68,000 | $70,040 | $72,141 | $74,305 |
| Reporter I | $38,556 | $39,712.68 | $40,904 | $42,131 |
| Reporter II | $77,250 | $79,568 | $81,955 | $84,413 |
| Sales Assistant/Coordinator | $51,062 | $52,594 | $54,172 | $55,797 |
| Sales Associate | $57,401 | $59,123 | $60,897 | $62,723 |
| Senior Archivist | $67,662 | $69,692 | $71,782 | $73,936 |
| Senior Broadcast Engineer | $57,349 | $59,070 | $60,842 | $62,667 |
| Senior Copywriter | $70,000 | $72,100 | $74,263 | $76,491 |
| Senior Facilities Maintenance Eningeer | | $59,000 | $60,770 | $62,593.10 |
| Senior Interaction Designer | $77,250 | $79,568 | $81,955 | $84,413 |
| Senior Listener Services Associate | $57,401 | $59,123 | $60,897 | $62,723 |
| Senior Maintenance Engineer | $66,150 | $68,134 | $70,178 | $72,284 |
| Senior Membership Officer | $54,587 | $56,225 | $57,911 | $59,649 |
| Senior Reporter | $85,538 | $88,105 | $90,748 | $93,470 |
| Senior Social Media Producer | $77,250 | $79,568 | $81,955 | $84,413 |
| Senior Video Producer | $75,000 | $77,250 | $79,568 | $81,955 |
| Social Media Producer | $60,000 | $61,800 | $63,654 | $65,564 |

4837-5797-4450.1

| JOB TITLE | 7/1/2018 | 7/1/2019 | 7/1/2020 | 7/1/2021 |
|---|---|---|---|---|
| Traffic & Continuity Coordinator | $52,955 | $54,544 | $56,180 | $57,866 |
| Video Producer | $68,000 | $70,040 | $72,141 | $74,305 |

Section 2.    Increases:  Employees shall receive the greater of (1) the increased minimum compensation set forth in Section 1 or (2) the following percentage increases, but not both.  This does not apply to employees on personal services agreements, provided that they receive the same percentage increases as set forth below each year or better in their personal services agreements.

Effective July 1, 2018, employees in the bargaining unit that existed prior to the voluntary recognitions of August 2018 and December 2018 who were employed as of such date and who remained on the payroll as of the ratification date shall receive an increase in their current base salary of 3%.

Effective July 1, 2019, employees on payroll as of that date shall receive an increase in their current base salary of 3%.

Effective July 1, 2020, employees on payroll as of that date shall receive an increase in their current base salary of 3%.

Effective July 1, 2021, employees on payroll as of that date shall receive an increase in their current base salary of 3%.

Section 3.    Career Development Fund:  The employees covered by this Agreement shall be eligible for the Employer's Career Development Fund.  Awards

under the Fund shall be available to and shall be granted to employees subject to the same criteria applicable to similarly situated non-represented employees of the Employer.  Nothing shall preclude the Employer from changing the Career Development Fund following a discussion with the Union in which the parties have an opportunity to consider alternatives, provided that such change applies to all non-covered administrative employees of the Employer.

Section 4.    Longevity Increments:  With respect to employees hired on or prior to December 31, 2005 only, the following longevity schedule in the pro rated annual amounts set forth below shall apply and become part of the employee's base rate.

| Years of Continuous Service | Incremental Amount | Cumulative Amount |
| --- | --- | --- |
| 2 years | $250 | $250 |
| 4 years | $500 | $750 |
| 7 years | $700 | $1450 |

## ARTICLE IX

## HOURS

The standard work week shall be comprised of thirty-five (35) hours.

## ARTICLE X

## OVERTIME AND NIGHT SHIFT DIFFERENTIAL

Section 1.    Overtime

(a)    Any authorized overtime which results in an employee working in excess

-14-

of thirty-five (35) hours and up to and including forty (40) hours in a calendar week (Sunday through Saturday) shall be compensated in cash at the rate of straight time.

(b)     Any authorized overtime which results in an employee working in excess of forty (40) hours in a calendar week shall be compensated in cash at the rate of one and one-half (1 ½) times their hourly rate.

(c)     Any employee who works authorized overtime for (2) or more continuous hours shall be entitled to a meal allowance in the amount of twenty dollars ($20.00). Time off for meals shall not be computed as overtime or be considered a break in continuity for purposes of this paragraph.  No meal allowance is due if the Employer provides a meal specifically for that overtime period. Employees with special dietary or religious needs (example: Employees who keep Kosher or Halal) may decline the meal provided and use the twenty dollar ($20) meal allowance.

(d)     Overtime compensation of at least four (4) hours shall be paid to any employee recalled from home for authorized overtime work and to any employee in an engineering job title required to work a sixth or seventh day.

(e)     There shall be no rescheduling to avoid the payment of overtime.

(f)     Employees who are required and authorized by the Employer to stand by in their homes, subject to recall, shall receive one-half (½) times their hourly rate for each hour so scheduled.

(g)     When an employee is required to begin a new shift within less than twelve (12) hours of the end of the employee's prior shift, the employee shall receive additional

half-time (½) for all time worked at the beginning of the new shift which falls within the twelve (12) hours.  The additional payment shall be based on the employee's straight time hourly rate and calculated in quarter (¼) hour increments.

(h)     An employee required to stay at a hotel due to inclement weather or other emergency shall be entitled to reimbursement for meals in accordance with the Employer's reimbursement policy.

Section 2.     Night Shift Differential:  There shall be a night shift differential of ten percent (10%) for all scheduled hours worked between 6 p.m. and 8 a.m. provided the employee is scheduled to work more than one (1) hour during said period.  The night shift differential shall be paid on overtime earned between 35-40 hours.  Such payments shall not be made in combination with any other premium payment or overtime compensation, except as required by the Fair Labor Standards Act.

## ARTICLE XI

## TEMPORARY UPGRADES

Section 1.     An employee assigned to fill a job title covered by this Agreement on an acting basis for a period of one week or more shall receive one-half (½) of the difference, if any, between his/her salary and the minimum salary of the higher job title or a premium of twenty percent (20%) over his/her regular salary, whichever is greater, for the period of such assignment.  In the event the employee is filling a job which is not covered by this Agreement for three consecutive work days or more, the employee shall receive a premium of twenty percent (20%) over his/her regular salary for the period of such assignment.  In the event the job title is filled by more than one employee during

4837-5797-4450.1

the week, then this provision shall apply to all such employees on a pro rata basis.

Section 2.      Temporary Upgrades Waiver

(a)      The additional payments required by Section 1 above shall be temporarily waived for three consecutive months where an Assistant or Associate Producer works as any of the following: a General Assignment Reporter; a Host; a Host, Reporter or Producer on a WNYC Studios Podcast; or a Reporter on  Gothamist.  This waiver shall only be applicable for each individual employee a single time for each of the above positions.  The waiver shall be not be applicable where an employee covered by this agreement who works on a WNYC Studios Podcast fills in for another employee on that same Podcast.

(b)      For the above waiver to be applicable, the employee must receive dedicated weekly time with a senior Host, Reporter, or Producer, or similar employee, that will include training for the employee in relevant job skills.

(c)      If any overtime is due to the employee, such overtime must still be paid, regardless of whether the employee is working as a Reporter II or other position where overtime is not normally paid.

(d)      The Union will consider requests to extend the waiver period on a case-by-case basis.

(e)      The Company may also seek a waiver under the above terms for employees other than Assistant and Associate Producers, which shall not be unreasonably denied.

4837-5797-4450.1

<u>Section 3.</u>      Notwithstanding the above, Assistant and Associate Producers who work as a Host, Reporter, or Producer on a WNYC Studios Podcast, and are not eligible for the temporary waiver in Section 2 above, shall receive the lesser of one-half the difference, if any, between their salary and the minimum salary of the SAG-AFTRA job title or a twenty percent premium.  Hosts or Reporters who perform in that same role for a WNYC Studios Podcast shall not receive any upgrade pay.  Further, Assistant or Associate Producers who perform in that same role for a WNYC Studios Podcast shall not receive any upgrade pay.

<u>Section 4.</u>      <u>The WNYC Fellowship Program Shall Continue in its Current Form:</u>

The WNYC Fellowship Program is a 3-month career development opportunity for employees. Employees must apply to the Fellowship Program in order to be selected. The fellows who are selected are given the opportunity to work on another program or assignment within the Content Division, with the explicit purpose of training and career development.

