**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FRED MOGUL,

                 Plaintiff,

         - against -

NEW YORK PUBLIC RADIO; WNYC;
and AUDREY COOPER;

             Defendants.

**FIRST AMENDED COMPLAINT**
**WITH JURY DEMAND**

**No. 21-cv-05882- CM**
**[rel. 1:21-cv-04972-CM]**

---

Plaintiff Fred Mogul, by his attorneys BELDOCK LEVINE & HOFFMAN LLP, as and for his first amended complaint against defendants, alleges as follows:

## INTRODUCTORY STATEMENT

1.        This is an action against defendants New York Public Radio (NYPR), WNYC and Audrey Cooper who by their actions defamed and wrongfully terminated the employment of plaintiff, a WNYC reporter for 18 years, in violation of law.

2.        The pretext for defendants' actions was two sentences of Associated Press (AP) copy, appearing in a draft of an unpublished story, which credited AP and contained a link to the AP story, and which plaintiff agreed to omit, although the story was prepared in accordance with past practice in the WNYC Newsroom and other newsrooms across the country.

3.        On the basis of these two sentences of draft unpublished copy, defendants

1

summarily terminated plaintiff's 18 years of employment as a reporter for WNYC, falsely accusing him of plagiarism and deception and making other false, defamatory and misleading statements about him.

4.      Following their summary termination of plaintiff's employment, defendants reiterated and published the false allegations of plagiarism and deception and other false statements of fact to Newsroom staff in two Zoom meetings held later that same day.

5.      Defendants knew or should have known that their statements were false; at a minimum they acted with reckless disregard and avoidance of the truth.

6.      Defendants' false statements constitute slander per se.

7.      Defendants' false and defamatory statements have injured plaintiff.  They have damaged his name, reputation and career, causing substantial professional harm.  They have also intentionally and unnecessarily inflicted emotional pain and suffering.

8.      Plaintiff brings this lawsuit to obtain redress for these injuries.

## PARTIES

9.      Plaintiff is a journalist.

10.     Until the actions complained of in this complaint, plaintiff was a reporter for NYPR and WNYC for over 18 years. He was a working journalist for almost 30 years.

11.     Plaintiff is a citizen of the United States and a citizen and resident of the State of New York.

12.     Plaintiff's date of birth is June 18, 1968.  He is currently fifty-three (53) years old.

13.     Plaintiff commenced employment as a reporter for NYPR in 2002.

14.      Plaintiff has primarily covered healthcare and medicine for WNYC since 2002.

15.      Defendant NYPR is a nonprofit media organization, with its principal office at 160 Varick Street, New York, New York.

16.      Defendant WNYC is part of NYPR.  WNYC is a radio station, billing itself as New York City's premier public radio station.

17.      Some years ago, WNYC added a website, WNYC.org.

18.      In 2018, NYPR acquired *Gothamist*, an internet news site.  Web versions of NYPR radio stories may appear on either WNYC.org or *Gothamist*.

19.      Defendant Audrey Cooper is Editor in Chief of NYPR.  Her office is located at 160 Varick Street, New York, New York.  Her background is print journalism.

20.      Plaintiff reserves the right to seek discovery in order to determine whether there is a basis to name Chief Executive Officer Goli Sheikholeslami, Executive Editor Jen Chung, Acting HR Head Janna Freed, Chief Content Officer Andrew Golis, and General Counsel Ivan Zimmerman as additional defendants.

## JURISDICTION AND VENUE

21.      The New York Supreme Court had original jurisdiction of this action pursuant to N.Y. C.P.L.R. § 301.  Venue was proper pursuant to N.Y. C.P.L.R. §§ 503 and 509.

22.      On July 8, 2021, defendants removed the complaint to federal court.

## FACTUAL ALLEGATIONS

### Plaintiff's Responsibilities and Job Performance

23.      Plaintiff received a B.A. from Amherst College.

24.      Plaintiff's professional accomplishments are extensive, as shown on his Curriculum Vita, a copy of which is attached as Exhibit A.

25.      Plaintiff is the recipient of awards from the Associated Press, the Association of Health Care Journalists, and the Dart Center for Journalism and Trauma.

26.      Until February 5, 2021, plaintiff was a Healthcare and Medicine Reporter for WNYC News.  His WNYC bio as it last appeared on WNYC's website is attached as Exhibit B.