Once the fellows are selected, they are backfilled by temporary employees for the duration of their fellowship (typically three months).  As a fellow, they are moving into a new program for a career development experience in a new environment.  Those selected do not receive a temporary upgrade under the collective bargaining agreement. Employees selected maintain their union status, pay, and all benefits under the collective bargaining agreement during the Fellowship period.  If any overtime is due to the employee, such overtime must still be paid, regardless of whether the employee is working in a position where overtime is not normally paid.

4837-5797-4450.1

## ARTICLE XII

## HOLIDAYS

<u>Section 1.</u>     <u>Holidays</u>

(a)     The following shall be paid holidays:

| | |
|---|---|
| New Year's Day | Columbus Day |
| Martin Luther King Day | Veteran's Day |
| President's Day | Thanksgiving Day |
| Memorial Day | Day after Thanksgiving |
| Independence Day | Christmas Day |
| Labor Day | |

(b)     In addition, the Employer shall, on or before July 1st of each year, designate at least two (2) optional days from among the following:  the day before Christmas, the day after Christmas, the day before New Year's Day and the day after New Year's Day.  Each employee shall be entitled to select, subject to the approval of the Employer, one (1) floating holiday from among the optional days designated by the Employer.

(c)     For employees who are regularly scheduled to work on a Monday through Friday basis, holidays falling on Saturday shall be deemed to have fallen on the previous Friday and holidays falling on Sunday shall be deemed to have fallen on the following Monday.  When a paid holiday falls on the regularly scheduled day off of an employee working five days per work, the Employer will provide such employee a compensatory day off.  A holiday that falls during an employee's approved vacation shall not count as a vacation day used.

(d)     To receive credit for a holiday and employee must be in pay status on the

day before and the day after the holiday.

Section 2.    Holiday Premium Pay

(a)    Any employee required to work on a designated holiday or the day on which the holiday is observed shall be entitled to a compensatory shift off in lieu of the holiday, provided that no employee shall receive credit for both the actual holiday and the day of observance for the same holiday.  Such compensatory time may be scheduled by the Employer either prior to or after the day on which the holiday falls.  At the request of the employee, such compensatory time shall be payable in cash.

(b)    Any employee required to work one of the holidays set forth in Section 1(a) above shall be entitled to one and one-half (1 ½) times their hourly rate for all regularly scheduled hours of work falling on actual holiday, but not for regularly scheduled hours of work on the day of observance.

(c)    Shifts which begin at 11 p.m. or later on the day before the holiday shall be deemed to have been worked entirely on the holiday, and shifts which begin at 11 p.m. or later on the holiday shall be deemed not to have been worked on the holiday.

## ARTICLE XIII

## ANNUAL LEAVE

Section 1.

(a)      Employees shall be entitled to a combined vacation, personal leave and religious holiday observance allowance (hereinafter "annual leave") in accordance with the following schedule.

| | |
|---|---|
| 1st through 3rd year of employment: | 3 weeks |
| 4th year through 14th year of employment: | 4 weeks |
| 15th year and thereafter of employment: | 5 weeks |

(b)      Full-time employees shall accrue paid annual leave at the rate of 4.04 hours per pay period (26 pay periods per annum) during the first three years of their employment; 5.395 hours per pay period in the 4th year through the 14th year of their employment; and 6.73 hours per pay period in the 15th year and thereafter of their employment.  Part-time employees (those employees regularly scheduled to work at least 25 hours per week) shall receive annual leave on a prorated basis based upon the number of hours worked per week.

Section 2.      There shall be no annual leave accrual during leaves of absence without pay and no annual leave accrual during childcare provider leave.

Section 3.      Except for three (3) personal business/religious observance days included in the total annual leave set for in Section 1(a) above, no Employee may use annual leave allowances prior to completion of four (4) months employment.

4837-5797-4450.1

Section 4.    Annual leave may be used in increments of a minimum of 2 hour blocks.

Section 5.    Annual leave balances shall be reported on the employee's pay stub.

Section 6.    Any accrued annual leave not used in one fiscal year may be carried over to the next succeeding fiscal year, but not beyond.

Section 7.    Periods of annual leave must be requested in writing not less than two (2) weeks prior to the date an employee wishes to begin such leave, except that an employee may use up to three (3) days of annual leave for personal business/religious observance with less than two (2) weeks notice, but at least two (2) days notice, in all non-emergency situations.  All usage of annual leave shall be subject to the approval of the employee's department head, based on the workload requirements and staffing needs of the Employer.  If the requests for annual leave of two (2) or more employees conflict, the department head shall decide between or among the employees based on their seniority.

Decisions on requests for annual leave shall be made within five (5) work days of the date of submission, except for requests for annual leave during the summer peak period or other such periods for which the Employer may establish a schedule for submission of and decision upon annual leave requests.  The parties shall mutually discuss procedures for the submission of and decision upon annual leave requests in meetings of the Labor Management Committee.

Section 8.    In the event an employee is seriously ill or disabled (but not hospitalized) while on annual leave, then such leave time may be charged to sick leave,

at the employee's option, after the employee submits proof of such illness or disability which is satisfactory to the department head.

**ARTICLE XIV**

**SICK LEAVE**

<u>Section 1.</u>     <u>Notice to Employer</u>

Except in unforeseen circumstances, eligible employees are requested to provide advance notice to their manager fourteen (14) days before taking accrued sick time.  If Family and Medical Leave Act leave is needed, employees must advise the Employer as soon as practicable for the need for sick time and in no case more than 24 hours after the employee is expected to have been at work.  The requested sick time may be approved or denied at Employer's sole discretion, in accordance with applicable law.

<u>Section 2.</u>     <u>Accrual and Eligibility</u>

(a)     Full time employees accrue sick time at a rate of 3.23 hours per pay period beginning on date of hire, to a maximum of twelve (12) days (84 hours) per fiscal year (July 1 – June 30), depending on pro-ration of the date of hire.

(b)     Part time, temporary and per diem employees accrue a pro-rated amount of sick time as a percentage of hours scheduled to work proportionate to a full time 35 hour work week, and date of hire, per fiscal year (July 1 – June 30), but in no instance shall accrue at less than one hour of sick time for every thirty hours worked.

(c)     Eligible new employees can use sick leave upon accrual.  Eligible employees cease to accrue sick time during periods of disability and any type of leave.

-23-

(d)     Sick time earned by an eligible employee by the end of each fiscal year (June 30) may be carried over to the subsequent fiscal year beginning July 1.  The maximum number of sick days that may be accrued for regular, full time employees is 30 days and for regular part-time employees will be 15 days.  For employees with more than 30/15 days (due to tenure) accrual will cease until the number of sick days falls below the maximum of 30/15 days.

(e)     Accrued, unused sick leave will not be paid upon termination of employment. If an employee is re-hired within six (6) months of the termination of employment, the Employer will reinstate the employee's previously accrued sick leave.

    Section 3.     Permitted Use of Sick Leave

(a)     Accrued, unused sick time hours are to be used for an employee or an employee's spouse, domestic partner, child, grandchild, grandparent, parent, sibling (step, half, adopted) or the child or parent of the eligible employee's spouse or domestic partner for the following purposes:  (1) medical diagnosis; (2) care or treatment of a mental or physical illness; (3) an injury or health condition; (4) preventative medical care, (5) when an employee's place of business is closed by order of a public official due to a public health emergency or (6) when the employee must care for a child whose school or childcare provider has been closed by order of a public official due to a public health emergency.

(b)     The Employer will ask for medical certification from a licensed healthcare provider when five (5) or more consecutive days of sick time are used.  Such certification does not need to specify the nature of the employee's or family member's injury, illness or condition (except if otherwise required by law).

4837-5797-4450.1

Section 4.      Pre FY 2017 Sick Leave

Any unused accrued sick days above the 30/15 day maximum and earned prior to July, 1 2016 will remain in effect and may be used only for employee's own physical or mental health needs or the physical or mental health needs of a spouse, domestic partner, child, grandchild, grandparent, parent, sibling (step, half, adopted) or the child or parent of the eligible employee's spouse or domestic partner. Health needs have been defined to include illness, injury or health condition, or medical care or treatment.

Section 5.      The requirements of the New York City Earned Sick Time Act are waived pursuant to N.Y. Admin. Sec. 20-916.

## ARTICLE XV

## SHORT TERM DISABILITY

Section 1.      Eligibility

All regular full time and part time employees that work 25 hours or more per week are eligible to apply for short term disability (STD) benefits if they are unable to work because of a qualifying disability due to an injury or illness.  STD insurance provides partial income replacement for non-work related short-term disabilities and is subject to all terms and conditions of the agreement between the Employer and the insurance carrier.  Applications for STD must be supported by medical documentation and must be approved by the insurance carrier.  If an application for STD is approved, and following a 5 business day (7 calendar day) waiting period, employees are eligible to

receive 60% of the employee's base salary for up to 13 weeks up to a maximum of $1500/week.