27.      In the course of covering health care and medicine for WNYC, plaintiff has interviewed and spoken to patients, health care providers, researchers and officials in hospitals, clinics, health agencies and labs across the region, and has developed relationships with news organizations throughout the country.  Through a fellowship with NPR and Kaiser Health News, his stories frequently run nation-wide.  His work has also appeared in the *New York Times*, *Time* magazine, the *Philadelphia Inquirer* and many other outlets.

28.      Plaintiff has worked collegially and maintained an excellent working relationship with WNYC's numerous reporters and editors over the years.

29.      Plaintiff's professional reputation is exemplary in all respects.

30.      Over the years of his work for WNYC, plaintiff has never had any question raised concerning his journalistic ethics.

**The January 28, 2021 News Story**

31.      During his years as a reporter in NYPR's news unit, plaintiff has had several editors.

32.      At WNYC, editors assign stories to reporters and edit drafts of stories prepared by reporters, among other things.

33.      Plaintiff's editor until early January 2021, was Matthew Schuerman.

4

34.     In January 2021, Mr. Schuerman was replaced by Nsikan Akpan, a new hire at NYPR, as plaintiff's editor.

35.     On or about January 26, 2021, Mr. Akpan assigned plaintiff to take an AP story about the Miami Heat's use of COVID sniffing dogs for spectators coming to games and prepare a local version of the story exploring the science behind canine COVID detection. He was to prepare several paragraphs, and then have a "Q&A" with a scientist.

36.     Plaintiff prepared the story, including conducting and condensing an interview with a researcher at the Children's Hospital of Philadelphia.

**First Draft of the Story**

37.     On January 27, 2021, plaintiff submitted a draft of the story to his editor via Google Docs, a cloud-based platform for sharing documents.

38.     Plaintiff's draft is attached hereto as Exhibit C.

39.     Plaintiff's setup paragraphs prior to the Q&A portion of the story included two paragraphs from the AP.  The first paragraph included a quote from a Miami Heat executive.  It also included a digital link to the AP story:

> *"If you think about it, detection dogs are not new," Matthew Jafarian, the Heat's executive vice president for business strategy, told the Associated Press.  "You've seen them in airports, they've been used in mission critical situations by the police and the military. We've used them at the arena for years to detect explosives."*

40.     The following paragraph, consisting of two sentences right under the link to AP, was also from the AP article:

> *A health screening questionnaire will be mandatory for all guests, masks must be worn continually, and only soda and water will be sold.  All transactions will be cashless and if a fan feels ill during a game, isolation rooms will be available.*

41.     Under what he understood and believed to be WNYC's practice and "usage" or

license agreement with AP, allowing WNYC to use AP copy with or without quotation marks as long as AP was credited, plaintiff added an attribution line at the end of his story crediting AP:

"~*Reporting from Miami by the Associated Press*"

42.     In draft stories for *Gothamist*, reporters do not generally insert their own bylines; rather bylines are inserted by editors, after the editing process is complete.  Editors then copy and paste the final draft from Google Docs into the software program Aviary, a Content Management System (CMS), for publication.

43.     Plaintiff's draft did not contain a proposed byline.

44.     But here, as noted above and as shown on the draft attached as Exhibit C, plaintiff added the AP attribution line at the end of the story to be included when his editor placed the story into the CMS for publication.

45.     In accordance with Newsroom policy, plaintiff prepared the story using the Google Docs platform and "shared" it with his editor using the "share" feature of Google Docs enabling his editor to edit and insert comments upon the draft.

46.     In Google Docs, all revisions are preserved and visible, including deletions.

47.     Using Google Docs' commenting feature, plaintiff's editor, Mr. Akpan, inserted a comment in the margin next to the two sentence AP copy following the quote and the AP link: "*We shouldn't copy-paste text (outside of quotes) from AP stories.*"

48.     Mr. Akpan struck through these two sentences and also struck the attribution to AP at the bottom of the draft.

49.     Plaintiff replied with this comment:

> "*We've been told that's kosher, I'm pretty sure, since we're paying members -- as long as they're bylined at the top or bottom.  Want me to rewrite or just omit?*"

6

50.     Following the two comments relating to the AP passage, Google Docs shows *"Suggestion accepted."*

51.     Mr. Akpan proceeded to place the story into the CMS for publication, deleting both the two-sentence paragraph and the AP attribution line.