Section 2.    Supplementing STD With Paid Time Off

(a)    Employees may use earned sick leave, vacation or personal days for payment during the 5 day waiting period.

(b)    Employees may use accrued sick days, vacation or personal days to supplement and continue receiving an unreduced salary.

Section 3.    Duration of Benefits

Salary continuation at 60% of an employee's regular compensation (excluding overtime and commission) will continue, for the duration of the medically documented disability, up to a maximum of 13 weeks from the date of disability.  Employees with absences that extend beyond 13 weeks may be eligible for long-term disability benefits. During any period of short-term or long-term disability, employees will not be eligible to accrue vacation or sick time, use summer hours or apply holidays to extend any period of their leave. STD runs concurrently with leave under the Family and Medical Leave Act.

## ARTICLE XVI

## PARENTAL LEAVE

Section 1.    Parental Leave

(a)    Regular full time and part time employees who are regularly scheduled to work at least 25 hours per week and who have successfully completed twelve months of continuous service are eligible for paid leave.

i.  Primary care providers (person mainly responsible for the care of the child) with more than 4 years of service at the time of the birth, adoption or fostering will receive ten (10) weeks of paid leave.

ii.  Primary care providers (person mainly responsible for the care of the child) with less than 4 years of service at the time of the birth, adoption or fostering will receive six (6) weeks of paid leave.

iii.  Non-primary care providers (person who assists with the care of the child) will receive six (6) weeks of paid leave.

(b)    All regular part time employees working less than 25 hours a week who have successfully completed twelve months of continuous service will receive a pro-rated portion of the paid parental leave, based upon normally scheduled work hours. This parental leave runs concurrently with leave under the Family and Medical Leave Act, and any disability leave an employee may be eligible for.  Employees must begin parental leave within 180 days of the date of birth, adoption or placement and over consecutive weeks.

(c)    Additionally, all normal benefit plans (e.g. medical, dental, vision, retirement, etc.) that an employee was eligible for and covered under prior to the parental leave will continue while the employee is on leave under the parental leave program.  Employees will not accrue vacation and sick leave while on parental leave and are not able to use summer hours or apply holidays to extend any period of their parental leave.

(d)     Make an appointment with HR to learn about this Leave at least three months prior to taking parental leave. Paperwork, including medical or legal certification is required at least 30 days prior to your anticipated parental leave.

<u>Section 2.</u>      <u>Extending Parental Leave</u>

(a)     Primary care providers (person mainly responsible for the care of the child) may request approval to extend their time off to care for their newborn or newly adopted or fostered children.  If approved, the extended parental leave would begin after the employee uses all available time under the parental leave program and any leave under the Family and Medical Leave Act.

    i.     Parental leave extension must run as consecutive weeks.

    ii.     The max amount of time allowed combining all leave requests is 24 weeks.

    iii.     Employees are eligible to use up to twenty five (25) sick days to extend parental leave.

    iv.     Employees who will be extending their leave beyond 20 weeks are required to use a minimum of two weeks' vacation.

    v.     While on unpaid parental leave, an employee will continue to be eligible for benefits for which they were enrolled prior to commencing the leave but will be responsible for payment of the employee portion of those benefits as if they were actively employed.  Contributions to the 403(b), if applicable, will be suspended during the unpaid portion of the leave.

4837-5797-4450.1

vi.   During this extension of leave period employees will be eligible to accrue vacation or sick time but will not be able to use summer hours or apply holidays to extend any period of their leave.

vii.   Employees will also not be eligible for Short Term Disability while on any portion of unpaid parental leave.

viii.   While leave may be taken for up to 24 weeks from the date of the birth, adoption or placement of the child and must be taken immediately following the birth, adoption or placement of the child, Employer cannot guarantee that a position will be available if leave extends beyond the 12-week Family and Medical Leave Act job protection.

(b)   Parental leave must be approved by the employee's immediate supervisor, department head and Human Resources.  If an employee fails to return to work at the conclusion of an approved parental leave, his/her employment will be terminated and the employee will not be eligible for severance, unless otherwise required by law.

## ARTICLE XVII

## OTHER PAID LEAVES

Section 1.     Personal Days:

(a)   Reporter IIs, Senior Reporters, Data Journalists, Interaction Designers, Senior Interaction Designers, Digital Producers, Video Producers, Social Leads, and Senior Social Media Producers shall be entitled to five (5) personal days in accordance with Company policy.

(b)   All Employees, except those enumerated in Section (a), are entitled to use

two (2) of their sick days as personal days each year.

Section 2.    Compensatory Time:

(a)    Effective upon ratification, Compensatory time may be accrued to a maximum of seventy (70) hours.  Any additional compensatory time earned thereafter shall be paid out until such time as the Employee's accrued compensatory time is seventy (70) hours or less.  Any Employee who has more than seventy (70) compensatory hours accrued has six (6) months from the date of ratification to use excess hours, after which time the excess hours shall be paid out.

(b)    Compensatory time off may be used in increments of a minimum of 2 hour blocks.

Section 3.    An employee shall be granted leave with pay in the following cases, upon submission of evidence satisfactory to the Employer.  Paid leaves of absence shall not alter an employee's seniority.

(a)    Bereavement Leave:  Regular, full-time and part-time employees may take up to five (5) paid days off with pay to grieve and mourn the passing of a relative.  For the purposes of this policy, a relative refers to a spouse, domestic partner, child, grandchild, grandparent, parent, sibling (step, half, adopted) or the child or parent of the eligible worker's spouse or domestic partner.  Whenever possible, the employee's manager will work with the employee to coordinate coverage that allows use of the employee's accrued time off in connection with bereavement leave (e.g. using accrued time off to extend the amount of time off following a bereavement leave).  Part time employees will not be paid if any of the days they are taking off for bereavement fall on a

day they would otherwise not be scheduled to work.

(b)     Jury Duty Leave:  Absence for jury duty provided the employee remits to the Employer an amount equal to any fees received for such jury duty, exclusive of any travel allowance.

(c)     Court Attendance Leave:  Absence for court attendance pursuant to subpoena or court order, provided neither the employee or any relation thereof has a personal interest in the case.

(d)     Arbitration Attendance Leave:  Absence for attendance as a witness at an arbitration brought pursuant to Article XXI, Grievance and Arbitration Procedure of this Agreement.

## ARTICLE XVIII

## LEAVES WITHOUT PAY

An Employee shall be granted leave without pay upon submission of evidence satisfactory to the Employer for (a) leaves of absence covered by the Employer's Family and Medical Leave Act policy, provided however, that the application or interpretation of such policy and the Family and Medical Leave Act shall not be subject to Article XXI, Grievance and Arbitration Procedure, and (b) other leaves without pay not to exceed one (1) year, granted at the discretion of the Employer.  Unpaid leaves of absence shall not alter an employee's seniority.

## ARTICLE XIX

## HEALTH AND RETIREMENT

Section 1.     Employees covered by this Agreement shall be afforded retirement and health coverage in accordance with the following:

Section 2.     All employees who have been employed by the Employer for less than five years as of the ratification date, and all employees hired thereafter, shall make a one-time choice between enrolling in the Employer's 403(b) with an employer match (declining any further or future contributions to the SAG or AFTRA pension plans), or enrolling in the AFTRA Retirement Fund (and declining any further or future Company 403(b) employer match).  This one-time choice shall be irrevocable

Section 3.     For all employees that choose to enroll in the Employer's 403(b) with the employer match, and notwithstanding any other provision of this Agreement, the Employer shall contribute to the SAG-AFTRA Health Plan at the rate of eight (8) percent in the first year of the Agreement, which shall increase to eight and one-quarter percent (8.25%) on July 1, 2021.

Section 4.     For all other employees who do not enroll in the Company 403(b) plan the Employer shall contribute to the SAG-AFTRA Health Plan and the AFTRA Retirement Fund on behalf of each such employee, a sum equal to twelve and three-quarters percent (12.75%) (effective July 1, 2019, thirteen and one-quarter percent (13.25%), and effective July 1, 2021, thirteen and a half percent (13.5%)) of his/her gross earnings (which shall include base salary, overtime, night differential, the minimum severance pay required under this Agreement, vacation pay, sick leave and all other

monies earned under this Agreement, with the exception of incentive and bonus payments and any severance payments beyond what is required in Article XXIII Effective January 2, 2020, the Employer's contributions to the SAG-AFTRA Health Plan and the AFTRA Retirement Fund on behalf of each employee shall be capped at an employee's annual maximum earnings of two-hundred twenty-five thousand dollars ($225,000).