52.     Mr. Akpan did not indicate that this was a significant issue.  He otherwise praised the story—including both the lede and the interview with the expert.

53.     Because he has been locked out of his Google work account, plaintiff no longer has direct access to the draft in Google Docs which shows Mr. Akpan's strikeouts and comments.

54.     However, copies of the stand-alone comments have been produced by NYPR counsel and are attached hereto as Exhibit D.

55.     Plaintiff prepared his story in accordance with WNYC policy and practice with respect to the use of AP copy.

56.      Plaintiff did not violate NYPR editorial policy or guidelines with respect to the use of AP copy in the draft story.

57.     Plaintiff did not commit plagiarism.

**The Story as Published**

58.     The story appeared as per Mr. Akpan's text deletions, after Mr. Akpan submitted it for publication adding plaintiff's byline at the top and without byline attribution to AP top or bottom.

59.     The published story is attached as Exhibit E.

60.     The AP story is attached as Exhibit F.

**Post- Publication**

61.     That was the last plaintiff heard, until he was contacted on Thursday, February

4, and asked to meet with Human Resources on Friday, February 5.  He was not told the reason

for the meeting, but he was informed he could bring a representative from his union, the Screen

Actors Guild-American Federation of Television and Radio Announcers (SAG-AFTRA).

62.     When plaintiff asked his editor about the upcoming meeting, he was told it was

about the AP copy.  Mr. Akpan said that when he flagged the copy and plaintiff told him that he

thought they could use AP copy without quotation marks as long as they by-lined AP, Mr. Akpan

asked Jen Chung, Executive Editor and co-founder of *Gothamist*, for clarity about policy.

63.     Mr. Akpan told plaintiff that Ms. Chung flagged the issue to Audrey Cooper,

Editor in Chief of NYPR.  He did not indicate that plaintiff was about to be terminated.  He said

that he would like to keep working with plaintiff and that plaintiff should explain the use of AP

copy as a misunderstanding.

64.     Plaintiff looked at the WNYC Newsroom NYPR Style Guide and Handbook

before the meeting.  The only provision referring to AP usage is on page 20, under the heading

"WHAT WE WRITE FOR WEB AND WHEN:"

> *Newscast items taken from the Associated Press or NPR may be posted on the web by editors or producers – with pic, etc. – if it is an important enough story and we don't have a reporter on it. We also use AP/NPR copy as a placeholder until we get our own copy up, or add to it as needed.*

65.     A comparison of stories on WNYC.org with the underlying AP stories shows

different patterns of quotation and attribution of AP copy.

66.     On WNYC.org, attribution to AP sometimes takes the form of a joint byline on

the top, and sometimes takes the form of an attribution tagline at the bottom, stating "With

reporting from the Associated Press," like plaintiff's draft story.  Plaintiff prepared a memorandum

for the meeting in which he cited examples of such stories.

67.     Plaintiff has subsequently found numerous other stories by colleagues using AP copy, without quoted passages, joint-bylined with AP or with an AP attribution tagline at the bottom, like plaintiff's draft story.  These WNYC reporters, hosts, and editors include Kate Hinds, Patricia Willens, Julianne Welby, Jennifer Vanasco, Joseph Capriglione, Alec Hamilton, Sean Carlson, Beth Fertig, Brigid Bergen, Arun Venugopal, Mirela Iverac, Yasmeen Khan and Stephen Nessen.

**February 5, 2021 Meeting with Plaintiff**

68.     The February 5 meeting took place on Zoom and was presided over by Editor in Chief Audrey Cooper, with Mr. Akpan, an HR representative and a representative from SAG-AFTRA, plaintiff's union, in attendance.

69.     Ms. Cooper started the meeting by stating that plaintiff "lifted" a paragraph from the AP story in the "final draft" of the story he submitted.

70.     She said that plaintiff's editor noticed the paragraph and told plaintiff it was not appropriate to "lift" copy verbatim.

71.     Plaintiff responded that he thought doing so was permitted if appropriate AP credit was attributed at the top or bottom.