Section 5.    The Employer shall furnish a remittance report and pay to the appropriate AFTRA Health and Retirement Plan office the contribution specified above not later than thirty (30) days following the end of the month in which the contributions accrued.

Section 6.    The Employer shall be bound by the Agreement and Declaration of Trust dated November 16, 1954, establishing the AFTRA Retirement Fund and the AFTRA Health Fund, and shall abide by all the terms and conditions specified therein. The Employer hereby appoints the Producer Principal Trustees and Alternate Trustees named therein and/or their successors.

Section 7.    Agreements with loan-out companies for covered services of the loaned-out employee shall provide that the Employer shall make health and retirement contributions directly to the Plan as agent, for this purpose, for the loan-out company.

4837-5797-4450.1

## ARTICLE XX

## TAX SHELTER ANNUITY

The Employer shall make available to employees an Employer 403(b) Tax Sheltered Annuity Program which shall be non-contributory by the Employer but which shall be administered without administrative charge to participants.

## ARTICLE XXI

## GRIEVANCE AND ARBITRATION PROCEDURE

Section 1.    All grievances shall be resolved exclusively pursuant to the procedures set forth in this Article XXI.  The term "grievance" shall mean any dispute arising out of (a) the interpretation, application or a claimed violation of this Agreement; (b) any personal services agreement between the Employer and an employee covered by this Agreement; or (c) any appeal of a claimed wrongful disciplinary action.

Section 2.    SAG-AFTRA shall present any grievance to the Employer to the attention of the Director of Human Resources, in writing, no later than thirty (60) calendar days after SAG-AFTRA knew or with due diligence should have known of the circumstances giving rise to the grievance.  The Employer and the Union shall meet within ten (10) days of receipt of the grievance.  If the grievance is not resolved, either party may, within thirty (30) working days of the grievance meeting, submit the grievance to arbitration before an impartial arbitrator selected in accordance with the rules and procedures of the American Arbitration Association.  The determination of the arbitrator shall be final and binding, and the costs of such arbitration shall be equally

divided between the parties.  The arbitrator shall not be empowered to order a monetary remedy which provides for any payment retroactive beyond ninety (90) days from the event giving rise to the grievance.

Section 3.    A failure to submit a grievance or demand arbitration in accordance with the requirements set forth above, including the time limits, shall permanently bar the grievance and/or the arbitration as the case may be.

## ARTICLE XXII
## DISCIPLINARY MEETINGS

All efforts shall be made to notify the Union in advance of any termination.  In the event the Employer wishes to have a meeting with an employee, which it reasonably anticipates will lead to the employee's termination, a union representative may attend said meeting, unless the employee waives his/her right to union representation.

## ARTICLE XXIII
## LAYOFFS/SEVERANCE

Section 1.    The Union shall be informed no later than five (5) days before the effective date of a projected layoff.  During said five (5) day period, the Employer, upon the request of the Union, shall consider any feasible alternatives to a layoff suggested by the Union.  The final decision concerning a layoff shall remain with the Employer.

Section 2.    All layoffs, whether by reason or lack of work, subcontracting, automation, new technology or otherwise, shall be made in inverse order of length of service within each job title within each department, but employees who possess a

-35-

higher level of performance, skill or ability, or employees engaged in special functions, may be retained by the Employer over employees in that job title with a greater length of service, whether or not in the same or another department.

Section 3.    In the event any work, other than work in the job titles of Host or Reporter, is contracted out, then prior to any lay-off of a covered employee as a consequence thereof, the Employer shall be obligated to lay-off all part time employees (those persons regularly scheduled to work less than 25 hours per week), except that the part-time persons who perform special jobs or have special skills may be retained for the purpose of performing those special jobs and/or special skills, with the understanding that if a bargaining unit employee subject to layoff is qualified to perform the special job or possesses the special skill, then the bargaining unit employee shall be offered the opportunity to accept the part-time work.  Acquiring programming from any source shall not be considered contracting out.

Section 4.    For purposes of Section 2, the following departments shall obtain:

Digital Audio Network Engineers

Broadcast Engineers (including Concert Engineers)

Maintenance Engineers

Newsroom

Show or Project (*Each separate show or project is a separate department for purposes of this paragraph).

Administrative Support

Membership

Sponsorship

Facilities

For the calculation of layoff seniority, an employee in a senior job title shall be

considered to hold the same job title as the base job title.

Section 5.     Subject to applicable law, employees who are laid off shall be given preference in hiring, based on seniority, for one (1) year following the effective date of their layoff.  Employees and SAG-AFTRA shall be notified by email of the availability of a position and the employee must report within ten (10) business days of the date such email is sent or lose all preference pursuant to this section.

Section 6.     The Employer shall pay severance pay to each laid off employee, or to an employee in the job title of Host, Reporter II or Senior Reporter who is terminated without cause in the amount equal to two (2) weeks pay for each year of continuous service.

(a)     Service as a Reporter I for those employees promoted to the job title of Reporter II or Senior Reporter shall be considered time worked for the purpose of calculating years of continuous service.

(b)     The Employer may, at its discretion, request that an employee sign a general release; if the employee declines to sign, the employee is entitled to fifty (50%) of the severance otherwise due under this Section.  As used in this paragraph, the general release is limited to a waiver of claims only, and is not inclusive of non-disparagement, non-disclosure, or substantive terms other than with respect to the release of claims.

(c)     Severance pay for part-time employees is calculated based upon their pro rata weekly rate for their part-time hours.

4837-5797-4450.1

(d)     Part-time employees who became full time employees within the five (5) year period prior to March 29, 2019 shall receive severance based pro rata on their part-time hours for that portion of time when they worked part-time.  Full time employees who become part-time employees shall receive severance based pro rata on their part-time hours for that portion of time when they worked part-time and full severance for the period of time they worked full time.

Section 7.     In the event an employee in the Host, Reporter II or Senior Reporter job title is laid off or terminated with or without cause after the first year in the job title, he/she shall receive four (4) weeks notice or pay in lieu thereof, in addition to any severance pay due under Section 6 above.  Such notice pay shall not be subject to the release requirement in Section 6.

Section 8.     Grant-Related Hiring:  Whenever the Employer engages regular employees for a limited period of time, not to exceed twenty-four (24) months, pursuant to a specific grant, such employees shall not be entitled to severance under Article XXIII upon the expiration of their anticipated employment period.  The employee shall be notified upon employment that they are being hired for a specific grant and their anticipated employment period

## ARTICLE XXIV

## BULLETIN BOARDS

The Employer shall provide a bulletin board to the Union at a mutually-agreed upon location.  All notices posted on the bulletin board shall be on Union stationery and shall be used only to notify employees of matters pertaining to Union affairs.

**ARTICLE XXV**

**UNION ACCESS AND RELEASE TIME**

Section 1.    Upon request to and approval by the Director of Human Resources or his/her authorized representative, the Union may use the Employer's premises for meetings held during employees' non-working time, subject to the availability of appropriate space and provided such meetings do not interfere with Employer's business.

Section 2.    An authorized representative or official of the Union shall be permitted on the Employer's premises during working hours for the purpose of representing employees in settlement of grievances covered by Article XXI, Grievance and Arbitration Procedure of this Agreement, subject to securing prior approval from the Director of Human Resources or his/her authorized representative, and provided such access does not interfere with the Employer's business.

Section 3.    Notwithstanding Section 1 and 2 herein, except as provided below, Union representatives or officials shall conduct Union business, including preparations for grievance or disciplinary hearings and for collective bargaining negotiations, on non-working time.

Section 4.    A maximum of one (1) union steward shall continue in pay status while representing employees at authorized grievance meetings held during the steward's regular shift.  A maximum of four (4) union stewards (no more than one (1) representative from the Host job title or one (1) representative from the Reporter job titles; one (1) representative from clerical job titles; one (1) representative from

engineering job titles; and one (1) representative from production job titles) shall continue in pay status while attending collective bargaining negotiations held during their regular shift.  Notwithstanding the foregoing, no Host or Reporter shall leave an on-air assignment for the purposes of attending a collective bargaining session.

Section 5.    The Union shall certify in writing to the Employer the names of its officers, stewards, and other authorized representatives and inform the Employer of any change in such representatives occurring during the term of this Agreement.

**ARTICLE XXVI**

**HOSTS AND REPORTERS**

Section 1.    Persons occupying the job titles of Host, Reporter I, Reporter II and Senior Reporter may be terminated with or without cause and such termination shall not be subject to Article XXI, Grievance and Arbitration Procedure, Article XXII, Disciplinary Meetings, and Article XXIII, Layoffs/Severance, sections 1, 2, 3, 4 and 5, but persons occupying the job titles of Host, Reporter II and Senior Reporter shall be subject, if eligible, to Article XXIII, Layoffs/Severance, sections 6 and 7.