72.     Plaintiff also told her that the draft was not the final draft but a first draft.

73.     He noted that the paragraph above the paragraph to which Ms. Cooper was referring quoted the AP story and linked to the AP story, and that the draft contained an attribution line "reporting from Miami by the Associated Press."

74.     Plaintiff pointed out the exchange of comments with Mr. Akpan on the Google Docs draft, including the reference to plaintiff's understanding that as paying members of AP,

using AP copy was permissible as long as a story is bylined at the top or the bottom.   He noted that he asked his editor if he wanted him to rewrite the story or omit the two sentences.

75.     He referred to the WNYC Newsroom Style Guide and Handbook.

76.     He also referred to the practice at WNYC among his colleagues to use AP copy without quotation marks as long as the story credited AP, offering to share his examples which he described in summary form.

77.     He told Ms. Cooper that this had been WNYC's attribution practice, protocol and understanding and that if she were to search, she would find stories by many of his colleagues like his draft.

78.     In response, Ms. Cooper told him that his reference to the WNYC Style Guide and Handbook did not apply.

79.     Instead, she referred to a provision in a different policy—which plaintiff later recognized as the NYPR Editorial Policy and Guidelines—which referred to plagiarism.

80.     Ms. Cooper also said that because he did not just "lift" the paragraph but also edited it to make it fit the story, his explanation "strains credibility."

81.     When plaintiff reiterated that he had cited the AP story and had a byline for AP, she said he did not.

82.     When plaintiff said that he put the byline at the bottom, she said he did not.

83.     He told her again that he put it at the bottom and it said "With reporting from Associated Press from Miami."

84.     Dismissing plaintiff's factually accurate statements, she dismissed plaintiff's references to Newsroom practice and AP usage as irrelevant.

85.     Ms. Cooper refused to accept or acknowledge plaintiff's explanation.

86.     When plaintiff tried to speak, Ms. Cooper cut him off.

87.     At no time did Ms. Cooper make any reference to plaintiff's offer to omit or rewrite the two sentences of copy or take into account the fact that the two sentences at issue followed a link to the AP article and were not, in any event, contained in the published story.

88.     Although the memorandum plaintiff had prepared for the meeting contained examples of other published stories using AP copy without quotes, Ms. Cooper did not provide him an opportunity to present it.

89.     Nor did she respond to plaintiff's request to clarify the distinction between stories by other reporters and his story.

90.     Ms. Cooper concluded by saying that she had made a decision to terminate plaintiff's employment effective immediately, and exited the meeting while plaintiff was in mid-sentence.

91.     Thus, defendant Cooper summarily dismissed an 18-year veteran WNYC reporter, accusing him of plagiarism and deception, on the basis of two sentences of AP copy appearing in a draft unpublished story which he offered to rewrite which followed a link to the AP story and included an attribution tagline crediting AP, all in accordance with past practice in the WNYC Newsroom.

**February 5, 2021 Newsroom Meetings**

92.     Following the meeting in which she terminated plaintiff's employment, defendant Cooper held a Zoom meeting with NYPR editors and two Zoom meetings with the NYPR Newsroom staff on February 5, 2021.

93.     The second Newsroom staff meeting included senior management Jen Chung, Executive Editor and Co-founder of *Gothamist*, Acting HR Head Janna Freed, Chief Content Officer Andrew Golis, and General Counsel Ivan Zimmerman.

94.     Both Newsroom staff meetings were attended, upon information and belief, by more than 50 reporters, editors and other staff members.

95.     In these meetings, defendant Cooper reiterated accusations of plagiarism and deception and other false statements against plaintiff.

96.     In the first meeting, defendant Cooper informed the Newsroom that she had just terminated plaintiff's employment for "plagiarism."

97.     Among other things, defendant Cooper falsely stated the following:

(a)     plaintiff "was caught plagiarizing a paragraph in one of his stories"

(b)     "it was about a decision that Fred made to do one of the laziest and unethical things that you can do in journalism, which is to borrow somebody else's work and pass it off as your own…… we are talking about …a text story that has your byline on it"

(c)     "it was a wholesale lifting of a paragraph. …. There was no attribution"

(d)     "he lifted a wholesale paragraph.  it was not cited . . . his byline was on this story . . . . It was very clear that he did not have a good excuse for it"

98.     At the end of the meeting, and only in response to a question, defendant Cooper disclosed to the Newsroom staff that the copy at issue was from an Associated Press article.