Section 2.    Article VII, Probationary Period shall not be applicable to the job titles of Host and Reporter I, Reporter II or Senior Reporter or employees transferred or promoted into the job titles of either Host or Reporter I, Reporter II or Senior Reporter.

Section 3.    After an employee has been in the job title of Reporter I for thirty (30) months, he/she shall either be terminated or promoted to Reporter II.  Persons hired in the job title of Reporter I shall be limited to persons who have graduated from

journalism school and who are employed for the first time thereafter as a reporter; persons who have no prior professional experience as a reporter, and persons who have professional experience as a reporter in television or radio but with less than two (2) years of experience in other than a top 50 market.  The ratio of employees in the job titles of (i) Senior Reporter or Reporter II to (ii) Reporter I shall be at least 2 to 1, except that notwithstanding this ratio, once a person has been hired into the job title of Reporter I, the Employer shall not be required to terminate or promote the Reporter I until the expiration of the 30-month period set forth above.

Section 4.      Full-time Reporter IIs shall not be covered by Article X (Overtime and Night Shift Differential), and Article XII, Section 2(b) (Holidays).  Reporter IIs shall be entitled to a payment of $400 if assigned to work on a 6th or 7th consecutive day or for any holiday to which he or she is assigned to work in excess of one (1) in a calendar year. A Reporter II shall be entitled to one (1) hour of compensatory time off for each full hour worked during the period between the end of one shift and the beginning of the next shift that is less than twelve (12) hours.

Section 5.      Reporter II Workload Committee: Both the Employer and SAG-AFTRA recognize that Reporter IIs will work reasonable time in excess of their regular schedule in connection with the stories on which they are assigned and in instances of news emergencies or other breaking news.  Additionally, both the Employer and SAG-AFTRA recognize the Employer's intention not to require Reporter IIs, against their wishes, to work an excessive number of hours on a regular or recurring basis.  Upon the request of either party, the Employer agrees to meet with SAG-AFTRA and the Reporter Workload Committee (comprised of an equal number of SAG-AFTRA and Employer

representatives) to discuss and resolve in a positive and expedient manner any and all workload issues raised by the Reporter IIs.  Upon SAG-AFTRA's request, the Employer will furnish information in its possession reflecting the amount of time Reporter IIs are working prior to any meeting with management.

## ARTICLE XXVII

## REPORTER/ PRODUCER

Section 1.      Preamble: The Parties do not intend this position to be a necessary intermediary step between Associate Producer and Producer I; there should be a presumption that Associate Producers primarily interested in pursuing a career path as a Producer should be promoted to Producer I rather than Reporter/Producer.

(a)      Ratio: The ratio of total employees in the job titles of either Senior Reporter or Reporter II to the number of employees in the job title Reporter/Producer shall be at least 3 to 1. This shall include per diems on both sides of the ratio.

(b)      Training requirements: the parties shall establish an ad hoc committee of management and newsroom Reporters and Producers to put together a robust training on how to use required technology, including, but not limited to, sound editing tools, review protocols of the newsroom, etc., for new hires and current employees who request additional training.

## ARTICLE XXVIII

## EDITORIAL PROCESS PROTECTIONS

Section 1.      The Company will make a good faith effort to inform bargaining unit employees if the stories they have written or the stories' headlines are substantially

changed before they are published.  This shall not interfere with the Company's ability to publish if time or other constraints do not allow for the employee to be contacted or respond.

Section 2.    If a bargaining unit employee disagrees with the final version of the story, the employee may choose to pull his or her byline.

Section 3.    All images and graphics authored by bargaining unit employees that appear on NYPR affiliated websites shall credit the original author or photographer by their full professional name.  The Employer shall make commercially reasonable efforts to include a credit where such work is used on outside publications. The remedy for a violation of this section shall be to add the appropriate crediting.

## ARTICLE XXIX

### CAREER DEVELOPMENT

Upon request of the Employee, the Employee's manager will discuss career development issues, including reasonable expectations as to whether a promotion may be available, and if so, whether the employee is on track for promotion opportunities, and any timeframe that might be applicable.

## ARTICLE XXX

### PERFORMANCE STATEMENTS AND PERSONNEL FILES

Section 1.    The Employer shall provide the employee with a copy of any negative or critical statement concerning his/her performance which is made part of the employee's personnel file and provide the employee with a copy of his/her performance

evaluation.  The Employee shall have ten (10) days from the date of receipt to respond in writing to the statement or evaluation, and any response which is timely shall be placed in the employee's personnel file.  The absence of a response shall not be deemed an admission or acceptance of the substance of the statement or evaluation.

Section 2.     Upon request, an employee shall be entitled, (a) to review his/her personnel file in the presence of an employee of the Human Resources Department, and (b) to be provided with a copy of any statement concerning the employee's performance (whether positive or negative) contained therein.

**ARTICLE XXXI**

**POSTING**

Section 1.     Five (5) days prior to filling a vacancy in a job title covered by this Agreement, the Employer shall post a notice of the vacant position.  In addition, the Employer shall post any vacant full-time temporary position of four (4) months or more in duration, if the job title would otherwise be covered by this Agreement.  All job postings shall remain posted until the position is filled or a decision is made not to fill the position.

Section 2.     All job postings shall set forth the job title, job duties, job qualifications, and proposed salary for the position.  If the Employer decides to postpone filling or not to fill the position, it shall notify the Union.

Section 3.     Notwithstanding the posting requirement set forth in section 1, the Employer may simultaneously advertise for or otherwise recruit for the vacancy.

Section 4.    The Employer shall interview and consider qualified employees who make formal application for a posted position.  It shall be the employee's responsibility to initiate the application process.  The Human Resources Department shall be responsible for notifying all employee applicants of the final hiring decision.

## ARTICLE XXXII

### NO STRIKE/NO LOCKOUT

During the term of this Agreement, there shall be no strikes, sympathy strikes, stoppages, slowdowns, or other concerted refusals to perform work (all of which are hereinafter referred to as "strikes"), and the Employer shall not implement any lock-out of employees.

## ARTICLE XXXIII

### PERFORMANCE OF WORK FOR UNCOVERED ENTITIES

The Employer may assign employees to perform work for uncovered entities without additional compensation, except required overtime.

## ARTICLE XXXIV

### USE ON INTERNET/OTHER PLATFORMS

The Employer shall have the right to use any radio program or any portion thereof on its website(s), on public broadcasting websites and on online services and other platforms, such as satellite radio.  However, if the Employer assesses a charge to the consumer for the downloading or use of such programs, the Employer shall notify SAG-AFTRA, and the parties shall negotiate a provision concerning the treatment of

such charge.

## ARTICLE XXXV

### MINIMUM TERMS

This Agreement contains the minimum terms and conditions of employment. The Employer shall not enter into any agreement or contract or employ any employee upon terms and conditions less favorable than those set forth herein.  Nothing in this Agreement shall be deemed to prevent the Employer from providing, or any employee from negotiating for or obtaining, terms and conditions in excess of the minimum terms and conditions provided for herein.

## ARTICLE XXXVI

### LABOR MANAGEMENT COMMITTEE

Section 1.     The Employer and the Union, having recognized that cooperation between management and employees is indispensable to the accomplishment of sound and harmonious labor relations, shall jointly maintain and support a Labor-Management Committee.  The Labor-Management Committee shall consider and recommend changes in the working conditions of the employees in the bargaining unit. Matters subject to the grievance procedure set forth in Article XXI, Grievance and Arbitration Procedure shall not be appropriate items for consideration by the Labor Management Committee.  The chairperson of the Committee shall alternate between the members designated by the Employer and the members designated by the Union.

Section 2.     The Labor Management Committee shall meet at the call of either

the Union or the Employer at times mutually agreeable to both parties.  At least one week in advance of a meeting the party calling the meeting shall provide to the other party a written agenda of matters to be discussed.  Minutes shall be kept and copies supplied to all members of Committee.

## ARTICLE XXXVII

## PART TIME EMPLOYEES

An employee who works on a part-time basis shall receive all of the benefits of the contract on a pro rata basis, except that STD benefits shall only be available to part-time employees regularly working 25 hours per week or more.