99.     At the second Newsroom staff meeting, many employees expressed concern that they had prepared stories using AP articles and copy in accordance with the same AP usage policy and practice relied on by plaintiff.

100.    Although plaintiff's draft story on its face contained an AP attribution line at the bottom, defendant Cooper denied that plaintiff credited AP.

101.    When one employee stated: "I just want to clarify that our understanding is that Fred did what we have done for many years, which is to say "with reporting from AP", which is either in the byline or it's at the bottom… that's what WNYC folks have done for a very long time", defendant Cooper responded: "That understanding is not correct.  That did not happen in this case."

102.    Chief content Officer Golis also denied that plaintiff credited AP in the draft he submitted, stating "let's be clear, he did not file it following the practices he himself thought he was supposed to follow."

103.    After denying plaintiff's AP attribution line, Defendant Cooper repeatedly dodged questions concerning plaintiff's AP attribution when questioned about it by Newsroom staff.

104.    Another employee stated: "I think you're not understanding Audrey that that is one hundred percent what we have been doing this whole time.  Like I've done it countless times for our WNYC copy.  And then we put, literally, at the bottom 'With reporting from the Associated Press.'……you need to understand that every single person here has done that in one way, shape or form."

105.    Another employee noted: "we haven't even had a conversation about this."

106.    The *New York Times* published an article on May 23, 2021, concerning ongoing issues at WNYC.  The article referred, among other matters, to the termination of plaintiff's employment.

107.     The *New York Times* article disclosed that there was a recording of at least one of the virtual meetings called by defendant Cooper "to inform the full newsroom of her decision to fire Mr. Mogul."  A copy of the *New York Times* article is attached as Exhibit G.

108.     According to the *New York Times* article, "several stunned radio reporters questioned the move."

109.     The *New York Times* reported that one WNYC host told Ms. Cooper: "Go through every single one of our articles and fire all of us, because that is exactly what we have all done."

110.     At the February 5 editors' meeting, after stating that plaintiff "committed plagiarism", Cooper falsely stated that "he lifted the paragraph from the AP and did not cite it and passed it off as his own, then he told us it was OK because it was the AP."

111.     In fact, as noted above and on Exhibit D, plaintiff's response to his editor was: "*We've been told that's kosher, I'm pretty sure, since we're paying members -- as long as they're bylined at the top or bottom.  Want me to rewrite or just omit?*"

112.     After misrepresenting both the draft story and plaintiff's dialogue with his editor, she characterized plaintiff's response as a "very unethical explanation as to why it was happening and it seems like it is likely a pattern of behavior."

113.     Cooper further stated that "Fred's explanation for why he did it strained credibility . . . his explanation was so odd and unbelievable . . . that we will be doing an audit of his past work to see what the extent of this practice was . . . . I have many reasons for thinking that this is a pattern of behavior that goes to laziness and ethics."

114.     No such audit, of plaintiff's past work or the work of other WNYC employees, has ever been produced to plaintiff.

14

115.    One employee has characterized defendant Cooper's description of plaintiff's actions as an out-and-out instance of "deception."

116.    According to other employees in attendance at the meetings, Cooper made false statements to support the charge of plagiarism which in addition indicated deception on the part of plaintiff, including statements that plaintiff "signed his name on AP copy without having AP on the byline;" "lifted another person's words" and "presented them as his own work;" "this was plagiarism because he didn't cite AP;"  "clear case of his taking credit for someone else's work;" explanation strained credibility;"  if the font weren't different, he would have "gotten away with it."

117.    The false and defamatory portrayal of plaintiff and his actions was reiterated not only by Mr. Golis' false denial of plaintiff's AP attribution, but in addition by Ms. Chung, Ms. Freed and Mr. Zimmerman, all present at the second meeting, who by their words and conduct, reiterated, ratified, supported and/or approved the republication of Ms. Cooper's false and defamatory statements about plaintiff.

118.    Within a week, approximately seventy (70) NYPR employees from various departments submitted a petition to CEO Goli Sheikholeslami protesting plaintiff's termination and requesting his reinstatement.

119.    On February 11, 2021, Ms. Sheikholeslami responded by defending the termination decision, characterizing it as "careful process that involved multiple members of newsroom leadership" including herself, based on a "thorough review of the facts."