## ARTICLE XXXVIII

## TEMPORARY AND PER DIEM EMPLOYEES

Section 1.      Notwithstanding any other Article, term or provision of this Agreement, temporary and per diem employees that, at the time of employment, are expected to work twenty-five (25) hours per week or more over an expected employment period of four (4) months or more ("25+ Hour Temps/Per Diems"), shall be subject to the following conditions under this Agreement, and no other Articles, terms, or provisions of this Agreement shall apply:

(a)      Articles I – X, XIV, XXX-XLI, and Side Letters to this Agreement.

(b)      Article XI, except that: a temporary or per diem employee assigned to fill in for his or her direct supervisor or manager for three (3) or more days shall receive a twenty percent (20%) increase.

(c)      Article XII: except that Section 1(b) shall not apply.

-47-

(d)     Article XIII shall not apply. Rather, temporary and per diem employees shall accrue annual leave at a rate of .029 hours per hour worked.

i.   Annual leave accrual shall be capped at two (2) weeks.

ii.   Temporary and per diem employees' use of annual leave shall be limited to two (2) consecutive days at a time for the first nine (9) months of employment, and thereafter may use five (5) days of annual accrual at one time with manager approval.

iii.   At the request of a variable hour employee, such vacation accrual shall be payable in cash.

(e)     Article XVII: Other Paid Leaves shall apply as modified below:

i.   Bereavement Leave: two (2) days paid leave for scheduled work days; two (2) additional unpaid days available.

ii.   In the event of Jury Duty, Court Attendance, or Arbitration Leave, the employee shall not receive pay for the absence, but their position shall be protected during the employee's absence.  This protection does not apply in the case of a termination due to the planned end date that occurs during the absence, or in circumstances where a program is cancelled during the absence.

iii.   Childcare Leave under the Agreement shall not apply; rather employees under this Section shall be covered by the New York Paid Family Leave provisions.

(f)     Article XX: Tax Shelter Annuity: employees shall be eligible to participate if they are eligible under the same terms and conditions of the plan that apply to staff employees.

-48-

(g)      Article XXVI:  Hosts and Reporters: except that Section 4 shall not apply.

(h)      Grievance and Arbitration Procedure under Article XXI; however:

     i.     Temporary and per diem employees may be terminated with or without cause and such termination shall not be subject to Article XXI, Grievance and Arbitration Procedure, Article XX, Disciplinary Meetings, and Article XXIII, Layoffs/Severance, sections 1, 2, 3, 4 and 5, but shall be subject, if eligible, to paragraph (h) below.

     ii.     Employer will continue to notify SAG-AFTRA on a weekly basis of new hires and terminations of temporary and per diem employees, and will notify SAG-AFTRA as soon as practicable of any terminations for cause.

(i)      In the event of a layoff or termination of a temporary or per diem employee who has worked an average of at least 14 hours per week over the four month period prior to the layoff or termination, said employee shall receive one (1) week's notice of layoff or termination.  This provision applies, for example, in the case of a termination due to the expiration of an assignment or planned end date with respect to a temporary or per diem employee, but does not apply in circumstances where a program is cancelled or where there are wider layoffs on a particular program or a department. Further, this provision does not apply if the termination is for cause.

Section 2.     Notwithstanding any other Article, term or provision of this Agreement, all temporary and per diem employees other than 25+ Hour Temps/Per Diems shall be covered only by the following provisions of this Agreement, and no other Articles, terms, or provisions of the Agreement shall apply:

(a)      Health & Retirement contributions pursuant to Article XIX,

(b)      Holiday pay under Article XII.2.(b);

(c)      Sick leave under Article XIV,

(d)      Night shift differential under Article X, Section 2.

(e)      Minimum Salary Per Annum under Article VIII,

(f)      Union Security and Check Off under Article III, except that the union

security obligations shall not attach until 6 months after the employee's date of hire, and

(g)      Grievance and Arbitration Procedure under Article XXI; however:

      iii.     Temporary and per diem employees may be terminated with or without

cause and such termination shall not be subject to Article XXI,

Grievance and Arbitration Procedure, Article XX, Disciplinary

Meetings, and Article XXIII, Layoffs/Severance, sections 1, 2, 3, 4 and

5, but shall be subject, if eligible, to paragraph (h) below.

      iv.     Employer will continue to notify SAG-AFTRA on a weekly basis of new

hires and terminations of temporary and per diem employees, and will

notify SAG-AFTRA as soon as practicable of any terminations for

cause.

(h)      In the event of a layoff or termination of a temporary or per diem

employee who has worked an average of at least 14 hours per week over the four month

period prior to the layoff or termination, said employee shall receive one (1) week's

notice of layoff or termination.  This provision applies, for example, in the case of a

termination due to the expiration of an assignment or planned end date with respect to

a temporary or per diem employee, but does not apply in circumstances where a

program is cancelled or where there are wider layoffs on a particular program or a department. Further, this provision does not apply if the termination is for cause.

Section 3.     Temporary and per diem employees that are employed as of the ratification date of this Agreement, March 29, 2019, shall receive credit for benefits accrual purposes for past months of work, if applicable.

Section 4.     Any employee not eligible to receive the terms under Section 1 from their date of hire shall be eligible to have their status reviewed after four (4) months of employment.  At the four (4) month look-back, a temporary or per diem employee that has averaged twenty-five (25) hours or more per week over the preceding four (4) month period shall be considered a 25+ Hour Temp/Per Diem as of the first day of the month following the employee's completion of four months of work, and the employee shall be given credit for vacation accruals for the past four (4) months of work. An individual employee can request reconsideration of their status as a 25+ Hour Temp/Per Diem every four (4) months with the four (4) month look back period described above applied.

Section 5.     If an employee covered by this Article is hired on as a staff employee, their date of hire as a temporary or per diem employee shall be used for all seniority based benefits so long as there is no more than 6 months break in continuity between the end of the employee's service as a temporary or per diem employee and their reemployment as a staff employee.

Section 6.     Starting July 1, 2019, and on each July 1 during the term of this Agreement thereafter, temporary and per diem employees who earn over the minimum scale in Article VIII above, and who have worked an average of at least 14 hours per week for the full twelve month period preceding July 1, will receive an increase in their

hourly rate of 3%.  However, specifically excluded from the above over-scale increases are employees who were hired with the knowledge that their position was grant funded.

## ARTICLE XXXIX

## GROUP RECOGNIZED IN DECEMBER 2018

Section 1.       All employees in the group certified in December 2018 shall receive the percentage increases set forth under Article VIII as of the date of ratification of the contract March 29, 2019, unless they have received a three percent (3%) increase between July 1, 2018 and ratification of this agreement, March 29, 2019; if any employee in this group received less than a three percent (3%) raise in the fiscal year beginning July 1, 2018, then that employee will receive an increase that is the difference between the raise they did receive and three percent (3%), so that between July 1, 2018 and the date of ratification, they have received a three percent (3%)  increase (i.e., employee A received an increase of one and a half percent (1.5%) on December 1, 2018 – employee A receives an increase of one and a half percent (1.5%) on ratification; employee B received an increase of three percent (3%) on March 1, 2019 – employee does not receive any additional increase on ratification).  All employees in the group certified in December 2018 shall receive the percentage increases set forth under Article VIII beginning July 1, 2019 and each year of the contract thereafter.

Section 2.       Any individual employed as a Concert Engineer shall, upon ratification of this Agreement, March 29, 2019, receive an increase in their hourly rate to $36.05.  Concert engineers shall receive the percentage increases set forth under Article VIII beginning July 1, 2019 and each year of the contract thereafter.

4837-5797-4450.1

Section 3.     The original date of hire by New York Public Radio shall be used for all seniority based benefits for all employees in the group certified in December 2018.

Section 4.     All employees in the group certified in December 2018 shall, upon the ratification date of this Agreement, March 29, 2019, receive all of the other benefits of the contract, as applicable, except as modified below in Section 5.

Section 5.     Premium Pay

(a)     Data Journalists, Digital Producers, Interaction Designers, Senior Interaction Designers, Video Producers, and Senior Video Producers shall receive premium pay in accordance with Article XXVI, Section 4.

(b)     Social Leads and Senior Social Media Producers shall receive a buyout of overtime and premium pay in the amount of two thousand five hundred dollars ($2,500) per year, paid on July 1 each year of the contract beginning July 1, 2019.  If an employee has not been employed for a full year as of that date, the amount shall be pro-rated on July 1.

(c)     Social Media Producers shall receive premium pay in accordance with Article X, except that they shall receive seven hundred and fifty dollars ($750) each year paid on July 1 each year of the contract beginning July 1, 2019, going up to $1,000 on July 1, 2021, as a buyout of  on call time that might otherwise be due under this Agreement.