**NYPR Practice**

120.    Upon information and belief, it has been the longstanding policy and practice of NYPR, and in particular WNYC, to include AP text with WNYC text and credit AP in an

attribution line at the bottom of the story or joint byline at the top of a story.

121.    Upon information and belief, the basis for such practice is understood by Newsroom staff to be NYPR's membership in the Associated Press, enabling WNYC to use AP copy.

122.    As indicated, *supra,* plaintiff has been able to find numerous examples which show that NYPR/WNYC has published stories in which AP copy was used in the same way it appeared in plaintiff's draft article.

123.    Side by side comparisons of several such stories are attached as Exhibit H.

124.    As one well-known WNYC journalist has stated:

> *"Almost every other journalist in the newsroom is guilty of some variation of what Fred did- so why the unequal treatment?  And if Fred was fired for some other reason, management should have the decency to say so, and not shame him with the worst transgression a journalist can commit."*

**Industry Practice**

125.    Upon information, WNYC practice is consistent with industry practice.

126.    Side by side comparisons of stories from other media organizations are attached as Exhibit I.

127.    According to one AP employee, what plaintiff did is what "people at newspapers and websites around the world do every day with our copy."

128.    The founder of the NiemanLab, a media studies center at Harvard University, tweeted, on the day after publication of the *New York Times* article: "AP customers can't really 'plagiarize' AP content.  They're paying for the right to use that content, either as freestanding stories or within their own work."

**NYPR Policy Documents**

16

***WNYC Newsroom Style Guide & Handbook***

129.     The WNYC Newsroom Style Guide & Handbook on page 20 provides in the

section Filing For Web: What We Write for Web and When:

> **Newscast items taken from the Associated Press or NPR** may be posted
> on the web by editors or producers – with pic, etc. – if it is an important enough
> story and we don't have a reporter on it. We also use AP/NPR copy as a placeholder
> until we get our own copy up, or add to it as needed.

***NYPR Editorial Policy and Guidelines***

130.     The NYPR Editorial Policy and Guidelines provide on page 11:

> 1. Plagiarism is an unforgivable offense.  NYPR staff members do not take
> other peoples' work and present it as our own.

> 2. a) Staff producing NYPR content must take special care in the use they
> make of information from wire service stories…No material from another source
> should ever be included verbatim, or substantially so, *without attribution*.
> (Emphasis added).

> b) Wire service is one category where it is acceptable to use quotations
> without attribution.  That is where a story from a wire service is about some public
> event like a press conference, speech by a public official in a public setting, an
> official statement of a government agency, a congressional hearing, and the like. In
> those cases, we reasonably expect that these reporters are reliable conveyors of
> those quotations in the same way we regard the transcript services we use for these
> events.

***Standards of Employee Conduct and Key Policies***

131.     The Standards of Employee Conduct provide for confidential investigation of

policy violations.

132.     In a May 24, 2021 email to employees, CEO Sheikholeslami confirmed that

"personnel issues are mostly confidential."

133.     In violation of NYPR standards and policies of confidentiality, defendants

published false and defamatory statements concerning plaintiff to the entire NYPR Newsroom

staff.

134.     Defendants have not acted in accordance with NYPR's own journalistic standards and professional ethics.

135.     Upon information and belief, defendants' actions have created a "chilling effect" on Newsroom employees, intending and operating to inhibit their speech and actions.

**Plaintiff's Damages**

136.     Plaintiff now finds himself, a veteran reporter with a distinguished career and reputation at NYPR/WNYC, without employment and labelled with a false charge of plagiarism, based on two sentences of unpublished AP copy, attributed to AP in accordance with widely held practice and general understanding of applicable policy.

137.     As noted above, an accusation of plagiarism constitutes "the worst transgression a journalist can commit."

138.     Defendants and their agents have acted in bad faith, with malice, without justification, and with the intention to harm plaintiff.

139.     Defendant's false, defamatory, and misleading statements have injured plaintiff. They have damaged his name, reputation and career, causing substantial professional harm.  They have also intentionally and unnecessarily inflicted emotional pain and suffering.