Section 6.     Gothamist: All current bargaining unit employees employed fulltime, part time, or temporary or per diem by the Gothamist as of December 26, 2018 will be classified as Reporter II.

## ARTICLE XL

## DURATION

Section 1.    The duration of this Agreement shall be from July 1, 2018 to and including June 30, 2022.

Section 2.    Negotiations towards a new agreement shall begin three (3) months prior to the expiration of this Agreement.  A good faith effort on the part of both parties shall be made to conclude negotiations and have a new agreement in place upon the expiration of this Agreement.

## ARTICLE XLI

## SAVINGS CLAUSE

In the event that any provision of this Agreement is found to be invalid, such invalidity shall not impair the validity and enforceability of the remaining provisions of this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the date first set forth above.

**NEW YORK PUBLIC RADIO**                    **SCREEN ACTORS GUILD – AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, NEW YORK LOCAL**

4837-5797-4450.1

BY: _____

DATE: _3/2/2020_

BY: _____

DATE: _3/2/2020_

**SCREEN ACTORS GUILD – AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, NATIONAL**

BY: _____

DATE: _3/2/2020_

55

# SIDELETTER #1

As of July 1, 2018

SAG-AFTRA, New York Local

1900 Broadway

New York, New York 10023

RE:     Grandfathered Medical and Tax Sheltered
        Annuity

Ladies/Gentlemen:

This letter shall modify the collective bargaining agreement (the "Agreement") by and between New York Public Radio (the "Employer") and Screen Actors Guild – American Federation of Television and Radio Artists, New York Local (the "Union") effective July 1, 2014 to and including June 30, 2018.

The following employees shall not be covered by Article XIX, Health and Retirement and Article XX, the Tax Sheltered Annuity and in lieu thereof shall be subject to the medical and dental benefits and the Employer's Contributory Tax-Deferred Annuity Program provided by the Employer to employees not subject to the Agreement. The Employer shall have the right to change, modify or eliminate such dental and medical benefits and the Employer's Contributory Tax-Deferred Annuity Program at anytime and without prior negotiations with the Union so long as the change modification or elimination applies to all participants in the plans generally. On thirty (30) days notice any listed employee shall have the option of terminating coverage under the employer's medical and dental benefits program and the Employer's Contributory Tax-Deferred Annuity Program and upon said notice, effective the 1st day of the next month following the thirty (30) days notice shall be covered under Article XIX, Health and Retirement and Article XX, Tax Sheltered Annuity of the Agreement.

Beth Fertig
Edward Haber
William O'Neil
Wayne Shulmister

4837-5797-4450.1

Effective upon ratification, such employees shall be entitled to receive the same percentage employer match of employee contribution as employees not subject to the Agreement.

4837-5797-4450.1

If the foregoing constitutes our understanding, kindly execute a copy of this letter in the space provided and it shall become a binding agreement between the Union and Employer.

Sincerely,

NEW YORK PUBLIC RADIO

By _____

ACCEPTED AND AGREED TO:

SCREEN ACTORS GUILD – AMERICAN FEDERATION

OF TELEVISION AND RADIO ARTISTS, NEW YORK LOCAL

By _____

58

**SIDELETTER #2**

As of July 1, 2018

SAG-AFTRA, New York Local

1900 Broadway

New York, New York 10023

RE:     Engineers Comp Time

Ladies/Gentlemen:

This letter shall supplement the collective bargaining agreement (the "Agreement") by and between New York Public Radio (the "Employer") and Screen Actors Guild – American Federation of Television and Radio Artists, New York Local (the "Union") effective July 1, 2018 to and including June 30, 2022.

Notwithstanding Article X, Section 1(a), Overtime, engineering employees shall be permitted to take compensatory time rather than cash for hours worked in excess of thirty-five (35) and up to and including forty (40), provided that such compensatory time may be taken in increments of two or more hours. Compensatory time may be accrued to a maximum of seventy (70) hours. Any additional compensatory time earned thereafter shall be paid out until such time as the employee's accrued compensatory time is seventy (70) hours or less.

If the foregoing constitutes our understanding, kindly execute a copy of this letter in the space provided and it shall become a binding agreement between the Union and Employer.

Sincerely,

NEW YORK PUBLIC RADIO

By_____

ACCEPTED AND AGREED TO:

59

SCREEN ACTORS GUILD – AMERICAN FEDERATION

OF TELEVISION AND RADIO ARTISTS,
NEW YORK LOCAL

By _____

**SIDELETTER #3**

As of July 1, 2018

SAG-AFTRA, New York Local

1900 Broadway

New York, New York 10023

Re:     Productivity Bonus

Ladies/Gentlemen:

This letter shall supplement the collective bargaining agreement (the "Agreement") by and between New York Public Radio (the "Employer") and Screen Actors Guild – American Federation of Television and Radio Artists, New York Local (the "Union") effective July 1, 2018 to and including June 30, 2022.

The employees covered by the Agreement shall be eligible for the Employer's Productivity Bonus program at the same times and on the same terms and conditions as similarly situated non-represented employees of the Employer.  The Productivity Bonus shall be based upon business performance factors determined by the Employer. Nothing shall preclude the Employer from changing or eliminating this program, provided that such change or elimination applies to all non-covered employees of the Employer, in which event such change or elimination automatically will apply to employees hereunder.

If the foregoing constitutes our understanding, kindly execute a copy of this letter in the space provided and it shall become a binding agreement between the Union and Employer.

Sincerely,

NEW YORK PUBLIC RADIO

By _____

ACCEPTED AND AGREED TO:

SCREEN ACTORS GUILD – AMERICAN FEDERATION

61

OF TELEVISION AND RADIO ARTISTS,
NEW YORK LOCAL

By Rebecca Hayes

**SIDELETTER #4**

As of July 1, 2018

SAG-AFTRA, New York Local

1900 Broadway

New York, New York 10023

RE:     Employee Contributions on Pre-Tax Basis

Ladies/Gentlemen:

This letter shall supplement the collective bargaining agreement (the "Agreement) by and between New York Public Radio (the "Employer") and Screen Actors Guild – American Federation of Television and Radio Artists, New York Local (the "Union") effective July 1, 2018 to and including June 30, 2022.

In connection with Article XIX, Health and Retirement, the Employer shall make all reasonable efforts to work with the Union to develop a plan, consistent with legal requirements, by which bargaining unit members may pay premiums for medical coverage to the AFTRA Health and Retirement Plan on a pre-tax basis, to be implemented as soon as practicable.

If the foregoing constitutes our understanding, kindly execute a copy of this letter in the space provided and it shall become a binding agreement between the Union and Employer.

Sincerely,

NEW YORK PUBLIC RADIO

By

ACCEPTED AND AGREED TO:

SCREEN ACTORS GUILD – AMERICAN FEDERATION

63

4837-5797-4450.1

OF TELEVISION AND RADIO ARTISTS,
NEW YORK LOCAL

By ___Rebecca Hayes___

**SIDELETTER #5**

As of July 1, 2018

SAG-AFTRA, New York Local

1900 Broadway

New York, New York 10023

RE:   High Definition Radio

Ladies/Gentlemen:

This letter shall supplement the collective bargaining agreement (the "Agreement) by and between New York Public Radio (the "Employer") and Screen Actors Guild – American Federation of Television and Radio Artists, New York Local (the "Union") effective July 1, 2018 to and including June 30, 2022.

High definition radio, which is part of 93.9 FM, 105.9 FM and AM 820, shall be covered by this Agreement.

The Employer may assign employees to such work as part of their regular duties and such work shall be performed without additional compensation except for required overtime.  Programming made for public radio stations WNYC-FM, 105.9 FM and AM 820 may be aired on high definition radio without limitation.

If the foregoing constitutes our understanding, kindly execute a copy of this letter in the space provided and it shall become a binding agreement between the Union and Employer.

Sincerely,

NEW YORK PUBLIC RADIO

By

65

4837-5797-4450.1

ACCEPTED AND AGREED TO:

SCREEN ACTORS GUILD – AMERICAN FEDERATION
OF TELEVISION AND RADIO ARTISTS, NEW YORK LOCAL

By _Rebecca Hayes_____

# SIDELETTER #6

As of July 1, 2018

SAG-AFTRA, New York Local
1900 Broadway

New York, New York 10023

Re: <u>Voice Tracking</u>

Ladies/Gentlemen:

This letter shall supplement the collective bargaining agreement (the "Agreement") by and between New York Public Radio (the "Employer") and Screen Actors Guild – American Federation of Television and Radio Artists, New York Local (the "Union") effective July 1, 2018 to June 30, 2022.