140.     As a consequence of defendants' actions, plaintiff has sustained damages, including termination of his employment, loss of income and benefits, damage to his name, reputation and career, damage to his ability to obtain future employment as a journalist, attorneys' fees and other special damages, as well as pain and suffering and emotional distress.

**LEGAL CLAIMS**

18

## FIRST CAUSE OF ACTION
### Defamation

141.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

142.    By their actions, defendants and their agents have defamed plaintiff in that they have made and published false and defamatory statements about him, which have damaged and will continue to damage him in his trade, business and profession.

143.    As described in the foregoing paragraphs, on the morning of February 5, 2021, Audrey Cooper falsely accused plaintiff of plagiarism and deception, made other false statements about him, and terminated his employment effective immediately.

144.    Following the false accusations and statements made to plaintiff on February 5, 2021, defendant Cooper repeated these false and defamatory statements to third parties as described in the foregoing paragraphs.

145.    Specifically, in two Zoom Newsroom staff meetings held on February 5, 2021, as well as a Zoom meeting with NYPR editors, defendant Cooper made false accusations of plagiarism and deception against plaintiff along with other false statements about plaintiff.

146.    On February 5, 2021, defendant Cooper in Zoom meetings of Newsroom staff, falsely accused plaintiff of plagiarism.

147.    On February 5, 2021, defendant Cooper in Zoom meetings of Newsroom staff, falsely accused plaintiff of deception.

148.    On February 5, 2021, defendant Cooper in Zoom meetings of Newsroom staff, falsely stated:

(a)  plaintiff "was caught plagiarizing a paragraph in one of his stories"

(b) "it was about a decision that Fred made to do one of the laziest and unethical things that you can do in journalism, which is to borrow somebody else's work and pass it off as your own . . . we are talking about . . . a text story that has your byline on it"

(c) "it was a wholesale lifting of a paragraph. . . . There was no attribution"

(d) "he lifted a wholesale paragraph. it was not cited . . . his byline was on this story . . . . It was very clear that he did not have a good excuse for it."

149. Defendant Cooper falsely denied that plaintiff credited AP in his draft story.

150. Chief Content Officer Golis also falsely denied that plaintiff credited AP in the draft he submitted.

151. Defendant Cooper falsely accused plaintiff of a pattern of unethical behavior.

152. Defendant Cooper made false statements of fact not only to support the false accusation of plagiarism but in addition to indicate deception on the part of plaintiff, including statements that plaintiff "signed his name on AP copy without having AP on the byline;" "lifted another person's words" and "presented them as his own work;" "this was plagiarism because he didn't cite AP;" "clear case of his taking credit for someone else's work;" explanation strained credibility;" if the font weren't different, he would have "gotten away with it."

153. Plaintiff did not "pass off somebody else's work as his own" or "take credit for somebody else's work" or attempt to do so. No byline was on the draft.

154. Plaintiff did not "lift" or use AP copy without attribution.

155. Plaintiff's draft story included a link and attribution line crediting AP.

156. Plaintiff did not commit plagiarism.

157. Plaintiff did not engage in deception.

158. Defendant Cooper's false accusations and statements constitute slander.

20

159.     Defendant Cooper's false accusations and statements constitute defamation.

160.     A charge of plagiarism tends to injure a journalist in his trade, business or profession as a journalist and is therefore defamatory per se.

161.     Defendant Cooper's charge of plagiarism was defamatory and slander per se.

162.     Defendant Cooper's charge of deceit was defamatory and slander per se.

163.     Defendant Cooper's false statements concerning plaintiff were defamatory per se.

164.     Defendant Cooper's statements to the Newsroom constituted a publication to third parties.

165.     Defendant Cooper made and published these false and defamatory statements concerning plaintiff knowing that they were false or with reckless disregard for their truth or falsity.

166.     Defendant Cooper's false statements were made with malice and motivated solely by spite and ill will, and with wanton, reckless, or willful disregard for their injurious effects on plaintiff.

167.     Defendant NYPR's senior executives, Jen Chung, Andrew Golis, Janna Freed, and Ivan Zimmerman, were present at the second Zoom Newsroom staff meeting on February 5, 2021.

168.     In the second meeting, defendant Cooper repeated and published all or part of her false and defamatory accusations and statements against plaintiff.

169.     By their words and/or conduct, NYPR executives Jen Chung, Andrew Golis, Janna Freed, and Ivan Zimmerman reiterated, ratified, supported, and/or approved the republication of defendant Cooper's defamatory statements.