Notwithstanding the terms of Article V (Employer Rights) of the Agreement, the following employees shall not have their employment terminated or their compensation reduced as a direct result of voice tracking:

Elliott Forrest

Terrance McKnight
Jeff Spurgeon

Voice tracking for classical radio WQXR shall require the following minimum call, which shall include all preparation, music selection and voicing work: for a 5 ½ hour – 6 ½ hour on-air shift, a three (3) hour minimum call. There shall be no minimum call for any other voice tracking, including voice tracking for classical music on Q2.  If the Union is dissatisfied with the application of the minimum call for classical radio WQXR, the Union may reopen this Agreement one time after December 31, 2011, solely on the issue of the minimum call for voicetracking for classical radio WQXR.  If following such reopening the parties are unable to reach agreement on this issue, the parties shall participate in mediation.  Nothing contained herein shall impact the parties' obligations under the No Strike/No Lockout provision of the Agreement.

If the foregoing constitutes our understanding, kindly execute a copy of this letter in the space provided and it shall become a binding agreement between the Union and the Employer.

Sincerely,

NEW YORK PUBLIC RADIO

By: _____

ACCEPTED AND AGREED TO:

SCREEN ACTORS GUILD – AMERICAN FEDERATION
OF TELEVISION AND RADIO ARTISTS, NEW YORK LOCAL

By: _____

68

**SIDELETTER #7**

As of July 1, 2018

SAG-AFTRA, New York Local

1900 Broadway

New York, New York 10023

                                    Re:    Non-Discrimination

Ladies/Gentlemen:

        This letter shall supplement the collective bargaining agreement (the "Agreement") by and between New York Public Radio (the "Employer") and Screen Actors Guild – American Federation of Television and Radio Artists, New York Local (the "Union") effective July 1, 2018 to and including June 30, 2022.

        The following Non-Discrimination provision shall be incorporated into the Agreement:

                The Employer and the Union shall abide by Federal, State,
                and Local Laws which prohibit discrimination in
                employment decisions on the basis of race, creed, color,
                national origin, sex, age, disability, marital status, sexual
                orientation, or citizenship status.

        If the foregoing constitutes our understanding, kindly execute a copy of this letter in the space provided and it shall become a binding agreement between the Union and Employer.

                                    Sincerely,

                                    NEW YORK PUBLIC RADIO

                                    By _____

ACCEPTED AND AGREED TO:

4837-5797-4450.1

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS, NEW YORK LOCAL

By _Rebecca Hayes_____

## SIDELETTER #8

As of July 1, 2018

SAG-AFTRA, New York Local
1900 Broadway

New York, New York 10023

Re:  <u>Reporter II Salary Conversion</u>

Ladies/Gentlemen:

This letter shall supplement the collective bargaining agreement (the "Agreement") by and between New York Public Radio (the "Employer") and Screen Actors Guild – American Federation of Television and Radio Artists, New York Local (the "Union") effective July 1, 2018 to June 30, 2022.

In the course of the negotiations of the 2014-2018 Agreement, the parties agreed to modifications to the compensation provisions applicable to Reporter IIs, as set forth in Article XXVI, Section 4. As a result of these changes, the Company agreed to compute a new salary for each incumbent Reporter II on the Company's payroll as of the ratification of the Agreement. The computation shall be performed as follows:

(a)  <u>Initial salary computation:</u>  The Company shall compute the total compensation for each employee by adding to his or her 2014 base salary the greater of the following:

(i) all overtime and other premium pay he or she earned in 2014, excluding productivity bonus and short turnaround payments; or

(ii) the average annual overtime and premium pay, excluding productivity bonus and short turnaround payments, he or she earned as a Reporter II during the period from 2011-2014.

(b)  <u>Conversion buyout:</u>  Any Reporter II for whom the calculation in (a) resulted in an amount less than $75,000 shall have such total number raised by 5% or to $75,000, whichever is greater; any Reporter II for whom the calculation in (a) resulted in an amount equal to or greater than $75,000 shall have such total number raised by 5%.

4837-5797-4450.1

If the foregoing constitutes our understanding, kindly execute a copy of this letter in the space provided and it shall become a binding agreement between the Union and the Employer.

Sincerely,

NEW YORK PUBLIC RADIO

By: _____

ACCEPTED AND AGREED TO:

SCREEN ACTORS GUILD – AMERICAN FEDERATION
OF TELEVISION AND RADIO ARTISTS, NEW YORK LOCAL

By: _____

72

**SIDELETTER #9**

As of July 1, 2018

SAG-AFTRA, New York Local
1900 Broadway

New York, New York 10023

Re: <u>Reservation of Rights Regarding WNYC Studios</u>

Ladies/Gentlemen:

        This letter shall supplement the collective bargaining agreement (the "Agreement") by and between New York Public Radio (the "Employer") and Screen Actors Guild – American Federation of Television and Radio Artists, New York Local (the "Union") effective July 1, 2018 to June 30, 2022.

        In the course of the negotiations of the 2018-2022 Agreement, the parties agreed to reserve their positions as to whether the Agreement covers employees of WNYC Studios.

        If the foregoing constitutes our understanding, kindly execute a copy of this letter in the space provided and it shall become a binding agreement between the Union and the Employer.

Sincerely,

NEW YORK PUBLIC RADIO

By: _____

ACCEPTED AND AGREED TO:

SCREEN ACTORS GUILD – AMERICAN FEDERATION
OF TELEVISION AND RADIO ARTISTS, NEW YORK LOCAL

4837-5797-4450.1

By: _____

**INTERNET JURISDICTION AGREEMENT**
**by and between**
**NEW YORK PUBLIC RADIO**
**and**
**SCREEN ACTORS GUILD - AMERICAN**
**FEDERATION OF RADIO AND TELEVISION**
**ARTISTS, NEW YORK LOCAL**
**effective**
**JULY 1, 2018 through JUNE 30, 2022**

This Agreement is made and entered into as of the 1st day of July 2014, by and between New York Public Radio (hereinafter "NYPR") and Screen Actors Guild – American Federation of Television and Radio Artists, New York Local (hereinafter "SAG-AFTRA"):

(1) This Agreement shall be separate from the collective bargaining agreement by and between NYPR and SAG-AFTRA covering WNYC-AM, WQXR-FM and WNYC-FM effective July 1, 2018 to and including June 30, 2022 (hereinafter called the "Broadcast Agreement"). No provision of the Broadcast Agreement shall apply to this Agreement.

(2) SAG-AFTRA shall have exclusive jurisdiction over the voicing work (with or without image) produced by WNYC.org when performed by persons assigned by WNYC.org on a full time basis (defined as regularly scheduled to work 25 or more hours per week) to perform such voicing work. SAG-AFTRA shall also have exclusive jurisdiction over the recording and production editing of such voicing work produced by WNYC.org when performed by persons assigned by WNYC.org on a full time basis (defined as regularly scheduled to work 25 or more hours per week) to perform such work; SAG-AFTRA shall also have exclusive jurisdiction over production of such voicing work produced by WNYC.org when performed by persons assigned by WNYC.org on a

-75-

full time basis (defined as regularly scheduled to work 25  or more hours per week) to perform such work.  Production work shall mean the duties regularly performed by Associate or Assistant Producers under the Broadcast Agreement.

(3)     On the day following the first employment that triggers jurisdiction, WNYC and SAG-AFTRA shall commence negotiations of the governing terms and conditions, which shall include, *inter alia*,  the genre and type of material, the work, and the persons that shall be covered, and whether those terms and conditions shall be incorporated into a separate agreement or included in the Broadcast Agreement.  In the event the parties are unable to reach agreement on such terms and conditions within sixty (60) days of the commencement of the negotiations, then at the option of either party, the provisions of Article XXXIII, Performance of Work for Uncovered Entities, of the Broadcast Agreement for work on WNYC.org may be cancelled.

(4)     For purposes of this Agreement, "WNYC.org" shall mean the dedicated website or that part of a larger website that makes available programming that is the type that as of the date of this Agreement is being produced by WNYC-AM and WNYC-FM.

(5)     Except with respect to the limited exception contained in the last sentence of paragraph 3 above, during the term of the Broadcast Agreement, the Broadcast Agreement shall remain in effect, and SAG-AFTRA shall not engage in any activity which may violate Article XXXII, No Strike/No Lockout of the Broadcast Agreement, at the facilities, or with respect to productions of, or programming for, WNYC-AM, WQXR-FM and WNYC-FM.

4837-5797-4450.1

NEW YORK PUBLIC RADIO

By: _____


SCREEN ACTORS GUILD – AMERICAN
FEDERATION OF TELEVISION AND RADIO
ARTISTS, NEW YORK LOCAL

By: Rebecca Hayes