170.     Such actions constituted a further publication to third parties.

171.     NYPR's CEO Goli Sheikhomeslami had authority and control over, and subsequently ratified and approved, the publication of defendant Cooper's defamatory statements.

172.     Defendant Cooper's defamatory statements were made in the scope and course of her employment as Editor in Chief of NYPR.

173.     Defendant NYPR, as defendant Cooper's employer, is liable for defendant Cooper's slander and defamation under the legal doctrine of respondeat superior.

174.     Defendants and their agents have published false, misleading and defamatory statements to third parties.

175.     Defendants had no privilege or authorization to publish these false and defamatory statements.

176.     In publishing false, misleading, and defamatory statements, defendants acted with actual and common law malice.

177.     Defendants knew or should have known that their defamatory statements were false and/or recklessly disregarded the truth, including by intentionally avoiding the truth.

178.     Defendants' false, misleading, and defamatory statements were intended to, have, and will continue to injure plaintiff in his trade, business or profession.

179.     Plaintiff requested a retraction of defendants' false and defamatory statements.

180.     Defendants have refused to issue a retraction.

181.     As a consequence of defendants' publication of false, misleading, and defamatory statements, plaintiff has sustained and will continue to sustain injuries and special damages, including termination of his employment, loss of income and benefits, damage to his name, reputation, and career, damage to his ability to obtain future employment as a journalist,

22

and damage to his trade, business, and profession as a journalist, as well as pain and suffering and emotional distress.

## SECOND CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

182.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

183.     The facts and circumstances of defendants' termination of plaintiff's employment constitute intentional and reckless tortious conduct under applicable New York law.

184.     As described in the foregoing paragraphs, on February 5, 2021, defendants NYPR, through its agents, including in particular defendant Cooper, falsely accused plaintiff of plagiarism and deceit, made other false statements about him, and terminated his employment effective immediately.

185.     As described in the foregoing paragraphs, on February 5, 2021, defendant NYPR, through its agents, including in particular defendant Cooper, published false and defamatory accusations against plaintiff of plagiarism and deceit and published such false and defamatory allegations to the entire NYPR Newsroom.

186.     In the field of journalism, a false accusation of plagiarism and termination of employment based on such a false accusation constitutes extreme and outrageous conduct.

187.     Defendants knew or should have known that their conduct would cause serious damage to plaintiff's name, reputation and career as a journalist.

188.     In fact, Defendants' conduct was calculated to damage plaintiff's name, reputation and career as a journalist.

189.     Defendants, through the foregoing acts, did commit extreme and outrageous conduct and thereby intentionally and/or recklessly cause plaintiff to suffer severe mental and emotional distress, pain and suffering, and damage to name, career and reputation.

190.     Defendants committed the foregoing acts intentionally, willfully, and with malicious disregard for plaintiff's rights and are therefore liable for punitive damages.

191.     As a direct and proximate result of defendants' actions, plaintiff has sustained damages, including termination of his employment, loss of income and benefits, damage to his name, reputation and career, and damage to his ability to obtain future employment as a journalist, as well as pain and suffering and emotional distress.

## JURY DEMAND

192.     Plaintiff demands a trial by jury.

## DEMAND FOR RELIEF

WHEREFORE, plaintiff respectfully requests the Court to award the following relief:

a)     Judgment declaring that defendants' acts complained of herein violate plaintiff's rights;

b)     Compensatory damages to compensate plaintiff for loss of his employment and all economic loss, including back pay, future lost earnings and benefits, damage to name, reputation, career and profession, pain and suffering, emotional distress and mental anguish, including but not limited to embarrassment, indignity and dis-accommodation, in an amount to be determined at trial;

c)     Punitive damages in an amount to be determined at trial;

d)     Attorneys' fees and costs;

e)     Such additional relief as may be just and proper.

24

Dated: New York, New York
       August 24, 2021

                                    BELDOCK LEVINE & HOFFMAN LLP

                              By: _____
                                    Cynthia Rollings
                                    Luna Droubi
                                    Rebecca Pattiz

                                    99 Park Avenue
                                    New York, New York 10016
                                    (212) 490-0400
                                    *Attorneys for Plaintiff*